**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| BENJAMIN DOEHR, ZACH SOLIZ, MITCHEL FEUER, KEVIN HOWARD, ANDRE HOWARD, MICHAEL CORDERO, ED MCDONALD, THEODORE HARKNESS, TIM KELLY, MAOR KRAMER, and CASEY GOODMAN, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br>v.<br><br>LUCKY STRIKE ENTERTAINMENT CORPORATION (f/k/a/ BOWLERO CORP), AMF BOWLING CENTERS, INC.; LUCKY STRIKE ENTERTAINMENT LLC,<br><br>Defendants. | **Case No.** ____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY** |

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

**COMPLAINT**

Plaintiffs Benjamin Doehr, Zach Soliz, Mitchel Feuer, Kevin Howard, Andre Howard, Michael Cordero, Ed McDonald, Theodore Harkness, Tim Kelly, Maor Kramer, and Casey Goodman, by and through counsel, bring this action on behalf of themselves and all others similarly situated against Defendants Lucky Strike Entertainment Corporation (f/k/a Bowlero Corporation and hereinafter "LSEC" ), AMF Bowling Centers, Inc. (together with LSEC, "Bowlero"),[1] and Lucky Strike Entertainment, LLC (together with Bowlero, "Defendants"), for damages, injunctive relief, and other relief, pursuant to federal and state antitrust and state unfair competition laws, and demanding a jury trial, allege as follows:

**NATURE OF THE ACTION**

1.    This action challenges Bowlero's multi-year anticompetitive scheme to consolidate bowling centers in communities throughout the United States, drive up the cost of bowling for millions of consumers, worsen those consumers' bowling experience, and increase its own profits.

2.    Plaintiffs and the consumers they seek to represent have suffered substantial injuries as a result of Bowlero's acquisition scheme, in the form of higher prices, reduced quality, and the veritable destruction of the decades-old pastime of bowling in America.

3.    On behalf of themselves, the class members they represent, and the general public, Plaintiffs seek not only monetary compensation but also the equitable and injunctive relief they deserve, namely the unwinding of Bowlero's acquisitions of bowling centers and the Professional Bowling Association, a prohibition on further acquisitions in bowling and adjacent

---

[1] In 2012, LSEC's predecessor entity Bowlmor acquired AMF Bowling Centers, Inc. In 2021, LSEC's predecessor entity Bowlero Corp. acquired Lucky Strike Entertainment LLC. In this complaint "Bowlero" refers to all iterations of LSEC: LSEC and its predecessor entities before the AMF Bowling Centers, Inc. acquisition, LSEC and AMF Bowling Centers, Inc. after the AMF Bowling Centers, Inc. acquisition, and LSEC and its predecessor entities after the acquisition of Lucky Strike Entertainment LLC.

Class Action Complaint
Case No.

markets, and an order requiring Bowlero to stop extracting discriminatorily favorable terms from suppliers that inhibit entry and expansion by independent rivals.

4. This Court has the power to preserve the century-long tradition of operating bowling centers in this country as a fair and honest line of business providing all Americans, regardless of age or socioeconomic status, the opportunity to gather and engage in a national pastime at fair prices.

5. Bowling has long held a unique place in this nation's social fabric, and in communities across the country, by providing an inexpensive way to spend an evening with family or friends. Bowling provides a safe and wholesome environment for adults and children alike to socialize, form local groups, compete, and have fun.

6. Indeed, in his seminal work *Bowling Alone*, political scientist Robert Putnam argued that league bowling, in which teams of bowlers play together over a season, provides "social capital" and fosters "social interaction and even occasionally civic conversations."

7. Traditionally, families and friends have gathered to bowl at local bowling centers run by small independent operators. These centers operate as much as community centers as entertainment venues and cater to the needs of their constituents; for example, many make sure to open their doors daily as early as 9 a.m. to cater to lifelong senior bowlers or provide special deals for valued league bowlers' early practice.

8. These traditions and communities historically fostered by bowling—customer service and value-for-money in the truest sense of those terms—have been radically upended by a Wall Street goliath: Bowlero.

9. In recent years, Bowlero—the single largest bowling center operator in the world—has entered or spread in dozens of cities in America, not by offering better lanes or a superior customer experience, but by gobbling up its competitors through unlawful acquisitions, and then cutting supply, raising prices, pushing alcohol, promoting gambling, and alienating virtually every customer except those who have no interest in bowling.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

2

10. Bowlero, which also owns a growing portfolio of outdoor amusement and water parks, has over 360 bowling centers in North America and a market capitalization of more than $900 million. Bowlero's dominance—fueled by repeated hedge fund and private equity investment on the road to going public—is the product of its Wall Street-engineered unlawful merger-driven playbook.

11. To the consolidation experts at Bowlero, the independent bowling centers that long served as the backbone of bowling represented a "fragmented market ripe for roll-up." And in Bowlero's quest to become the "Starbucks" of bowling, each independent operator presented "an attractive consolidation opportunity to drive growth." Bowlero's larger rivals were targets of this consolidation strategy too: all told it went from operating six centers in the United States in 2012 to nearly 350 in 2026 by buying up independent operators and large chains alike.

12. As its dominance grew, Bowlero's end-game strategy—lucrative extraction—grabbed the attention of investors: in Bowlero's own words, "[w]e're raising price on everything." This predatory approach has led to increased prices for America's bowlers, including through the use of algorithmic dynamic pricing to squeeze every possible dollar out of families hoping to bowl at popular times, as well as for shoe rentals, food and drinks, and league play.

13. For Bowlero, owning an ever-increasing number of bowling centers is not about improving bowling for the public, but rather the opportunity to squeeze as much money as possible out of hard-working families once they are in the door. As an executive explained to investors, Bowlero runs the "best mousetrap" possible: bring them into the center to bowl, and then upsell and overcharge them on food and beverage. As a customer harmed by Bowlero's conduct put it after he received a quote of over $400 to go bowling at a Bowlero in California with his family around the holidays: "The bowling alley felt to me like the last egalitarian, fun, middle-American thing . . . and for [Bowlero's pricing practices] to reach its tentacles into that realm felt pretty appalling."

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

3

14.    Bowlero's "mousetrap" business model has not only increased prices for consumers, but also made the quality of the experience much worse, including lanes that are not properly conditioned and often break down, centers that are understaffed and lacking needed mechanical technicians, unclean bathrooms, and atmospherics like night-club blacklights and extremely loud music that detract from the experience and distract bowlers.

15.    Bowlero's consolidation strategy has been so effective that it now leverages its dominance to obtain more favorable terms from suppliers than its competitors can obtain—savings it then funnels directly into marketing and advertising, giving it an enormous advantage as it drowns out its smaller local competitors on the airwaves and the internet.

16.    Bowlero has made it clear that it is not done. Over the last few years, armed with a war chest of ill-gotten gains amassed through its dominance of local bowling markets across the country, Bowlero has begun to expand its acquisition playbook to outdoor amusement and water parks, which threatens further dominance and destruction in both markets.

17.    Bowlero's strategy to dominate bowling markets throughout the country is unlawful and is precisely the type of anticompetitive conduct our nation's antitrust laws were designed to prevent.

18.    Through this action, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, seek to halt Bowlero's unlawful acquisition scheme, to be made whole for the harm it has already inflicted on them, and an order from this Court unwinding Bowlero's unlawful acquisitions. Such relief is sorely needed to restore a level playing field—so that independent bowling centers can compete once again, without one hand tied behind their backs—and to prevent Bowlero from leveraging its dominance in bowling center markets to roll up and ruin related markets.

## PARTIES

19.    Plaintiff Benjamin Doehr is a resident of Seattle, Washington. Mr. Doehr is an avid bowler and has been bowling in leagues in the Seattle area since around 2019. In the last four years, Mr. Doehr has bowled at both Bowlero and non-Bowlero locations, and has

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

experienced price increases at both. Mr. Doehr has particularly noticed increased prices and reduced quality at Garage Billiards & Bowl ("Garage"), a formerly independent bowling center subsequently acquired by Bowlero. Over the last four or five years, Mr. Doehr has observed substantial price increases for bowling, food, and beverages at Garage, as well as increased league registration fees. Bowlero has also cancelled league events at Garage to make room for corporate events, according to Mr. Doehr. At the same time, Mr. Doehr and his friends have noticed that Bowlero has failed to consistently oil the lanes at Garage and replaced its classic bowling pins with string pins, which has further deteriorated the bowling experience. Mr. Doehr has been directly harmed by Bowlero's anticompetitive conduct.

20.    Plaintiff Zach Soliz is a resident of Los Angeles, California. Mr. Soliz vividly remembers bowling with his family as a child in Arlington, Texas, and has enjoyed the sport ever since. Since moving to Los Angeles in 2015, Mr. Soliz has bowled regularly, including at both Bowlero and non-Bowlero centers in the last four years. In the last four years, Mr. Soliz has been forced to pay ever-increasing prices at both Bowlero and non-Bowlero centers in his area. In addition, Mr. Soliz has experienced the declining quality of Bowlero centers in his area. Mr. Soliz has been directly harmed by Bowlero's anticompetitive conduct.

21.    Plaintiff Mitchel Feuer, who is a resident of Yonkers, New York, has been bowling regularly for nearly 50 years. Lately, he enjoys taking his grandson bowling or getting in some bowling practice on his own. Mr. Feuer has gone bowling at both Bowlero White Plains and Lucky Strike Nyack in the last four years. Mr. Feuer has been dismayed at how much bowling prices have increased during this period; as a longtime bowler, he finds Bowlero's prices to be "extravagant." Mr. Feuer estimates he was charged approximately $45 an hour to bowl and $12 to rent shoes at a recent visit to Bowlero White Plains—and, when he arrived at his designated lane, he realized that Bowlero had failed to even oil it. Mr. Feuer had a similar experience with high prices and poor lane quality at Lucky Strike Nyack. Mr. Feuer also regularly bowls at a nearby bowling center that is not operated by Bowlero. While this non-Bowlero center is not as expensive as Bowlero, it has increased its prices over the last four years as well. Mr. Feuer has

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

paid these higher prices on multiple occasions in the last four years and has been directly harmed by Bowlero's anticompetitive conduct.

22.     Plaintiff Kevin Howard is a resident of Mount Vernon, New York. Mr. Howard enjoys bowling as a leisure activity with family and friends and has bowled at Bowlero and non-Bowlero locations in the last four years. He last went to a Bowlero location in April 2024, and he paid much higher prices for bowling and food than he had paid in the past at this location. At his April 2024 visit, Mr. Howard paid approximately $62 for only one-and-a-half hours of bowling. In addition, Mr. Howard noticed that the prices for the food, beverage, and shoe rentals at the Bowlero center had also noticeably increased. To Mr. Howard, the Bowlero location felt more like a dark and loud nightclub than a welcoming and well-maintained bowling alley. Mr. Howard has been directly harmed by Bowlero's anticompetitive conduct.

23.     Plaintiff Andre Howard (no relation to Plaintiff Kevin Howard) is a resident of Oakland, California. Mr. Howard has been bowling since he was seven years old and is an active participant in bowling leagues and tournaments. Mr. Howard has bowled at a Bowlero center in his area in the last four years and has experienced increased prices and worsened quality. For example, the last time he bowled at this center, the poor maintenance of the machines resulted in damage to his bowling ball. At other times, he has noticed that the center's pin-setting machines often break and that Bowlero does not perform timely maintenance on them and does not keep the center clean. Mr. Howard has also bowled at non-Bowlero centers in the last four years. Mr. Howard has been directly harmed by Bowlero's anticompetitive conduct.

24.     Plaintiff Michael Cordero is a resident of San Francisco, California. Mr. Cordero is the son of a longtime (and very talented) bowler, and Mr. Cordero himself has been bowling regularly for more than ten years. For many years, Mr. Cordero's weekly routine included bowling on either Friday or Saturday with his stepbrother and two other friends at non-Bowlero bowling centers in their area. These weekly games used to cost approximately $40 an hour. However, the non-Bowlero bowling centers in Mr. Cordero's area—drafting off of Bowlero's increased prices—have significantly increased their prices over the last four years to the point

Class Action Complaint
Case No.

that Mr. Cordero now must pay approximately $60 an hour. The result is that Mr. Cordero can no longer afford to bowl each week with his family and friends—instead, he now bowls once every four or five months. Mr. Cordero has paid increased prices at non-Bowlero bowling centers in his area in the last four years and has been directly harmed by Bowlero's anticompetitive conduct.

25.    Plaintiff Ed McDonald is a resident of Vacaville, California. Mr. McDonald was a league bowler at his local bowling center in Vacaville when, in 2021, it was acquired by Bowlero. Mr. McDonald is still in his league and bowls weekly at this Bowlero-owned center. While Mr. McDonald's league used to bowl on Saturday nights, Bowlero moved the league to Monday nights, forcing Mr. McDonald's league to share space with a different league already scheduled at that time. Since Bowlero acquired his local center, Mr. McDonald estimates that the cost of bowling—for both league and non-league play—as well as food has gotten significantly more expensive. At the same time, the quality of the center has decreased. For example, the bowling alley is now often dirty, the machines (including the reader) often break (including at a recent league game in April 2026), and the alley sometimes runs out of oil in the middle of games. Mr. McDonald has been directly harmed by Bowlero's anticompetitive conduct.

26.    Plaintiff Theodore Harkness is a resident of Fairfax, Virgina. Mr. Harkness has been bowling his entire life and currently enjoys bowling with his friends in the Northern Virginia area. Recently, Mr. Harkness bowled at Lucky Strike Tyson's Corner and was surprised by how expensive it was—he paid approximately $60 for just two hours of bowling (not including the cost of food and beverages). For nearly 20 minutes of that time, the alleyway shut down because of a machine malfunction and Bowlero neglected to provide Mr. Harkness or any other bowlers a refund. Mr. Harkness has also bowled at non-Bowlero centers in his area over the last four years and has noticed those prices increase as well—though not to the same degree as Bowlero's. Mr. Harkness has paid increased prices at both Bowlero and non-Bowlero bowling centers in his area in the last four years and has been directly harmed by Bowlero's anticompetitive conduct.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

7

27.     Plaintiff Tim Kelly is a resident of Herndon, Virginia. Mr. Kelly has been a bowler since he was four years old. While he used to bowl competitively, in recent years he would go bowling to have fun and relax. In the last four years, Mr. Kelly has bowled at multiple Bowlero locations and has experienced higher prices and worsened quality. For example, Mr. Kelly estimates that prices at multiple Bowlero locations in his region have doubled, and in some cases tripled (when considering surge prices), since Bowlero acquired them. Mr. Kelly was also a frequent bowler at Bowl America Chantilly, a bowling center that Bowlero acquired and subsequently closed. In the last four years, Mr. Kelly has also bowled at non-Bowlero centers in his area. Mr. Kelly has been directly harmed by Bowlero's anticompetitive conduct.

28.     Plaintiff Maor Kramer is a resident of Chicago, Illinois. Mr. Kramer has been bowling since he was a young child and currently enjoys bowling with friends a few times a year. In the last four years, Mr. Kramer has bowled at both Bowlero and non-Bowlero centers in his area. Mr. Kramer has noticed prices increase at both Bowlero and non-Bowlero centers during that time. For example, he has noticed that Lucky Strike Wrigleyville, acquired by Bowlero from Defendant Lucky Strike Entertainment LLC in 2023, is more expensive and has worse customer service as compared with before Bowlero acquired it. Mr. Kramer has paid increased prices at both Bowlero and non-Bowlero bowling centers in his area in the last four years and has been directly harmed by Bowlero's anticompetitive conduct.

29.     Plaintiff Casey Goodman is a resident of North Highlands, California. Mr. Goodman is a longtime bowler who enjoys both league and non-league bowling. In the last four years, Mr. Goodman has bowled at both Bowlero and non-Bowlero bowling centers in his area and has faced increased prices at both over that time. In particular, Mr. Goodman has been impacted by Bowlero's consistent increase in league fees and higher prices for food and beverages. He has also experienced worsened quality at Bowlero centers, including lanes breaking down, balls damaged by improperly maintained lanes, and often dirty facilities. Mr. Goodman has been directly harmed by Bowlero's anticompetitive conduct.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

8

30.    Defendant Lucky Strike Entertainment Corporation (f/k/a Bowlero Corporation) is a publicly traded corporation incorporated under the laws of Delaware and headquartered in Mechanicsville, Virginia.

31.    Defendant AMF Bowling Centers, Inc. ("AMF"), a wholly owned subsidiary of Bowlero, is a corporation incorporated under the laws of Virginia and headquartered in Mechanicsville, Virginia.

32.    Defendant Lucky Strike Entertainment LLC is a limited liability company incorporated under the laws of Delaware and headquartered in Encino, California.

### JURISDICTION AND VENUE

33.    Plaintiffs, on behalf of themselves and all others similarly situated, bring this action against Defendants seeking equitable and injunctive relief, as well as damages, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for Defendants' violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs, on behalf of themselves and all others similarly situated, also seek monetary and non-monetary equitable relief, including injunctive relief and restitution, as well as damages, under state antitrust and unfair competition laws.

34.    This Court has jurisdiction over the subject matter of this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 14 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; and 28 U.S.C. §§ 1331, 1337, and 1367.

35.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and Defendants are licensed to do business in, are doing business in, have agents in, are found in, transact business in, or are subject to personal jurisdiction in this District.

36.    This Court has personal jurisdiction over Defendants because they, *inter alia*: (a) are headquartered in the United States; (b) transacted business in the United States, including in

Class Action Complaint
Case No.

this District; (c) directly sold or marketed goods and services in the relevant markets throughout the United States as a whole, including in this District; (d) have substantial aggregate contacts within the United States, including in this District; or (e) directed or engaged in acquisitions and other conduct the substantial, reasonably foreseeable, and intended effect of which was a substantial lessening of competition, or the creation of a monopoly causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the protection of the laws of Washington and of the United States.

37. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and otherwise harming Class members throughout the United States.

**FACTS**

**I. Bowling in America**

38. Bowling's history in America dates to the early 1800s, when Dutch settlers played "lawn bowling" in what later became New York City's first public park, Bowling Green. In Washington Irving's 1819 classic *Rip Van Winkle*, Rip learns of Dutch immigrants playing an early form of bowling in the Catskill mountains that sounded "like distant peals of thunder." By 1895, with the ever-growing popularity of the activity, the American Bowling Congress was formed, and rules, equipment, and alley conditions were formalized, including adding a pin to make the 10-pin bowling we know today.

39. Bowling's popularity exploded after the Second World War, in large part due to the rise of the suburban middle class and the invention of the automatic pinsetter, which replaced the need for bowling alleys to employ individuals to manually clear and re-spot falling pins. This led to bowling centers lowering prices and increasing hours of operation. By the late 1960s and early 1970s, there were over 12,000 bowling centers throughout the United States and roughly 50 million active bowlers.

Class Action Complaint
Case No.

40.     One aspect that made bowling so popular was that it appealed to families of all economic backgrounds. At their peak some bowling alleys in the 1950s and 1960s even offered nursery and day care services "so parents could enjoy their game with a bit more peace of mind." Bowling alleys marketed their centers as wholesome and family friendly, and often offered deals catered to this type of customer, like free bowling lessons for children.

41.     Another driver of bowling's popularity was league bowling. By the end of the 1970s, nearly 10 million Americans participated in a bowling league. As political scientist Robert Putnam famously explored in his work *Bowling Alone*, a big reason for the popularity of bowling leagues was that they were uniquely accessible across class lines—unlike, for instance, "fashionable country clubs," league bowling was "solidly middle-American" and "common among both men and women, couples and singles, working-class and middle-class, young and old."

42.     While participation in bowling leagues has declined dramatically since its peak, bowling remains the number one participation sport in the United States, and approximately 67 million Americans bowl at least once a year. In the 2024-25 season alone, the U.S. Bowling Congress, the national governing body for ten-pin bowling, had more than 1 million active members and certified more than 29,000 bowling leagues. Today, there are roughly 3,400 bowling centers equipped with nearly 78,000 lanes for these millions of American bowlers. Market research estimates indicate that bowling centers saw combined revenues of $5.1 billion in 2025.

43.     Bowlero operates roughly 350 bowling centers across North America and currently captures approximately 35% of total U.S. bowling revenue. It is far and away the largest operator in the market—what one market research firm calls the "undisputed category leader in North America." Its next closest rivals (as measured by number of centers) operate 64 (Main Event) and 56 (Round1 Bowling) centers, respectively, and these rivals offer bowling alongside other entertainment activities like arcades and laser tag. Another large rival, Pinstripes, filed for Chapter 11 bankruptcy in 2025.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

11

44.    The remining bowling centers in the country are independent. According to one estimate, there are 3,500 such bowling centers that remain—down from nearly 12,000 centers in the mid-1960s. Whereas big chains like Bowlero seek to provide the same flashy and noisy corporate experience across locations, these independent bowling centers are unique to their communities and often still feature the family-oriented offerings like discounts for seniors, family packs, and bargains for league bowlers that defined bowling for decades.

45.    Bowling centers attract distinct types of customers. These include, among others, family and casual bowlers, league bowlers, small groups, and corporate events. Most bowling centers offer a mix of walk-in and reservation-only bowling.

46.    As discussed in more detail below, the prices these customers pay have increased dramatically—in large part due to Bowlero's consolidation, adoption of algorithmically-driven pricing schemes, and food and beverage upselling. Where a general manager of a Los Angeles bowling alley in 1994 could confidently state that "[a] family of four can go bowling on a Saturday night for $35," today that same family of four can spend multiple hundreds of dollars for a worse experience.

47.    In addition to consolidation of bowling centers, the markets for bowling supplies relied on by bowling centers is now dominated by a few major players, including companies like QubicaAMF and Brunswick Corporation, which "provide the bulk of bowling infrastructure" such as "lanes, pinsetters, scoring systems, and lane management software." Another important supplier is Kegel, which describes itself as the "undisputed leader in lane care and lane maintenance." Lane care and maintenance, including the use of lane conditioning oils, is essential to maintain the proper usability and overall durability of bowling lanes—without it, the repeated roll of the bowling ball would slowly destroy a lane's surface. In addition to guarding against wear and tear, proper lane conditioning is crucial to ensure the bowling ball reacts consistently in the lane when rolled. Lane care and maintenance supplies are therefore crucial to a bowling center's ability to operate and remain attractive to customers.

Class Action Complaint
Case No.

## II.  Bowlero's Roll-Up Scheme

48.     Bowlero's current dominant position in the bowling center industry is the direct result of its unlawful consolidation scheme.

49.     The acquisition of rival bowling centers has long been the central pillar of Bowlero's corporate strategy. For example, in a November 2025 presentation to investors, Bowlero provided an overview of its most recent consolidation efforts, declaring that it has created "[c]onsistent value [to investors]. . . [t]hrough [a]quisitions," and noting that it had "deployed $700M of capital into acquisitions the past three years."

50.     Bowlero's roll-up playbook puts independent bowling centers directly in its sights. In fact, one company executive has described the nation's independent bowling centers as "ripe for roll ups." And the company has repeatedly presented its thesis to investors and the public that this "highly fragmented industry" represents "an attractive consolidation opportunity to drive further growth."

### A.  AMF and Brunswick Acquisitions

51.     In the early 2010s, Bowlero's predecessor company, Bowlmor, operated just six locations that, as CEO Thomas Shannon has noted, attracted customers with "racy" advertisements and an "upscale vibe."

52.     That was about to change. In 2012, AMF Bowling Worldwide, Inc. ("Prior AMF"), then the largest operator of bowling centers in the country, filed for bankruptcy. Sensing an opportunity, Bowlmor, in a deal funded by certain of Prior AMF's second lien lenders including Cerberus Capital Management and Credit Suisse Group AG, combined with Prior AMF pursuant to Prior AMF's chapter 11 restructuring. The deal brought Prior AMF's 272 U.S. bowling centers under Bowlero's corporate control and overnight made Bowlero—at the time known as Bowlmor AMF—the largest operator of bowling centers in the world with an annual revenue of approximately $450 million in 2013.

Class Action Complaint
Case No.

53. As its CFO at the time put it in 2013, Bowlero was on its way to its goal: to "d[o] to bowling what Starbucks did to coffee." But to achieve its goal, instead of growing organically by building new bowling centers, Bowlero would use a roll-up playbook.

54. In fact, during the following year Bowlero (then still Bowlmor AMF) acquired a leading bowling center competitor, Brunswick Corporation, in a roughly $260 million cash deal. The acquisition brought Brunswick's 85 bowling centers (a number of which Bowlero has subsequently shuttered) throughout the country under Bowlero's control, increasing Bowlero's center count substantially and its annual revenue to approximately $600 million in 2014 dollars.

### B. Further Private Equity Investment and Professional Bowlers Association Acquisition

55. Bowlero's rapid consolidation scheme—acquiring hundreds of bowling centers in a matter of years—unsurprisingly caught the attention of private equity. In 2017, private equity firm Atairos Group acquired a substantial ownership interest in Bowlero (then still Bowlmor AMF), in a transaction valued at more than $1 billion. Atairos Group executives specifically highlighted Bowlero's "great potential for continuing growth" through "acquisitions" and its "proven, scalable platform" as one of the reasons for the investment. Today, Atairos Group, through A-B Parent LLC, still owns 10% or more of Bowlero's Class A common stock (and, Atairos Group and Bowlero CEO Thomas Shannon together "own approximately 95% of the outstanding shares of [Bowlero's] common stock").

56. After amassing a dominant position in the industry, Bowlero sought to further solidify its grip and set its sights on the Professional Bowlers Association ("PBA"). The PBA, founded in 1958, is the world's premier bowling organization, and includes thousands of members from more than 20 countries. Critically, the PBA organizes competitive professional bowling tours, including the PBA Tour, PBA Regional, and PBA50 Tours, which are hosted at bowling centers across the country. The PBA also has major television deals with media companies like Fox Networks, CBS, and the CW Network, and its televised tournaments are watched by millions of viewers each year. Bowlero acquired the PBA in September 2019.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

14

## C. SPAC Merger and IPO

57. As Bowlero continued to grow, the company's Wall Street investors saw a further opportunity to cash in—this time by jumping on the special purpose acquisition company ("SPAC") bandwagon of 2020 and 2021. SPAC deals raise capital in an initial public offering for a to-be-announced acquisition and then use that cash to merge with a private company, effectively taking it public.

58. In July 2021, Bowlero announced that it had combined with a SPAC called Isos Acquisitions Corporation ("Isos") and would go public as "BOWL" on the New York Stock Exchange. The deal included what is known as a PIPE (private investment in public equity) transaction of the company's convertible preferred and common stock, anchored by investors from major Wall Street funds like Apollo Global Management, Inc., Brigade Capital Management, Soros Fund Management LLC, The Donerail Group LP, and Wells Fargo Asset Management. Funds managed by affiliates of Apollo, in particular, played a leading role, committing a forward purchasing agreement for Isos of up to $75 million (and ultimately committing roughly $100 million to the transaction).[2] The deal valued Bowlero at $2.6 billion.

59. At the time, Bowlero operated nearly eight times more bowling centers than its nearest rival. In its filing with the SEC, Isos echoed prior statements made by company executives that bowling's "fragmentation presents a consolidation opportunity to drive further growth."

## D. Continued Roll-ups: Bowl America, Independent Bowling Centers, and Lucky Strike

60. Sure enough, once publicly listed Bowlero's roll-up playbook continued apace: only a month after going public, Bowlero further increased its dominance by acquiring Bowl

---

[2] A forward purchasing agreement essentially commits the investor to purchasing some amount of SPAC units upon the completion of the SPAC merger and listing on a public stock exchange. The idea is that the agreement provides a cash guarantee to the company merging with the SPAC and therefore serves as a backstop, helping the SPAC demonstrate to the market that it is a worthy investment.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

America, the operator of 17 bowling centers across Florida, Virginia, and Maryland, for approximately $44 million.

61. After its Bowl America acquisition, Bowlero's roll-up playbook continued in full force, with Bowlero gobbling up both the independent bowling alleys its executives had described as "ripe for roll up" as well additional larger rivals.

62. Bowlero acquired dozens of independent bowling centers across the country between 2021 and 2024, including:

63. In 2021 a center in Charlotte, North Carolina; a center in Vacaville, California and a center in Spring Hill, Florida;

64. In 2022 three centers in Wichita, Kansas; two centers in The Villages, Florida, one center in Rocklin, California; three centers in Wisconsin including two in and around Appleton and one in Milwaukee; and two centers in and around Omaha Nebraska;

65. In 2023 one center in Cherry Hill, New Jersey; two centers in Cape Coral, Florida; one center in Scottsdale, Arizona; and two centers in Michigan—one in the greater Grand Rapids area and one in the Detroit area; and

66. In 2024 two centers in the greater Detroit, Michigan area.

67. By 2023, Bowlero's revenues had increased from a few hundred million in 2021 to over $1 billion for the first time, representing more than a third of the industry's total domestic revenues, and the company was operating far and away the most bowling centers in the world. Bowlero did not hide its dominance, touting to investors on Wall Street that the company was in the "dominant position in a fragmented market" with a "rich opportunity set of assets to roll up" and a "successful acquisition . . . blueprint." Market analysts concurred while noting that Bowlero generated "high EBITDA margins[.]"

68. But Bowlero's acquisitive hunger was still growing with the company looking to further consolidate the industry. Bowlero next targeted rival Defendant Lucky Strike Entertainment, LLC ("Lucky Strike") which operated 14 locations in what Bowlero CEO Thomas Shannon described as "really marquee locations" in cities like Denver, San Francisco,

Class Action Complaint
Case No.

and Los Angeles, and, according to studies commissioned by Bowlero, had a brand that was "meaningfully more powerful" than Bowlero's. In September 2023, Bowlero completed its acquisition of Lucky Strike in an all-cash deal of approximately $90 million dollars, bringing all 14 Lucky Strike locations under Bowlero's control.

69. The importance of Lucky Strike's brand to Bowlero—and the centrality of the acquisition to Bowlero's business—was so profound that by the end of 2024 Bowlero officially rebranded the entire company from Bowlero to Lucky Strike Entertainment, adopting the NYSE ticker "LUCK." And just this year, Bowlero announced plans to operate more than 200 of its existing locations under the Lucky Strike brand moving forward and in fact to ultimately eliminate the Bowlero brand entirely.

### E. Bowlero's Roll-Ups Have Enabled It to Obtain Discriminatory Terms from Its Suppliers Not Available to its Competitors

70. Bowlero has weaponized the market dominance it achieved through its roll-up playbook to extract discriminatory terms from its suppliers that are more favorable than those available to its competitors.

71. As one Bowlero executive has put it, "there is scale that comes in these acquisitions" and "we can use our scale to drive procurement synergies." These supplier concessions have been so valuable to Bowlero that, in 2025, it hired a Chief Procurement Officer specifically to "drive efficiencies" in this area. Indeed, Bowlero attributed "benefits from our procurement function" as a main driver of significantly decreasing CapEx in Q4 2025.

72. For example, Bowlero has negotiated a deal with Kegel, the world's leading supplier of bowling lane conditioning oil, for Kegel to develop two exclusive oil options only available to Bowlero and decided to use those two oils exclusively instead of the nine oils that were previously used in its bowling centers. The result is that Bowlero, by leveraging its dominant position, is able to pay significantly less for lane oil than its competitors. Bowlero has used its dominant position to extract other, similar concessions with equipment manufacturers,

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

17

either in the form of exclusive products or product discount rates, harming competition in those critical supply markets.

73.    Likewise, Bowlero has deployed its illegally acquired scale to force major food and beverage suppliers to provide it with price concessions unavailable to its competitors, further limiting independent bowling centers' ability to compete with it. As one market report explained, Bowlero's "volume contracts" for food and beverage "drive favorable margins" for the company. This extractive strategy allowed Bowlero to leave the Bowling Proprietors' Association of America—a non-profit membership organization that represents thousands of independent bowling centers throughout the country and negotiates group rates with key suppliers for its membership—for a period between 2021 and 2022 without any financial repercussions, which is something no independent bowling alley could afford to do.

### F.    Recently, Bowlero Has Pivoted to Rolling Up Outdoor Amusement and Water Parks

74.    Since 2024, Bowlero has initiated another roll-up strategy to extend its dominant position in the market for bowling centers into the distinct but related markets for outdoor amusement and water parks.

75.    In May 2024, Bowlero acquired Raging Waves, a large water park in Yorkville, Illinois. Bowlero CEO Thomas Shannon asserted to investors at the time that the transaction presented a potential first step toward extending Bowlero's "operating philosophy" beyond bowling centers to the broader "location-based entertainment industry."

76.    In October 2024, Bowlero acquired Boomers Parks, a chain of six outdoor amusement parks in California and Florida and a water park, Big Kahuna's, in Destin, Florida. Mr. Shannon told investors at the time that, within weeks of the acquisition, Bowlero "had begun shuttering unprofitable parts of the portfolio." These closures included the Boomers location in Los Angeles, California.

77.    In early 2025, the pace of Bowlero's cross-market acquisitions accelerated. In March 2025, Bowlero acquired Visalia Adventure Park and Sequoia Springs Splash Park, an

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

18

amusement park and water park, respectively, in Visalia, California. In April 2025, Bowlero acquired Shipwreck Island Waterpark in Panama City, Florida. And around July 2025, Bowlero acquired two more water parks, Wet 'n Wild Emerald Pointe in Greensboro, North Carolina and Raging Waters in San Dimas, California; an amusement park, Castle Park in Riverside, California; and two additional Boomers-branded amusement parks in Palm Springs, California, and Vista, California. As Mr. Shannon explained, this series of acquisitions solidified Bowlero's "leadership" across "three verticals[:] bowling, water parks, and high quality family entertainment centers."

78.     According to Mr. Shannon, "the playbook for the water parks and . . . [amusement parks] is the same as it has been for bowling." Shannon expects continued expansion into these related markets, articulating his ultimate goal of splitting revenue "40% bowling, 40% water parks, and 20% [amusement parks]." As he told investors, "I view this as ultimately becoming sort of a mini Disney."

III. Relevant Markets for Operating Bowling Centers

A. Relevant Product Markets

79.     A relevant product market in which Bowlero's roll-up scheme has substantially lessened competition and tended to create a monopoly is the market for operating bowling centers. Bowling centers are locations for tenpin bowling play equipped with multiple lanes.

80.     Bowling centers are offered by a distinct group of vendors—namely, bowling center operators offering the specialized equipment and infrastructure required to qualify as a bowling center.

81.     Bowling centers generally comply with the U.S. Bowling Congress's standards for products and lane dimensions. The U.S. Bowling Congress is the sanctioning body for the sport of bowling. It publishes a manual setting forth equipment specifications "to ensure fair play and to ensure that technological advances in the design and manufacture of bowling equipment are in the best interests of the sport."

82.     Among the standards the U.S. Bowling Congress promulgates are:

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

19

a.   bowling ball required specifications;

b.   ball manufacturing requirements;

c.   tenpin and bowling lane specifications (e.g., approach length, foul line width, lane length, pit length, gutter width, lane panel drop offs, etc.);

d.   deck area requirements;

e.   specifications for pinsetting devices;

f.   specifications for string machine devices;

g.   specifications for automatic scoring devices;

h.   specifications for automatic foul detecting devices;

i.   specifications for lane inspection process; and

j.   specifications for lane dressing or lane surface.[3]

83.     A small group of specialized vendors in each relevant geographic market offers products meeting these specifications. Because bowling centers require such specialized equipment and space, operators of other entertainment and activity centers cannot easily switch to operating a bowling center instead.

84.     Bowling centers are a distinct product for antitrust purposes. Other outside-the-home sporting and entertainment options are not reasonable substitutes for bowling centers from the standpoint of consumers.

85.     Bowling is not just an activity and form of entertainment; it is a sport. Indeed, the U.S. Bowling Congress maintains a detailed specification manual precisely "in order to protect the nature of the sport of bowling" and "preserve the character and integrity of the sport."

86.     A substantial portion of consumers—including league players who make up at least 10% of Bowlero's customer base—go bowling to practice and play the sport of bowling.

_____

[3] For example, the U.S. Bowling Congress stipulates that "[a] regulation bowling lane, including flat gutters, kickbacks and approach, must be constructed of wood and/or other materials which have been tested according to U.S. Bowling Congress procedures for the specified time period and approved."

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

20

The U.S. Bowling Congress, through its USBC Center Certification Department, certifies bowling centers to ensure standardization in tenpin play across the country.

87. Other sporting and entertainment options nearby a bowling center are not a reasonable substitute because they do not offer the bowling consumer the ability to bowl. Indeed, Bowlero's CEO Thomas Shannon identifies "bowling" as a completely separate "vertical" from "high quality family entertainment centers." In other words, Bowlero itself views family fun centers as distinct products from bowling centers.

88. Bowling centers offer an activity an entire group of people spanning a wide range of ages and mobility or activity levels—including paradigmatically families—can engage in together all year round. Indeed, a substantial portion of bowling centers' customer base is families and other mixed-age or -ability groups.

89. For these groups of consumers, many other forms of entertainment are not reasonable substitutes. For example, dance clubs, bars, and other entertainment options geared towards adults are often not reasonable substitutes for bowling centers because families generally do not take children or elderly adults there. Laser tag, mini golf, trampoline parks, and other venues requiring high levels of mobility to participate in the activity are not reasonable substitutes for bowling centers, because grandma or the infant and her parent must sit on the sidelines, separated from and generally not interacting with the others participating in the activity.

90. In fact, market analysts explicitly distinguish operators of bowling center networks with entertainment venues that include some combination of limited bowling with other activities like virtual reality, laser tag, billiards, video games, mini golf, gravity ropes, and escape rooms.

91. Concerts and similar activities are not reasonable substitutes for bowling because concerts generally target a distinct age demographic, concert-going is a completely passive activity, concerts offer very little opportunity for conversation and interaction, and they are generally more expensive and require more planning (advanced tickets) than bowling. Bowling

Class Action Complaint
Case No.

is a unique activity in that the entire group of people, regardless of age and agility, can be together and talk with one another while either participating in or watching the bowling. Indeed, in large part due to these unique attributes, bowling is one of America's favorite and most popular pastimes.

92.    Amusement parks and water parks are not reasonable substitutes for bowling centers. In addition to the previously discussed differentiating factors, amusement parks and water parks are much bigger than bowling centers, generally require attendees to walk long distances, wear bathing suits, get wet, and dedicate several hours to the visit. In addition, amusement parks and water parks largely cater to children and young adults, while bowling centers offer an entertainment and sporting option that appeals to a wide range of ages. Amusement and water parks are also generally much higher priced than bowling centers. And, as noted above, Bowlero itself views amusement and water parks as distinct products from bowling centers.

93.    A relevant antitrust market need not include all substitute products or services. The loss of competition between a narrower group of substitutes can cause harm to competition, making the narrower group a properly defined antitrust market.

94.    The hypothetical monopolist test is a tool used to determine if a group of products (i.e., bowling centers) is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT") of one of those products or services, then that group of products or services (i.e., bowling centers) is a properly defined antitrust product market.

95.    A hypothetical monopolist of bowling centers in a given geographic market could profitably impose a SSNIPT. In other words, in response to such a SSNIP imposed by a monopolist at one bowling center, a sufficient number of consumers would switch to other

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

22

bowling centers nearby and not switch away to other forms of out-of-home entertainment, making such a price increase profitable.

96. As discussed below, Bowlero competes in localized relevant geographic markets for bowling centers throughout the United States.

### B. Relevant Geographic Markets and Acquisitions in These Markets

97. Consumers prefer to go bowling at bowling centers near where they live or work. Bowling center competition therefore primarily occurs locally. Relevant geographic markets for bowling centers are localized areas around each bowling center. While commuting patterns, traffic flows, and other local characteristics may cause some variation in the distance and time consumers are willing to travel to go bowling, consumers in most markets are generally not willing to travel more than 30 to 60 minutes to go bowling.

98. Therefore, the competitive effects of Bowlero's bowling center acquisitions since 2021 (together, the "Acquisitions") are appropriately assessed in localized geographic markets within 30 to 60 minutes of a Bowlero bowling center. A hypothetical monopolist controlling all bowling centers in any such localized market within one of the core-based statistical areas (i.e., metropolitan and micropolitan statistical areas) below could profitably implement a SSNIPT in a bowling center in such relevant geographic market:

### 1. California

99. **Los Angeles-Long Beach-Anaheim, CA MSA**. This metropolitan statistical area ("MSA") includes, for example, Bowlero's Lucky Strike Los Angeles, Lucky Strike Montebello (formerly Bowlero Montebello), and Lucky Strike Pasadena (formerly Bowlero Pasadena), as well as its Lucky Strike Hollywood (formerly Lucky Strike Hollywood & Highland) and Lucky Strike at L.A. Live locations that it acquired from Lucky Strike Entertainment, LLC in September 2023 (the "Los Angeles Acquisitions").

100. Taking this MSA as an example, a hypothetical monopolist controlling all bowling centers within 30 to 60 minutes of travel time to Bowlero's Lucky Strike Hollywood and Lucky Strike at L.A. Live locations could profitably implement a SSNIPT.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

101.    **San Francisco-Oakland-Fremont, CA MSA**. This MSA includes, for example, Bowlero's Lucky Strike Alameda (formerly Bowlero Alameda) location, as well as its Lucky Strike San Francisco location that it acquired from Lucky Strike Entertainment, LLC in September 2023 (the "San Francisco Acquisition").

102.    **Santa Rosa-Petaluma, CA MSA**. This MSA includes, for example, Bowlero's AMF Petaluma Lanes location, as well as its Double Decker Lanes location that it acquired in October 2022 (the "CA Wine Country Acquisition").

103.    **Sacramento-Roseville-Folsom, CA MSA**. This MSA includes, for example, Bowlero's AMF Rocklin Lanes and Bowlero North Sacramento locations, as well as its Lucky Strike Rocklin (formerly Strikes Unlimited) location that it acquired in October 2022 (the "Sacramento Acquisition").

### 2.    *Washington*

104.    **Seattle-Tacoma-Bellevue, WA MSA**. This MSA includes, for example, Bowlero's Garage Billiards & Bowl location that it acquired in May 2019, and its Lucky Strike Bellevue location that it acquired from Lucky Strike Entertainment, LLC in September 2023 (the "Seattle Acquisition").

### 3.    *Arizona*

105.    **Phoenix-Mesa-Chandler, AZ MSA**. This MSA includes, for example, Bowlero Old Town, Bowlero Christown, and AMF Tempe Village Lanes locations, as well as Bowlero's Mavrix location that it acquired in July 2023 (the "Phoenix Acquisition").

### 4.    *Colorado*

106.    **Denver-Aurora-Centennial, CO MSA**. This MSA includes, for example, Bowlero Cherry Creek, Lucky Strike Wheat Ridge (formerly Bowlero Wheat Ridge) locations, as well as Bowlero's Lucky Strike Denver location that it acquired from Lucky Strike Entertainment, LLC in September 2023 (the "Denver Acquisition").

Class Action Complaint
Case No.

##### 5. *Kansas*

107.    **Wichita, KS MSA**: This MSA includes, for example, Bowlero Northrock (formerly Northrock Lanes), Bowlero Northridge (formerly West Acres Bowling Center), and Lucky Strike Wichita (formerly the Alley Indoor Entertainment) locations, all three of which Bowlero acquired in May 2022 (the "Wichita Acquisitions").

##### 6. *Nebraska/Iowa*

108.    **Omaha, NE-IA MSA**. This MSA includes, for example, Bowlero's Lucky Strike Elkhorn (formerly The Mark) and Bowlero Council Bluffs (formerly Thunderbowl) locations, which it acquired in October and November 2022, respectively (the "Omaha Acquisitions").

##### 7. *Wisconsin*

109.    **Appleton, WI MSA**. This MSA includes, for example, Bowlero's Super Bowl Family Entertainment Center and Sabre Lanes locations, which it acquired in October 2022 (the "Appleton Acquisitions").

110.    **Milwaukee-Waukesha, WI MSA**. This MSA includes, for example, Bowlero's AMF West Lanes and Bowlero Wauwatosa locations, as well as its JB's on 41 location that it acquired in October 2022 (the "Milwaukee Acquisition").

##### 8. *Illinois*

111.    **Chicago-Naperville-Elgin, IL-IN MSA**. This MSA includes, for example, Bowlero's Bowlero Lyons, Bowlero River Grove (formerly Brunswick Zone River Grove), Bowlero Niles (formerly Brunswick Zone Niles) locations, as well as its Lucky Strike Wrigleyville and Lucky Strike Chicago locations it acquired from Lucky Strike Entertainment, LLC in September 2023 (the "Chicago Acquisitions").

##### 9. *Michigan*

112.    **Grand Rapids-Wyoming-Kentwood, MI MSA**. This MSA includes, for example, Bowlero's AMF Eastbrook Lanes location as well as its Lucky Strike Holland (formerly BAM! Entertainment Center) and Lucky Strike Grand Rapids (formerly Spectrum

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

Entertainment Complex) centers, which it acquired in August 2023 and November 2024, respectively (the "Grand Rapids Acquisitions").

### 10.  New York

113.    **New York-Newark-Jersey City, NY-NJ MSA**. This MSA includes, for example, Bowlero's Bowlero White Plains location, as well as the Lucky Strike West Nyack location, which it acquired from Lucky Strike Entertainment, LLC in September 2023 and subsequently closed (the "New York Acquisition").

### 11.  Pennsylvania/New Jersey

114.    **Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA**. This MSA includes, for example, Bowlero's Bowlero Deptford (formerly Brunswick Zone Deptford), Bowlero Boothwyn, Bowlero Turnersville (formerly Brunswick Zone Turnersville), Bowlero Bristol, and Lucky Strike Feasterville (formerly Brunswick Zone XL Feasterville) locations, as well as its Bowlero Limerick (formerly Limerick Bowl), Lucky Strike Cherry Hill (formerly The Big Event), and Philadelphia locations that it acquired in August 2021, February 2023, and September 2023, respectively (the "Philadelphia Acquisitions").

115.    **Reading, PA MSA**. This MSA includes, for example, Bowlero's Berks Lanes and Hiester Lanes locations that it acquired in August 2021 (the "Reading Acquisitions").

### 12.  Maryland

116.    **Baltimore-Columbia-Towson, MD MSA**. This MSA includes, for example, Bowlero's AMF Southwest Lanes – MD and AMF Southdale Lanes locations, as well as the Bowl America Glen Burnie location, which it acquired from Bowl America in August 2021 and subsequently closed (the "Baltimore Acquisition").

### 13.  Washington, DC and Bordering States

117.    **Washington-Arlington-Alexandria, DC-VA-MD-WV MSA**. This MSA includes Bowlero's Lucky Strike Bethesda (formerly Bowlero Bethesda), Lucky Strike Rockville (formerly Bowlero Rockville), Lucky Strike College Park (formerly AMF College Park Lanes), AMF Marlow Heights Lanes, and AMF Capital Plaza Lanes locations, its Lucky Strike

Class Action Complaint
Case No.

Gaithersburg location (formerly Bowl America Gaithersburg) that it acquired in August 2021, as well as its Lucky Strike Montgomery Mall location, which it acquired from Lucky Strike Entertainment, LLC in September 2023 and subsequently closed. This MSA also includes Bowlero's Lucky Strike Tysons Corner, Lucky Strike Arlington, Lucky Strike Centreville, Bowlero Annandale, and Bowlero Dale City locations, as well as its Bowl America Burke, Bowl America Bull Run, Bowl America Chantilly, Bowl America Fairfax, Bowl America Falls Church, Bowl America Shirley, Bowl America Woodbridge, and Lucky Strike Sterling (formerly Bowl America Dranesville) locations (together with the Lucky Strike Montgomery Mall location, the "DMV Acquisitions"). Bowlero acquired all of these Bowl America locations in August 2021 and subsequently closed the Bowl America Chantilly location.

### 14. Virginia

118.    **Richmond, VA MSA**. This MSA includes Bowlero's Bowlero West End, Bowlero Richmond, and Bowlero Mechanicsville locations, as well as Bowlero's Bowl America Southwest and Bowl America Short Pump locations that it acquired from Bowl America in August 2021. This MSA also included Bowlero's Bowl America Eastern and Bowl America Midlothian locations that it acquired from Bowl America in August 2021 and subsequently closed (together with the Bowl America Southwest and Bowl America Short Pump locations, the "Richmond Acquisitions").

### 15. Carolinas

119.    **Charlotte-Concord-Gastonia, NC-SC MSA**. This MSA includes Bowlero South Boulevard location, as well as Bowlero Charlotte (formerly Strike City) and Lucky Strike South Charlotte (formerly 10 Park Lanes) locations that it acquired in October 2018 and September 2021, respectively (the "Charlotte Acquisitions").

### 16. Florida

120.    **Jacksonville, FL MSA**. This MSA includes Bowlero Southside (formerly Bowl America Southside) and Bowlero Mandarin (formerly Bowl America Mandarin) locations that Bowlero acquired from Bowl America in August 2021. This MSA also included Bowlero's Bowl

Class Action Complaint
Case No.

America Orange Park location, which it acquired from Bowl America in August 2021 and subsequently closed (together with the Bowl America Southside and Bowl America Mandarin locations, the "Jacksonville Acquisitions").

121. **Wildwood-The Villages, FL MSA**. This MSA includes Bowlero's AMF Leesburg Lanes location as well as its Fiesta Bowl and Spanish Springs Lanes locations that it acquired in September 2022 (the "Villages Acquisitions").

122. **Cape Coral-Fort Myers, FL MSA**. This MSA includes Bowlero's Bowland Cape Coral and Bowlero Midpoint (formerly HeadPinz Cape Coral) locations that it acquired in April 2023 (the "Cape Coral Acquisitions").

## C. *Barriers to Entry and Expansion*

123. There are high barriers to entry and expansion in the relevant markets for bowling centers in the United States.

124. Operating a bowling center requires specialized and expensive facilities, equipment, and knowledge. As discussed *supra*, Section III.A, a bowling center generally must comply with the U.S. Bowling Congress's standards, which specify strict requirements for everything from the lane size to the bowling balls.

125. Operating a bowling center requires a large upfront capital investment in the facility and equipment. A proprietor cannot simply "hang a shingle" as they can in several other business areas. It generally requires millions of dollars in upfront investment to purchase an existing bowling center or build one.

126. Once a bowling center is built, it requires a constant capital investment to keep the bowling center competitive, current, and up to standards, and to fix broken or failed equipment. This is an additional, ongoing—and often uncertain—capital expenditure that makes it hard to predict net revenues and serves as an additional barrier to entry and expansion.

127. Depending on the locale (e.g. urban versus rural), it can be difficult to find the space to build a new bowling center, particularly in places where parking is scarce and

Class Action Complaint
Case No.

commercial business space is expensive. This serves as a further barrier to entry and expansion, particularly in urban and suburban markets.

128. It is hard to break into a community as a new bowling center. League players, families, and other groups of bowlers are used to their familiar centers and are reluctant to give new entrants the chance to compete for their business. In other words, brand recognition in bowling is a real and significant element that prevents new entrants from easily breaking into a market.

129. In addition, as explained in detail below, Bowlero's anticompetitive conduct—including its acquisitions of rival bowling centers and the PBA, the concessions and unfair advantages it can extract from key suppliers, and the marketing war chest it can deploy (or threaten to deploy)—has further increased the barriers to entry and expansion.

130. Finally, Bowlero's dominance resulting from its acquisitions now positions the company to further extend this unlawfully acquired dominance into adjacent or complementary markets—namely, local markets for amusement and water parks—which will further increase barriers to entry and expansion.

131. Bowling centers, amusement parks, and water parks generally share suppliers for essential or complementary inputs, from food and beverages to janitorial supplies to arcade machines.

132. As Bowlero extends its scale and scope across markets, it builds "procurement synergies," which pose barriers to entry and expansion, and it builds local buyer power, which it can leverage to extract improved and potentially discriminatory concessions from suppliers.

133. Absent intervention, Bowlero's entrenchment and cross-market growth could enable it to foreclose rivals entirely in certain geographic regions through exclusive deals and other unfair advantages with those suppliers. Such an accumulation of buyer power will increase barriers to entry in multiple markets and has already harmed or threatens to harm both Bowlero's coerced distributors and rival bowling centers whose costs have increased relative to Bowlero's.

Class Action Complaint
Case No.

134.    Bowlero's cross-market integration raises barriers to entry and expansion in additional ways. Bowlero cross-subsidizes its bowling centers and amusement and water parks through on-site, intra-brand marketing—advertising, for example, the Raging Waves water park at Chicago-area bowling centers. Rival bowling centers cannot match either the scale or scope of Bowlero's advertising and cannot similarly or effectively cross-subsidize their marketing efforts.

135.    Bowlero also creates cross-subsidies by pooling data it collects on its customers across its properties, which it uses to personalize marketing and pricing for both lines of business. Through cross-marketing and commercial surveillance, Bowlero thereby raises costs for rival bowling centers, who must either increase marketing expenditures or risk losing customers in the face of increased search costs relative to Bowlero. Ultimately, these increased marketing costs have been or will be passed on to bowling consumers in the form of higher prices.

## IV. Bowlero's Anticompetitive Acquisitions Have Harmed Competition and Injured Consumers and Threaten Further Competitive Injury

136.    Bowlero's consolidation scheme has enabled it to acquire and entrench its dominance, use that power to produce substantial anticompetitive effects in numerous local markets, and leverage it to fuel a new roll-up scheme in the adjacent amusement and water park space.

137.    Bowlero's acquisitions substantially increased its market shares and concentration levels in the majority of the relevant markets—thus raising a presumption that the acquisitions substantially lessened competition in those markets.

138.    Bowlero's acquisitions eliminated competition with multiple locations with which Bowlero had been competing directly.

139.    Bowlero's acquisitions entrenched Bowlero's dominant position in nearly all of the relevant markets as well as nationally, and allowed Bowlero to leverage that unlawfully acquired dominance to obtain preferred deals from suppliers not available to its competitors and to extend its dominance to an adjacent market.

Class Action Complaint
Case No.

140.    There is also significant direct evidence that Bowlero can exercise the power it unlawfully acquired through its acquisition scheme—namely, evidence that Bowlero has increased prices while reducing quality, including by:

      a.   reducing lane conditioning and maintenance;

      b.   reducing operating hours

      c.   reducing maintenance staff and security; and

      d.   imposing loud music, blacklights, and massive video boards that make it difficult to bowl and converse with family, friends, or competing bowlers.

141.    In some markets, Bowlero has leveraged the dominance it acquired through its roll-ups to drastically reduce output altogether by closing an acquired facility, enabling Bowlero to raise prices at its remaining locations, shunting consumers to more distant, less desirable bowling centers, or inducing them to give up or scale back on one of their favorite activities for lack of availability.

142.    While reducing output and quality, and in lieu of any real innovation, Bowlero has implemented a constant stream of policies to rip off its customers, whether through gift cards that cannot actually be redeemed online, center-based "monetization" apps that push gambling on its customers, or its relentless and explicit upselling campaign to extract as many food and beverage dollars from its customers as possible.

143.    Bowlero can exercise its power in this harmful way because its anticompetitive scheme has successfully eliminated meaningful competitive restraints.

### A. Bowlero's Acquisitions Have Enabled It to Control High Shares of Concentrated Markets and Were Thus Presumptively Unlawful

144.    In virtually all of the relevant markets, Bowlero's anticompetitive conduct has substantially increased concentration levels and Bowlero's shares of these markets.

145.    For purposes of this complaint, Bowlero's share of a given relevant market is measured by dividing the number of lanes it operates by the total number of lanes in that market. Market analysts often highlight bowling center lane counts when assessing acquisitions. At the

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

31

same time, the share-of-lanes metric is a conservative measure of Bowlero's market shares, which likely underestimates the company's dominance. When shares are measured by revenues, Bowlero's shares are even higher given that it generally generates substantially larger revenues per visitor and per lane than its local, smaller competitors.

146.    The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2,000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2,000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

147.    The Department of Justice and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established case law and widely accepted economic research, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The Merger Guidelines—themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

148.    The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

- A merger that creates a firm with a market share of over 30% and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points.

149.    Supreme Court precedent separately establishes that a merger that results in a combined firm with a market share of 30% or more is also presumptively unlawful.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

150. The increase in market concentration caused by Bowlero's acquisitions is indicative of the mergers' negative impact on competition. In all but four of the relevant markets,[4] Bowlero's acquisition of one or more bowling centers in that market increased Bowlero's market share to at least an estimated 26% and in some cases to as high as an estimated 95%, and/or increased the HHI by at least approximately 100 points and in some cases by as much as over 4,000 points, and/or resulted in a post-merger HHI exceeding 1,800 and in some cases as high as an estimated 8,990.

151. In each of these relevant markets, Bowlero's acquisition of one or more bowling centers was presumptively unlawful either by achieving a combined market share of 30% or more, or by increasing the HHI by least 100 points to above 1,800. This is the case in each relevant market in which Bowlero made sequential acquisitions, irrespective of whether those acquisitions are evaluated in isolation or collectively.

152. For example, in 2023 with its acquisition of Lucky Strike, Bowlero acquired two Lucky Strike locations in Los Angeles, depicted in green on the map below: Lucky Strike Hollywood & Highland Park (in Hollywood), and Lucky Strike at L.A. Live (in downtown Los Angeles).

153. At the time, Bowlero already owned and operated Lucky Strike Los Angeles (near LAX airport), Lucky Strike Mar Vista, Bowlero Montebello (now Lucky Strike Montebello), and Bowlero Pasadena (now Lucky Strike Pasadena), among other centers in the Los Angeles-Long Beach-Anaheim, CA MSA, which are depicted in blue on the map below.

154. Based on publicly available information, Bowlero went from controlling an estimated 127 lanes across four locations, to controlling an estimated 157 lanes across six locations.

---

[4] The three exceptions are the relevant markets in the Reading, PA; Jacksonville, FL; and Wichita, KS MSAs, in which Bowlero acquired one or more locations from the same owner and did not previously operate in that market.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

33

155.    The remaining competitors in this area, depicted in black on the map below, are Shatto 39 Lanes, XLanes LA, Pinz Bowling Kitchen & Bar, Round1 Bowling & Arcade – Burbank, Back Alley Bowling – Glendale, Montrose Bowl, Highland Park Bowl, Alhambra Valley Bowl, and Action Lanes, which collectively offer an estimated 229 lanes.

156.    Bowlero's market share in this area therefore went from an estimated 33% to 41%, and the estimated HHI in this market went from 1,606 to 2,118—a more than 500-point increase.

157.    Bowlero's September 2023 acquisitions of Lucky Strike Hollywood & Highland Park and Lucky Strike at L.A. Live were presumptively illegal.



**Figure 1**

158.    Another example is The Villages, Florida. In 2022, Bowlero acquired Fiesta Bowl and Spanish Springs Lane from The Villages of Lake-Sumter, Inc., depicted in purple on the map below.

159.    At the time, Bowlero already owned and operated AMF Leesburg Lanes, Bowlero East Ocala, and Bowlero West Ocala in The Villages, FL MSA, which are depicted in blue on the map below.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

34

160. Based on publicly available information, Bowlero went from controlling an estimated 104 lanes across three locations, to controlling an estimated 168 lanes across five locations.

161. The remaining competitors in this area, depicted in black on the map below, are Adrenaline Rush Raceway and Parkview Lanes, which controlled a combined total of 34 lanes.

162. Bowlero's estimated market share in this area therefore went from 52% to 83%, and the estimated HHI in this market went from 3,808 to 7,071—a more than 3,200-point increase.

163. Bowlero's 2022 acquisitions of Fiesta Bowl and Spanish Spring Lanes were presumptively illegal.



**Figure 2**

164. A third example is in the Northern Virginia region of the greater D.C-Maryland-Virginia area. In its 2021 acquisition of Bowl America, Bowlero acquired eight Bowl America locations across Arlington, Alexandria, and Fairfax Counties, depicted in orange on the map below: Bowl America Dranesville, Bowl America Falls Church, Bowl America Shirley, Bowl

Class Action Complaint
Case No.

America Burke, Bowl America Woodbridge, Bowl America Chantilly, Bowl America Fairfax, and Bowl American Bull Run.

165.    At the time, Bowlero already owned and operated a Bowlero at Tysons Galleria (now Lucky Strike Tysons Corner), a Bowlero in Arlington (now Lucky Strike Arlington), Bowlero Annandale, Bowlero Dale City, and Bowlero Centreville (now Lucky Strike Centreville).

166.    Based on publicly available information, Bowlero went from controlling an estimated 180 lanes across five locations, to controlling an estimated 502 lanes across 13 locations.

167.    The remaining competitors in this area, depicted in black on the map below, are Punch Bowl Social and Uptown Alley, which controlled a combined total of 28 lanes.

168.    Bowlero's estimated market share in this area therefore went from 34% to 95%, and the estimated HHI in this market went from 4,866 to 8,992—a more than 4,100-point increase. Alternatively, excluding from the post-acquisition calculations Bowl America Chantilly, which was closed following Bowlero's acquisition of Bowl America, Bowlero's estimated market share in this area went from 34% to 95%, and the estimated HHI in this market went from 4,866 to 8,914—a more than 4,000-point increase.

169.    Bowlero's 2021 acquisitions of Bowl America Dranesville, Bowl America Falls Church, Bowl America Shirley, Bowl America Burke, Bowl America Woodbridge, Bowl America Chantilly, Bowl America Fairfax, and Bowl American Bull Run were presumptively illegal.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

36



**Figure 3**

170. Based on publicly available information, in relevant local markets comprised of bowling centers within approximately one hour's driving time of the acquired center(s) in the following MSAs, Bowlero's estimated market share and concentration levels in the market changed as follows:

- Los Angeles-Long Beach-Anaheim, CA MSA: As discussed in paragraphs 152-157, Bowlero's acquisitions of Lucky Strike Hollywood & Highland Park and Lucky Strike at L.A. Live resulted in Bowlero's market share increasing from an estimated 33% to 41% and the HHI increasing from an estimated 1,606 to 2,118—a more than 500-point increase. These acquisitions were thus presumptively illegal.

- San Francisco-Oakland-Fremont, CA MSA: Bowlero's acquisition of Lucky Strike San Francisco resulted in Bowlero's market share increasing from an estimated 38% to 49% and the HHI increasing from an estimated 2,098 to

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

37

2,951—a more than 800-point increase. This acquisition was thus presumptively illegal.

- Santa Rosa-Petaluma, CA MSA: Bowlero's acquisition of Double Decker Lanes resulted in Bowlero's market share increasing from an estimated 25% to 56% and the HHI increasing from an estimated 2,415 to 3,978—a 1,562-point increase. This acquisition was thus presumptively illegal.

- Sacramento-Roseville-Folsom, CA MSA: Bowlero's acquisition of Strikes Unlimited resulted in Bowlero's market share increasing from an estimated 29% to 45% and the HHI increasing from an estimated 1,647 to 2,596—a nearly 1,000-point increase. This acquisition was thus presumptively illegal.

- Seattle-Tacoma-Bellevue, WA MSA: Bowlero's acquisition of Lucky Strike Bellevue resulted in Bowlero's market share increasing from an estimated 36% to 42% and the HHI increasing from an estimated 2,020 to 2,440—a more than 400-point increase. This acquisition was thus presumptively illegal.

- Phoenix-Mesa-Chandler, AZ MSA: Bowlero's acquisition of Mavrix resulted in Bowlero's market share increasing from an estimated 65% to 67% and the HHI increasing from an estimated 4,322 to 4,640—a more than 300-point increase. This acquisition was thus presumptively illegal.

- Denver-Aurora-Centennial, CO MSA: Bowlero's acquisition of Lucky Strike Denver resulted in Bowlero's market share increasing from an estimated 62% to 64% and the HHI increasing from an estimated 4,112 to 4,310—a nearly 200-point increase. This acquisition was thus presumptively illegal.

- Omaha, NE-IA MSA: Bowlero's acquisitions of The Mark and Thunderbowl Lanes resulted in Bowlero obtaining an estimated 33% market share and the HHI increasing from an estimated 1,370 to 1,899—a more than 500-point increase. These acquisitions were thus presumptively illegal

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

38

- Appleton, WI MSA: Bowlero's acquisitions of Sabre Lanes and Super Bowl Family Entertainment Center resulted in Bowlero obtaining an estimated 32% market share and the HHI increasing from an estimated 1,051 to 1,555—a more than 500-point increase. These acquisitions were thus presumptively illegal

- Milwaukee-Waukesha, WI MSA: Bowlero's acquisition of JB's on 41 resulted in Bowlero's market share increasing from an estimated 31% to 40% and the HHI increasing from an estimated 1,319 to 1,880—a more than 500-point increase. This acquisition was thus presumptively illegal.

- Chicago-Naperville-Elgin, IL-IN MSA: Bowlero's acquisitions of Lucky Strike Chicago and Lucky Strike Wrigleyville resulted in Bowlero's market share increasing from an estimated 51% to 55% and the HHI increasing from an estimated 2,958 to 3,234—a nearly 300-point increase. These acquisitions were thus presumptively illegal.

- Grand Rapids-Wyoming-Kentwood, MI MSA: Bowlero's acquisitions of BAM! Entertainment Center and Spectrum Entertainment Complex resulted in Bowlero's market share increasing from an estimated 11% to 34%. These acquisitions were thus presumptively illegal.

- New York-Newark-Jersey City, NY-NJ MSA: Bowlero's acquisition of Lucky Strike West Nyack resulted in Bowlero's market share increasing from an estimated 36% to 41% and the HHI increasing from an estimated 1,963 to 2,312—a more than 300-point increase. Alternatively, excluding from the post-acquisition calculations Lucky Strike West Nyack, which Bowlero recently shuttered, Bowlero's market share increased from 36% to 37% and the HHI increased from 1,963 to 2,143—a 180-point increase. This acquisition was thus presumptively illegal.

- Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA: Bowlero's acquisitions of Limerick Bowl, The Big Event, and Lucky Strike Philadelphia resulted in

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

39

Bowlero's market share increasing from an estimated 31% to 48% and the HHI increasing from an estimated 1,342 to 2,568—a more than 1,000-point increase. These acquisitions were thus presumptively illegal. Bowlero's acquisitions of The Big Event and Lucky Strike Philadelphia on their own were also presumptively illegal, as Bowlero's market share increased from an estimated 39% to 48% and the HHI increased from an estimated 1,806 to 2,567—a nearly 800-point increase.

- Baltimore-Columbia-Towson, MD MSA: Bowlero's acquisition of Bowl America's Glen Burnie location resulted in Bowlero's market share increasing from an estimated 81% to 91% and the HHI increasing from an estimated 6,708 to 8,272—a more than 1,500-point increase. Alternatively, excluding from the post-acquisition calculations Bowl America Glen Burnie, which Bowlero closed after it acquired Bowl America, Bowlero's market share increased from an estimated 81% to 90% and the HHI increased from an estimated 6,708 to 8,101—a nearly 1,400-point increase. This acquisition was thus presumptively illegal.

- Washington-Arlington-Alexandria, DC-VA-MD-WV MSA:
    o As discussed in paragraphs 164-169, Bowlero's acquisitions of Bowl America Dranesville, Bowl America Falls Church, Bowl America Shirley, Bowl America Burke, Bowl America Woodbridge, Bowl America Chantilly, Bowl America Fairfax, and Bowl American Bull Run resulted in Bowlero's share of a Northern Virginia market within this MSA increasing from an estimated 34% to 95% and the HHI increasing from an estimated 4,866 to 8,992—a more than 4,100-point increase. These acquisitions were presumptively illegal.
    o In addition, Bowlero's acquisition of Lucky Strike Montgomery Mall was also presumptively illegal, as it resulted in Bowlero's share of a DC-centric market within this MSA increasing from an estimated 78% to 81% and the HHI increasing from an estimated 6,216 to 6,795—a nearly 600-

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

40

point increase. Bowlero subsequently closed the Lucky Strike Montgomery Mall location, reducing output in the market and leaving concentration levels still high at an estimated HHI of 6,692.

- Richmond, VA MSA: Bowlero's acquisitions of Bowl America Southwest, Bowl America Short Pump, Bowl America Eastern, and Bowl America Midlothian resulted in Bowlero's market share increasing from an estimated 32% to 67% and the HHI increasing from an estimated 2,484 to 4,749—a more than 2,000-point increase. These acquisitions were thus presumptively illegal.

- Charlotte-Concord-Gastonia, NC-SC MSA: Bowlero's acquisition of 10 Park Lanes resulted in Bowlero's market share increasing from an estimated 57% to 69% and the HHI increasing from an estimated 3,740 to 5,082—a more than 1,300-point increase. This acquisition was thus presumptively illegal.

- Wildwood-The Villages, FL MSA: As discussed in paragraphs 158-163, Bowlero's acquisitions of Fiesta Bowl and Spanish Spring Lanes resulted in Bowlero's market share increasing from an estimated 52% to 83% and the estimated HHI increasing from an estimated 3,808 to 7,071—a more than 3,200-point increase. These acquisitions were thus presumptively illegal.

- Cape Coral-Fort Myers, FL MSA: Bowlero's acquisitions of Bowland Cape Coral and Headpinz Cape Coral resulted in Bowlero obtaining an estimated 83% market share and the HHI increasing from an estimated 2,945 to 3,757—a more than 800-point increase. This acquisition was thus presumptively illegal.

### B. *Bowlero's Unlawful Acquisitions Otherwise Have Substantially Lessened or May Substantially Lessen Competition or Tend to Create a Monopoly*

171.    On top of enabling Bowlero to control high shares of concentrated markets, Bowlero's consolidation scheme has substantially lessened competition and tended to create a monopoly in the relevant markets in several ways.

Class Action Complaint
Case No.

172.   *First*, the acquisitions eliminated substantial competition between firms previously competing head-to-head to offer the same products, which has led to higher prices and lower quality for consumers in these markets.

173.   For example, prior to acquiring Bowl America, Bowlero and Bowl America competed directly for bowling customers in the Northern Virginia region within the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA. Likewise, prior to acquiring Lucky Strike, Bowlero and Lucky Strike often competed directly against each other.

174.   Bowlero's acquisitions in the relevant markets in the following MSAs eliminated substantial head-to-head competition because they occurred in relevant markets in which Bowlero previously operated one or more centers and purchased one or more rival centers, or Bowlero purchased two or more centers that did not previously share the same owner: Los Angeles-Long Beach-Anaheim, CA MSA; San Francisco-Oakland-Fremont, CA MSA; Santa Rosa-Petaluma, CA MSA; Sacramento-Roseville-Arden-Arcade, CA MSA; Seattle-Tacoma-Bellevue, WA MSA; Phoenix-Mesa-Scottsdale, AZ MSA; Denver-Aurora-Centennial, CO MSA; Omaha, NE-IA MSA; Appleton, WI MSA; Milwaukee-Waukesha, WI MSA; Chicago-Naperville-Elgin, IL-IN-WI MSA; Grand Rapids-Wyoming-Kentwood, MI MSA; New York-Newark-White Plains, NY-NJ MSA; Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA; Baltimore-Columbia-Towson, MD MSA; Washington-Arlington-Alexandria, DC-VA-MD-WV MSA; Richmond, VA MSA; Charlotte-Concord-Gastonia, NC-SC MSA; and Wildwood-The Villages, FL MSA. The reduction in competition left consumers in these markets facing higher prices that they generally could not avoid if they wanted to continue to bowl.

175.   As another example, prices at both Lucky Strike Philadelphia and Bowlero competitors in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA rose within a year of Bowlero's acquisition of Lucky Strike Philadelphia in that market.

176.   A further anticompetitive effect of the elimination of this head-to-head competition has been that Bowlero has shuttered numerous locations it acquired.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

42

177.    Bowlero White Plains used to compete with Lucky Strike West Nyack, a 20-minute drive across the Hudson River via Route 287. After Bowlero acquired Lucky Strike's 14 locations in September 2023, it promptly closed the Lucky Strike West Nyack location, leaving Bowlero White Plains as the only viable alternative for many bowlers in the area. Lucky Strike operated the West Nyack location profitably since its opening in 2007 before Bowlero shut it down. The closure of this location therefore cannot be justified by insufficient demand for two locations in this close proximity. Bowlero shut down Lucky Strike Nyack for one reason: it enabled Bowlero to force consumers in the area to Bowlero White Plains, where it could charge them much more than it could when it was competing with this strong rival with a powerful brand 20 minutes away.

178.    The same story has played out in multiple other markets over the last four years.

179.    In Richmond, Virginia, Bowlero acquired four Bowl America locations and promptly closed two of them, funneling customers to the three preexisting Bowlero locations in the region or the remaining two Bowl America locations, where it was able to increase prices.

180.    In Fairfax, Virginia, Bowlero was already operating Bowlero Centreville, which was roughly equidistant from both Bowl America Chantilly (to the northeast) and Bowl America Bull Run (to the southwest), when it acquired these two Bowl America locations. Less than a year later, it closed Bowl America Chantilly, thereby capturing and diverting nearly all of its preexisting customer base to Bowlero Centreville, where those customers now pay significantly higher prices for a worse experience.

181.    In a competitive market, customers would have turned to competitors in the face of Bowlero's heightened prices and onslaught of upselling tactics. Yet, as one Bowlero executive noted, "the consumer is not pushing back on our price movements." This is because Bowlero has acquired so much market dominance, and so reduced output, that consumers have been left with few reasonable alternatives at competitive prices.

182.    *Second*, Bowlero's acquisitions have enabled it to use its unlawfully acquired buyer power to extract concessions from suppliers not otherwise available to competitors. The

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

43

larger Bowlero gets, the better deals it obtains from suppliers like Sysco Foods (food and beverage), QubicaAMF (bowling balls), and Kegel (lane oil). Indeed, this is one of Bowlero's self-proclaimed reasons for its acquisition spree. As CFO Bobby Lavan put it, Bowlero is now able to "use our scale to drive procurement synergies."

183. Bowlero has in turn deployed the massive savings it has unlawfully extracted from suppliers not to lower prices for consumers or to invest in real improvements in its bowling centers, but to drown out any marketing efforts of its rivals with massive advertising campaigns and "partnerships." Bowlero's nationwide scale provides a significant unlawfully acquired advantage over local independent rivals, as it can invest in a single national marketing campaign benefitting all of its hundreds of centers.

184. It is these unfair advantages, combined with Bowlero's unlawfully acquired market power, that have enabled Bowlero to squeeze both suppliers and customers and—as it has claimed—to increase operating margins on acquired centers from an average of approximately 20% to 40% or higher within only 120 days following an acquisition.

185. Indeed, with its acquisition and control of the PBA—which, as one executive put it, created "huge synergies between the center business and the television product"—Bowlero ensures that every single American who streams a bowling tournament or event is bombarded with its brands' logos and ads, as well as marketing pitches for its bowling centers.

186. By flooding potential customers with Bowlero advertising, Bowlero primes them to default to a Bowlero location. Consumers today see very little advertising or information about any other bowling center besides Bowlero's. Thus, Bowlero's extraction of discriminatorily favorable terms translates directly to harm to its rivals, creates substantial barriers to entry and expansion, and consequently harms bowlers and competition.

187. As the foregoing alleged facts make clear, the larger scale on which Bowlero operates and acquires inputs does not generate any cognizable efficiencies and does not benefit bowlers or competition. Bowlero has not taken the concessions it extracts from suppliers due to its size and passed them through to consumers in the form of lower prices, or used them to invest

Class Action Complaint
Case No.

in quality improvements or innovation in its centers. Rather, Bowlero has weaponized these special advantages to unfairly keep its competitors at bay, increase consumer prices, and fund its market-extension strategy into markets adjacent to bowling.

188.    **Third**, Bowlero's acquisitions have enabled Bowlero to extend its national dominance to the specific local markets in which it has acquired rival centers, including those in which Bowlero did not previously have a presence.

189.    For instance, even before its acquisition of Lucky Strike, Bowlero was a dominant force in bowling across the country. It was the largest operator of bowling alleys and operated more than eight times as many centers as its closest rival. Indeed, at the time, financial analysts observed that "Bowlero already generates the highest EBITDA [earnings before interest, taxes, depreciation, and amortization] margins of the live entertainment peer group." Bowlero's ability, on the heels of its roll-ups of numerous independent centers and key rivals like Bowl America, to capture margins unavailable to firms in comparable markets untainted by Bowlero's roll-up scheme demonstrates just how dominant Bowlero's market position was even before the Lucky Strike acquisition.

190.    Acquiring Lucky Strike further entrenched Bowlero's dominance, by, among things, reinforcing and supplementing the key sources of that dominance such as overall size, scale, and customer base, buying power in relation to key bowling, food, and beverage inputs, advertising capabilities, and most importantly brand recognition. Instead of passing on any savings to its customers, Bowlero raised prices: in fact, in December 2023, just two to three months after closing the Lucky Strike deal, Bowlero "identif[ied] pricing opportunities across certain centers" and "took an average price increase of 2%." With those price increases in place, Bowlero realized an immediate 50% increase in profitability at Lucky Strike locations in the first quarter of 2024 (the first full quarter under Bowlero's control) as compared with the first quarter of 2023 under former Lucky Strike management.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

45

191.    Over and over, Bowlero's acquisitions in relevant markets have allowed it to translate its national dominance into local market power and the creation of anticompetitive effects.

192.    For example, in August 2021, Bowlero completed its acquisition of three Bowl America centers in Jacksonville, Florida: Bowl America Southside, Bowl America Mandarin, and Bowl America Orange Park. Bowl America was already dominant in Jacksonville, holding an over 30% share of the market. The entry of Bowlero—a bowling center powerhouse on a national scale, with shares approaching monopoly levels in several markets throughout the United States—replacing the smaller but still dominant Bowl America substantially reduced the competitive structure of the market by raising entry barriers and by dissuading the remaining centers from aggressively competing.

193.    The acquisition raised entry barriers because a major competitive weapon in the successful marketing of bowling is—as Bowlero is the first to emphasize—advertising. As one Bowlero executive put it, "the market opportunity right now really affords us an ability to gobble up a lot of market share with increased brand building and awareness marketing."

194.    Whereas Bowl America was limited in its advertising budget with a national footprint of only 17 centers and pre-pandemic annual revenues of around $24 million, Bowlero swooped in with a national footprint of roughly 320 centers at the time, annual revenues of more than $300 million, and a slush fund of favorable extracted concessions from suppliers and exclusive access to marketing opportunities through its ownership of the PBA.

195.    Any would-be entrants (or incumbents thinking of expanding) in this market understood that if they dared try, Bowlero could and likely would deploy its advertising war chest to block the rival's efforts to introduce competition. Thus, moving forward a would-be entrant into the market would be more reluctant to challenge Bowlero than it would have been facing the smaller Bowl America.

196.    Similarly, following the acquisitions, existing rivals are all the more disciplined, knowing if they dare start a price war with Bowlero, the company can and likely will retaliate

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

aggressively. As a result, the market became substantially more oligopolistic, with prices rising across the board, at the former Bowl America and independent centers alike—precisely what Bowlero envisioned and caused.

197.    This pattern repeated itself in every single relevant market in which Bowlero acquired rivals but did not have a preexisting presence.

198.    For example, in May 2022, Bowlero extended its national dominance to Wichita, Kansas by entering this market through the acquisition of three commonly owned centers in one fell swoop. These three centers already controlled an approximately 54% share of the market. Overnight, they fell into the hands of Bowlero, which began to use its war chest of advertising dollars to out-promote its rivals in this market. Bowlero's rivals heard the message loud and clear: Don't dare to run your own competitive advertising campaigns, and don't dare to start a price war. As discussed more fully below, prices in Wichita rose dramatically following these acquisitions, and many longtime league bowlers simply quit the sport.

199.    This pattern repeated itself in the Reading, PA and Jacksonville, FL MSAs. Not surprisingly, based on publicly available information, no new entrants have entered these markets since Bowlero's respective acquisitions in each of them.

200.    And Bowlero is just getting started in terms of wielding what it calls its "marketing muscle" by combining the brand recognition of Lucky Strike with Bowlero's scale. In fact, Bowlero itself has explained that rebranding all of its centers in given regions to Lucky Strike will allow it to more effectively amortize marketing spend across not only centers in that region but also across the country.

201.    As CEO Thomas Shannon put it, having over 200 locations will make Lucky Strike a "very, very powerful brand," and will allow Bowlero to invest in a "serious marketing effort . . . that's never occurred before." That is why Bowlero has recently focused "very heavily [on its] . . . marketing investment," including increasing, on a year-over-year basis between 2024 and 2025, its marketing investment by $4 million and its marketing team investment by $1

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

47

million—investments which translated into increased media impressions, online revenue, and booking conversions.

202. **_Fourth_**, Bowlero was able to further entrench its dominance, lessen competition, and increase barriers to entry through its unlawful acquisition of the PBA, the nation's premier professional bowling league.

203. By acquiring the PBA, Bowlero has been able to significantly integrate the marketing and other business activities of the two companies. Indeed, Bowlero recently appointed an individual to serve simultaneously as Chief Executive Officer of the PBA and Bowlero's Head of Media, and describes Bowlero's bowling centers as a "physical extension" of the PBA.

204. Bowlero can cross-promote its centers to the millions of PBA Tour television viewers, send PBA Tour stars to its centers, and provide exclusive PBA content and promotions on its thousands of video screens across its hundreds of bowling centers.

205. As one market analyst noted, Bowlero acquired the PBA "to take advantage of the brand awareness this could drive for Bowlero and the opportunity to leverage the 20M+ viewers who annually catch the sport on FS1 or Fox networks." Bowlero President Lev Esker confirmed that the company shared this analyst's viewpoint, noting simply that "pushing content on the [PBA] telecast . . . increases the awareness of our centers." In fact, the advertising opportunity afforded to Bowlero through its acquisition of PBA was so great that Bowlero was able to almost immediately decrease its planned marketing spend by roughly $10 million annually—explaining why CEO Thomas Shannon has suggested his interest in acquiring the PBA in the first place was, among things, to serve "as an infomercial" for the Bowlero brand.

206. At the same time, Bowlero can host PBA tournaments at its own centers for free while charging rivals tens of thousands of dollars to host tournaments. Furthermore, Bowlero has superior access to LeaguePals, the PBA's exclusive provider of cloud-based bowling league management software, allowing Bowlero to automatically enroll its own league bowlers into the PBA League Bowler Certification program at no cost, which qualifies bowlers for PBA-

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

48

approved tournaments and other perks not available to U.S. Bowling Congress members, including "real time scores," "instant recognition through LeaguePals through unique initial rewards," and "[m]ore robust National Tournaments with a superior prize fund structure and TV exposure." As Bowlero put it to investors, owning the PBA "reinforces" its business model.

207.    Moreover, the PBA is a vital business partner for many rival bowling centers. As the PBA itself notes to prospective PBA tournament hosts, hosting a PBA tournament can allow a bowling center to "[b]uild a strong reputation within the Bowling Community and drive increased traffic and visibility," bring in hundreds of bowlers, staff, and a TV crew into a center's market, and gain access to digital marketing opportunities through the PBA's website, social media channels, and television broadcast deals.

208.    Bowlero's acquisition of, and assumption of control over, the PBA has altered the bowling center market structure to disadvantage competitors in each of the relevant geographic markets, who know they must stay in Bowlero's good graces so as not to jeopardize their ability to partner with the PBA. In this sense, Bowlero's outsized dominance in the market, and supercharged buying power, make competitors hesitant to compete aggressively.

209.    Bowlero need not even exercise its power—by, for instance, acquiring a bowling center near a competitor or outspending them on advertising—because competitors' knowledge that Bowlero has the market power and capital to do those things is threatening enough to keep competitors in check. All the while, Bowlero is taking a cut of the $35,000 minimum fee these competitor centers have to pay the PBA to host a PBA Tour event in order to remain relevant and competitive in the eyes of local league bowlers.

### C. There is Direct Evidence that Bowlero Has Used Its Unlawfully-Acquired Dominance to Harm Customers

210.    Bowlero's unlawfully acquired dominance has allowed the company to reduce output, impose supra-competitive prices, and worsen product quality with impunity. As one Bowlero executive put it in 2022, even before the Lucky Strike acquisition, "[w]e're raising price on everything."

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

49

211.    Consumers in all the alleged markets have paid higher prices as a result of Bowlero's unlawful acquisitions. For example, following Bowlero's acquisition of three independent bowling centers in Wichita in 2022, Bowlero implemented huge price hikes after taking over all three centers. Some reports indicate that, a year after Bowlero acquired Northrock Lanes, the cost of lanes, food, and beverages had tripled at this bowling center. Another former Northrock Lanes bowler noted that, pre-acquisition, one could bowl five or six games in an hour for $10, whereas after Bowlero took over, it would cost $16-17 to play three games during the week and $22 on the weekend. A former Northrock Lanes league bowler explained that after taking over, Bowlero got rid of league play on Fridays altogether to increase lane space for higher-paying casual bowlers and subsequently increased the league play price so much that eight league teams quit in the first week (all the while doubling the cost of a pitcher of beer from $8 to $16).

212.    As another example, at Garage Billiards & Bowl, an independent bowling center in Seattle acquired by Bowlero, one bowler seeking to reserve two hours of bowling for three people in 2023 had to pay $284.36: $172.00 for reserving a lane for two hours; $20.06 for three shoe rentals; $75.00 for a food and beverage mandatory credit; and a $17.29 "event fee."

213.    Another online commentor observed that Bowlero acquires a "really nice bowling alley with affordable prices and good deals" and then "immediately raise[s] prices, [] stop[s] doing lane maintenance, and barely oil[s] lanes anymore." This consumer lamented these changes because the acquisition meant there were no other bowling alley options in the area.

214.    With even more bowling centers at its disposal after the Lucky Strike acquisition, Bowlero was determined to continue to raise prices in every way it could. Bowlero even brought on a specialized in-house price consultant to "look[] at pricing by hour, by date, by center, by products" and to take advantage of all the "opportunity to be dynamic that the consumer will just spend more . . . ."

215.    "Dynamic" pricing refers to the practice of using artificial intelligence algorithms to manipulate prices in real-time based on different data inputs, in order to extract the maximum

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

price a consumer will be willing to endure as opposed to having a fixed and transparent set of consumer prices. The inputs used to algorithmically exploit consumers vary and can include time of day, competitor pricing, and external factors like weather or major events.

216.    For example, a two-pronged strategy that Bowlero employed to raise prices was to artificially drive consumer traffic to Fridays and Saturdays and then implement dynamic pricing to extract as much money from consumers during those high-demand times as possible. As Bowlero President Lee Ekster put it, "[o]ur goal is to fill the centers on the weekends at the highest price we can" and "ultimately dynamic pricing allows you to do that."

217.    As part of this strategy Bowlero got rid of popular, family-focused offerings like Summer Games and midweek, fixed-price "All You Can Bowl" specials with the explicit aim to "dr[ive] wallet share pickup in our premium times of Friday and Saturday." The company has also focused on these times in its marketing, including introducing its #Saturdays4Bowling marketing campaign.

218.    Once driven to these "premium times," families faced astronomical prices. For example, the *Wall Street Journal* reported on a family of three hoping to bowl at a Bowlero in California on the last Thursday of December 2025 who received a price quote on Bowlero's website of $418.90—a price that one member of the family described as "outrageous for a pedestrian family activity." Because Bowlero's algorithm knew its centers would see more demand during the winter holidays, that price was more than double what the Bowlero location would charge for a Thursday afternoon in February.

219.    Another strategy Bowlero has employed is to make sure centers adopt a monomaniacal focus on upselling its bowling customers on food and beverages. As one executive put it, Bowlero's market dominance translated directly into it having the "best mousetrap" in the business—use bowling to get people in the door and then maximize food and beverage profit.

220.    Bowlero's upselling campaign is intricate and multi-faceted. As the company indicated to investors, it implemented "revamped menus," a renewed "focus on food and

Class Action Complaint
Case No.

beverage sales," and "mobile ordering [and] tablets," to "drive the needle on 'attachments'"—meaning non-Bowling offerings like food, beverage, and arcade games.

221.    Consumers cannot avoid Bowlero's relentless upsell campaign. As just one example, whereas Bowlero presents its signature "pizza and pitcher" special as a good deal to customers, when speaking with its Wall Street investors the company is clear about why the special makes sense financially: "there'll be an upsell on the beer." Tying in with its campaign to push consumers to weekends, the company takes particular advantage of the "opportunities" to "upsell . . . on the weekends," on top of already-increased prices due to its dynamic pricing algorithm. And, at least at some of its centers, Bowlero now charges a mandatory food and beverage credit for anyone reserving a bowling lane during a "prime" time—even if those customers just want to bowl.

222.    Bowlero's upsell campaign has been very effective in extracting margins at the expense of consumers. For example, the company announced in its Q1 2025 earnings call that its food and beverage sales were up 18% year-over-year in the quarter and that the ratio of food and beverage spend to bowling spend—a key metric for Bowlero that analyzes how many dollars customers spend on food and beverage per dollar spent on bowling—was up to $.80 across the company and as high as $1.10 in locations that instituted the company's new "premium plus" menu.

223.    Bowlero has been able to accomplish such upselling and price increases due to the dominance it amassed through its unlawful acquisitions, which has also enabled it to dramatically reduce the quality of the bowling experience in the local markets in which it operates with no repercussions.

224.    For instance, Bowlero has drastically slashed what it considers to be its "least profitable operating hours" during the week in order to push consumers towards weekend play when those consumers tend to pay more. For example, before Bowlero's acquisition of Lucky Strike, a bowler in Los Angeles could bowl at Lucky Strike L.A. Live beginning at 11:30 a.m.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

52

each weekday. Today, by contrast, Bowlero does not open Lucky Strike L.A. Live's doors until 4:00 p.m. each weekday. Bowlero has deliberately limited output and increased prices.

225.    League play has been impacted as well: when Bowlero takes over a center, league bowlers suffer. For example, leagues have been rescheduled away from Friday and Saturday nights as part of Bowlero's dynamic pricing and upsell strategy. The result is that longtime league bowlers are either forced to pay more (for worse quality of bowling) or simply abandon their league play. And, when they do play, they must contend with the fact that Bowlero has put large screens at the end of lanes playing loud music videos or displaying sports betting content, or otherwise employed black lights, neon "glow" lighting, and loud music making it difficult to concentrate on bowling (let alone hold a conversation with one's teammates).

226.    This helps explain why Northrock Lanes in Wichita had about 1,000 distinct league bowlers before Bowlero took over as compared with about 400 today. And, because of Bowlero's dominance in the Wichita region, a vast majority of these league bowlers simply stopped bowling altogether. It thus comes as no surprise that Northrock Lanes won "Gold" in local "Best of Wichita" consumer rankings in the bowling category every year but one from 2016 to 2022—the year Bowlero took over—and has not won "Gold" since.

227.    While consistently raising prices for its consumers, Bowlero has sought to ruthlessly cut back its own costs at every turn. These cuts often target center personnel who served important purposes to maintain the quality of the bowling experience. This includes Bowlero's failure to consistently and adequately condition and maintain its bowling lanes. As discussed in paragraph 44, proper lane conditioning is of the utmost importance for bowling quality as it protects and preserves the lane surface, controls ball motion and reaction, and creates consistency and fairness for bowlers. Lack of such conditioning can mean badly deteriorated lanes, unpredictable rolling patterns, and dirt combining with lane oil to form a sticky mixture on the bowling ball. Bowlero customers in many bowling centers have reported sticky or dirty lanes, indicating a failure on the part of Bowlero to properly maintain them.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

53

228.    As another example, Bowlero touted to its investors the cost saving it saw from getting rid of both security and maintenance staff at its centers. These changes might save Bowlero money and make Wall Street investors happy, but they further degrade the bowling experience for consumers, by making the centers less safe and service worse.

229.    One online report indicates that after removing security on weekends at one acquired location in Wichita, Bowlero staff had to call the police to deal with repeat trespassers.

230.    Customers now also face increased wait times for oft-broken equipment to get fixed. Simultaneously, remaining employees are left overwhelmed and unable to perform the job as they would like. One example of this dynamic is reflected in finding of the U.S. Equal Employment Opportunity Commission which has recently issued determinations of probable cause as to 55 charges of age discrimination lodged against Bowlero.

231.    Bowlero does not just decrease the quality of bowling at its centers, but it also makes the broader consumer experience worse.

232.    One example is Lucky Strike gift cards, which Bowlero introduced after its acquisition of Lucky Strike and appear prominently on gift card racks at Costco and other retail stores. Bowlero fails to disclose that the recipient cannot use the gift card to reserve a lane ahead of time at the Lucky Strike of their choice; instead they are forced to reserve the lane and pay ahead of time with a credit or debit card, or alternatively show up at the location when they want to bowl and hope there is a lane available (which will often not be the case on "prime" weekend times). A supplier in a competitive market would not get away with such tactics; consumers would catch on and go elsewhere for bowling gift cards. Bowlero is a behemoth in virtually every major city and town in America, and it can do what it wants, without a meaningful impact on the company's bottom line.

233.    And while Bowlero *says* it is innovating with "enhancements" like on-demand menus at each lane and apps that allow consumers to turn bowling into gambling, these changes are drawn straight from Wall Street analysts' reports about how the company can extract even more profit from its customers.

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

54

234. As one report put it, "installing and boosting usage of lane-side ordering kiosks" and "rolling out [Bowlero's in-house gambling app] MoneyBowl availability throughout the network" provide "opportunities to boost . . overall spending levels per guest." It is plain as day that this is not innovation; it is rent extraction designed to keep customers in the "mousetrap" through constant prompts to spend more at every turn.

235. The elevation of gambling across the Bowlero network is an especially concerning vector. For instance, Bowlero launched its MoneyBowl app in 2022. MoneyBowl solicits bets from customers on various bowling outcomes (e.g., bowl a certain score) and provides odds-based payouts or, in states in which gambling laws prohibit such activity, coupons to be redeemed within the Bowlero center. Bowlero estimated to market analysts that successful implementation of MoneyBowl would increase games played by customers. And, because MoneyBowl is linked to each lane's scoring system, it is constantly tracking customers and providing what one market report called "an attractive opportunity to learn more about the customer." At the same time, Bowlero entered a partnership with sports betting marketing company BettorView to inundate the many large TV screens at Bowlero locations with customized sports betting data and special sports betting promotions, further promote region-specific partnerships Bowlero has with other sportsbook brands, and further promote Bowlero's food and beverage offerings.

236. Consumers want more, higher-quality bowling at a low cost; Bowlero worsens the experience of bowling while also flooding them with casino-style "monetization opportunities."

### D. Bowlero's Unlawful Acquisitions Have Directly Enabled and Caused Bowlero's Competitors to Raise Prices and Worsen Terms to Consumers

237. The lessening of competition resulting from Bowlero's acquisitions have also led to increased prices for bowling at bowling centers not acquired by Bowlero. Having seen Bowlero establishments charging higher prices and facing less price-competition overall, independent bowling centers have raised their own prices for bowling, causing families and

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

bowling leagues to pay more for bowling even if they are able to find alternatives to Bowlero in their attempts to avoid Bowlero's price increases.

238.    For example, within less than a year of Bowlero's acquisition of Lucky Strike Philadelphia, which has substantially concentrated the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA market, multiple Bowlero competitors raised prices for both bowling and shoe rentals (including by reducing the maximum number of bowlers per lane). Similarly, Bowlero competitors in Wichita, KS raised prices on both bowling and beverages within a year of Bowlero's acquisition in that MSA.

239.    That non-Bowlero bowling centers would draft off Bowlero's conduct and raise prices of their own comes as no surprise. Indeed, it was reasonably foreseeable to Bowlero that, by rolling up these various markets, reducing output, and increasing its own prices, other bowling centers would increase prices as a result, as any price competition had been eliminated.

## V. Class Action Allegations

240.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of all others similarly situated, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Injunction Class"):

> All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a bowling center operator in the United States.

241.    Plaintiffs Mr. Doehr, Mr. Soliz, Mr. Feuer, Mr. K. Howard, Mr. A. Howard, Mr. McDonald, Mr. Harkness, Mr. Kramer, Mr. Kelly, and Mr. Goodman bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of all others similarly situated, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Injunction Bowlero Purchaser Subclass"):

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

56

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from Defendant or any current or former subsidiary of Defendant in the United States.

242.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary relief including damages and/or restitution on behalf of the following class (the "Nationwide Damages Class"):

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a bowling center operator in any of the relevant markets.

243.    Plaintiffs Mr. Doehr, Mr. Soliz, Mr. Feuer, Mr. K. Howard, Mr. A. Howard, Mr. McDonald, Mr. Harkness, Mr. Kramer, Mr. Kelly, and Mr. Goodman bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary relief and damages and/or restitution on behalf of the following class (the "Nationwide Bowlero Purchaser Damages Class"):

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from Defendants or any current or former subsidiary of Defendants in any of the relevant markets; and

Plaintiffs Mr. Doehr, Mr. Soliz, Mr. Feuer, Mr. K. Howard, Mr. A. Howard, Mr. Cordero, Mr. McDonald, Mr. Harkness, Mr. Kramer, Mr. Kelly and Mr. Goodman bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all others similarly situated, seeking monetary relief including damages and/or restitution on behalf of the following class (the "Nationwide Umbrella Damages Class"):

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling in any of the relevant markets from any bowling center operator other than Defendants and any current or former subsidiary of Defendants.

244.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all others similarly

Class Action Complaint
Case No.

situated, seeking damages and/or restitution on behalf of the following classes (the "Regional Classes"):

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Los Angeles–Long Beach–Anaheim, CA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the San Francisco-Oakland-Fremont, CA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Santa Rose-Petaluma, CA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Sacramento-Roseville-Folson, CA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Seattle-Tacoma-Bellevue, WA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Phoenix-Mesa-Chandler, AZ MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Denver-Aurora-Centennial, CO MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Wichita, KS MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Omaha, NE-IA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Appleton, WI MSA.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

58

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Milwaukee-Waukesha, WI MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Chicago-Naperville-Elgin, IL-IN-WI MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Grand Rapids-Wyoming-Kentwood, MI MSA.

All persons or entities who, during the period from and including May 6, until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the New York-Newark-Jersey City, NY-NJ MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Reading, PA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Baltimore-Columbia-Towson, MD MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Richmond, VA MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Charlotte-Concord-Gastonia, NC-SC MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Jacksonville, FL MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Wildwood-The Villages, FL MSA.

All persons or entities who, during the period from and including May 6, 2022 until the present, purchased bowling from a Defendant or any current or former subsidiary of a Defendant at a bowling center located in the Cape Coral-Fort Myers, FL MSA.

245.    The Nationwide Classes are referred to herein as the "Nationwide Classes." The Regional Classes are referred to herein as the "Regional Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities, any person who has signed a valid arbitration agreement with Bowlero, the Court and Court personnel, and all counsel of record.

246.    The Classes are so numerous as to make joinder impracticable. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

247.    Common questions of law and fact exist as to all members of the Classes. Such questions of law and fact common to the Classes include:

a.    Whether Bowlero engaged in unlawful acquisitions in the relevant markets.

b.    Whether bowling centers are the relevant product market at issue.

c.    The identity of the relevant geographic markets.

d.    Bowlero's pre- and post-acquisition share of each relevant market.

e.    The concentration level or HHI of each relevant market before and after Bowlero's acquisition(s) in such market.

f.    Whether Bowlero is a dominant bowling industry participant at the national level.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

60

g.  Whether Bowlero's Acquisitions have substantially lessened competition or tended to create a monopoly or may substantially lessen competition or tend to create a monopoly.

h.  Whether Plaintiffs are entitled to a presumption that Bowlero's Acquisitions have substantially lessened competition or tended to create a monopoly or may substantially lessen competition or tend to create a monopoly.

i.  Whether Bowlero's Acquisitions caused prices to increase or quality or output to decrease in the relevant markets.

j.  Whether Bowlero receives discriminatorily favorable treatment from national suppliers of bowling center inputs.

k.  Whether Bowlero uses its bowling center business to cross-market or cross-subsidize its other businesses and vice versa.

l.  Whether Bowlero violated Clayton Act Section 7.

m.  Whether Bowlero violated Sherman Act Section 2.

n.  For each Regional Class, whether Bowlero violated the applicable state law.

o.  The appropriate injunctive and related equitable relief; and

p.  The appropriate measure of classwide damages.

248.  Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they suffered damage in the form of paying supra-competitive prices to bowl at bowling centers, and/or face the threat of damage in the form of paying supra-competitive prices to bowl at bowling centers.

249.  Plaintiffs' claims arise out of the same course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust litigation and class action litigation.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

61

250.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

251.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

252.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## VIOLATIONS ALLEGED

### COUNT ONE

*Violations of Clayton Act § 7, 15 U.S.C. § 18, by Plaintiffs on Behalf of All Classes Against Defendants Lucky Strike Entertainment Corporation and AMF Bowling Centers, Inc.*

253.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

254.    Between 2021 and 2024, Bowlero made the Acquisitions in the relevant bowling center markets identified in paragraphs 97 through 121.

255.    Specifically, Bowlero made the Los Angeles Acquisitions; the San Francisco Acquisition; the CA Wine Country Acquisition; the Sacramento Acquisition; the Seattle Acquisition; the Phoenix Acquisition; the Denver Acquisition; the Wichita Acquisitions; the Omaha Acquisitions; the Appleton Acquisitions; the Milwaukee Acquisition; the Chicago Acquisitions; the Grand Rapids Acquisitions; the New York Acquisition; the Philadelphia

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

Acquisitions; the Reading Acquisitions; the Baltimore Acquisition; the DMV Acquisitions; the Richmond Acquisitions; the Charlotte Acquisitions; the Jacksonville Acquisitions; the Villages Acquisitions; and the Cape Coral Acquisitions.

256. The effects of Bowlero's Acquisitions may be to substantially lessen competition or to tend to create a monopoly—in fact, Bowlero's Acquisitions have already substantially lessened competition and tended to create a monopoly—in the relevant geographic markets for bowling centers. Specifically:

- The Los Angeles Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Los Angeles-Long Beach-Anaheim, CA MSA;

- The San Francisco Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the San Francisco-Oakland-Fremont, CA MSA;

- The CA Wine Country Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Santa Rosa-Petaluma, CA MSA;

- The Sacramento Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Sacramento-Roseville-Folsom, CA MSA;

- The Seattle Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Seattle-Tacoma-Bellevue, WA MSA;

- The Phoenix Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Phoenix-Mesa-Chandler, AZ MSA;

- The Denver Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Denver-Aurora-Centennial, CO MSA;

- The Wichita Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Wichita, KS MSA;

- The Omaha Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Omaha, NE-IA MSA;

- The Appleton Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Appleton, WI MSA;

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

63

- The Milwaukee Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Milwaukee-Waukesha, WI MSA;

- The Chicago Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Chicago-Naperville-Elgin, IL-IN MSA;

- The Grand Rapids Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Grand Rapids-Wyoming-Kentwood, MI MSA;

- The New York Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the New York-Newark-Jersey City MSA;

- The Philadelphia Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA;

- The Reading Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Reading, PA MSA;

- The Baltimore Acquisition substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Baltimore-Columbia-Towson, MD MSA;

- The DMV Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA;

- The Richmond Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Richmond, VA MSA;

- The Charlotte Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Charlotte-Concord-Gastonia, NC-SC MSA;

- The Jacksonville Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Jacksonville, FL MSA;

- The Villages Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Wildwood-The Villages, FL MSA; and

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

64

- The Cape Coral Acquisitions substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Cape Coral-Fort Myers, FL MSA.

257. Bowlero cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that the Acquisitions are lawful.

258. Each Acquisition or group of Acquisitions in each MSA violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

259. Each Acquisition or group of Acquisitions also accelerated the trend toward concentration in the industry.

260. Plaintiffs were directly injured as a result of Bowlero's violations of Clayton Act Section 7, and the harm to competition caused by those violations.

261. As a result of Bowlero's violations of Clayton Act Section 7, and the harm to competition caused by those violations, Plaintiffs are entitled to recover damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

262. Plaintiffs will suffer actual and threatened irreparable injury and loss of property, for which there is no adequate remedy at law, unless the Court enjoins Bowlero from its unlawful conduct and continuing and threatened future violations of the antitrust laws. Plaintiffs are thus entitled to injunctive relief against Bowlero under 15 U.S.C. § 26.

263. Plaintiffs are also entitled to recover from Bowlero costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § § 15 and 26.

### COUNT TWO

***Violations of Clayton Act § 7, 15 U.S.C. § 18, by Plaintiffs on Behalf of All Classes Against Lucky Strike Entertainment LLC***

264. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

265. Lucky Strike participated in the acquisitions in the relevant bowling center markets identified in paragraphs 98-100, 105, 110, 112-113, and 116.

Class Action Complaint
Case No.

266.    Specifically, Lucky Strike participated in Bowlero's acquisition of Lucky Strike at L.A. Live, Lucky Strike Hollywood (formerly Lucky Strike Hollywood & Highland), Lucky Strike San Francisco, Lucky Strike Bellevue, Lucky Strike Denver, Lucky Strike Chicago, Lucky Strike Wrigleyville, Lucky Strike Fenway, Lucky Strike Somerville, Lucky Strike West Nyack, Lucky Strike Philadelphia, and Lucky Strike Montgomery Mall (collectively the "Lucky Strike Acquisitions").

267.    The Lucky Strike Acquisitions may substantially lessen competition and tend to create a monopoly.

268.    In fact, the Lucky Strike Acquisitions have already substantially lessened competition and tended to create a monopoly in the relevant geographic markets for bowling centers. Specifically:

- The acquisition of Lucky Strike at L.A. Live and Lucky Strike Hollywood (formerly Lucky Strike Hollywood & Highland) substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Los Angeles-Long-Beach-Anaheim, CA MSA;

- The acquisition of Lucky Strike San Francisco substantially lessened competition and tended to create a monopoly in the relevant market(s) in the San Francisco-Oakland-Fremont, CA MSA;

- The acquisition of Lucky Strike Bellevue substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Seattle-Tacoma-Bellevue, WA MSA;

- The acquisition of Lucky Strike Denver substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Denver-Aurora-Centennial, CO MSA;

- The acquisition of Lucky Strike Chicago and Lucky Strike Wrigleyville substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Chicago-Naperville-Elgin, IL-IN MSA;

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

66

- The acquisition of Lucky Strike West Nyack substantially lessened competition and tended to create a monopoly in the relevant market(s) in the New York-Newark-Jersey City, NY-NJ MSA;

- The acquisition of Lucky Strike Philadelphia substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA; and

- The acquisition of Lucky Strike Montgomery Mall substantially lessened competition and tended to create a monopoly in the relevant market(s) in the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA.

269.    Lucky Strike cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that the Lucky Strike Acquisitions are lawful.

270.    Each of the Lucky Strike Acquisitions in each MSA listed in paragraph 266 violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

271.    Each of the Lucky Strike Acquisitions also accelerated the trend toward concentration in the industry.

272.    Plaintiffs were directly injured as a result of Lucky Strike's violations of Clayton Act Section 7, and the harm to competition caused by those violations.

273.    As a result of Lucky Strike's violations of Clayton Act Section 7, and the harm to competition caused by those violations, Plaintiffs are entitled to recover damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

274.    Plaintiffs will suffer actual and threatened irreparable injury and loss of property, for which there is no adequate remedy at law, unless the Court enjoins Lucky Strike from its unlawful conduct and continuing and threatened future violations of the antitrust laws. Plaintiffs are thus entitled to injunctive relief against Lucky Strike under 15 U.S.C. § 26.

275.    Plaintiffs are also entitled to recover from Lucky Strike costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. §§ 15 and 26.

Class Action Complaint
Case No.

**COUNT THREE**

***Violations of Sherman Act § 2, 15 U.S.C. § 2, by Plaintiffs on Behalf of All Classes Against Defendants Lucky Strike Entertainment Corporation and AMF Bowling Centers, Inc.***

276.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as fully set forth herein.

277.    Between 2021 and 2024, Bowlero made the Acquisitions in the relevant bowling center markets identified in paragraphs 97-121.

278.    Specifically, Bowlero made the Los Angeles Acquisitions; the San Francisco Acquisition; the CA Wine Country Acquisition; the Sacramento Acquisition; the Seattle Acquisition; the Phoenix Acquisition; the Denver Acquisition; the Wichita Acquisitions; the Omaha Acquisitions; the Appleton Acquisitions; the Milwaukee Acquisition; the Chicago Acquisitions; the Grand Rapids Acquisitions; the New York Acquisition; the Philadelphia Acquisitions; the Reading Acquisitions; the Baltimore Acquisition; the DMV Acquisitions; the Richmond Acquisitions; the Charlotte Acquisitions; the Jacksonville Acquisitions; the Villages Acquisitions; and the Cape Coral Acquisitions.

279.    Bowlero's Acquisition(s) in each relevant market constituted attempted monopolization of such relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

280.    Bowlero possesses market power in each relevant bowling center market as demonstrated by, *inter alia*, its high market shares, barriers to entry, and ability to charge supra-competitive prices in the relevant markets.

281.    Bowlero carried out its Acquisitions with the specific intent to monopolize the relevant bowling center markets.

282.    There is a dangerous probability that Bowlero's Acquisitions have resulted or will result in Bowlero's achievement of a monopoly in the relevant bowling center markets.

283.    Bowlero's Acquisitions have reduced competition and have anticompetitive effects in the relevant bowling center markets, including Plaintiffs' antitrust injury and damages.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

68

284. Bowlero's Acquisitions had no procompetitive benefit or justification. The anticompetitive effects of Bowlero's Acquisitions outweigh any procompetitive justifications.

285. All of Bowlero's Acquisitions in the relevant markets constitute an unlawful scheme to monopolize and attempt to monopolize the relevant markets, in which Bowlero possesses market power and there are substantial barriers to entry and expansion. Each Acquisition in a relevant market reinforced and strengthened Bowlero's dominance nationally and in each other relevant market in which Bowlero operated. Bowlero carried out its acquisition scheme with the specific intent to increase its dominance nationally and monopolize the relevant bowling center markets. There is a dangerous probability that Bowlero's Acquisitions have resulted or will result in Bowlero's achievement of national dominance and monopolies across the relevant bowling center markets.  Bowlero's Acquisitions have reduced competition and have anticompetitive effects in the relevant bowling center markets and nationally, and have no procompetitive benefit or justification, and the anticompetitive effects of Bowlero's Acquisitions outweigh any procompetitive justifications.

286. Plaintiffs were directly injured as a result of Bowlero's violations of Sherman Act Section 2, and the harm to competition caused by those violations.

287. As a result of Bowlero's violations of Sherman Act Section 2, and the harm to competition caused by those violations, Plaintiffs are entitled to recover from Bowlero damages, in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

288. Plaintiffs will suffer actual and threatened irreparable injury and loss of their property, for which there is no adequate remedy at law, unless the Court enjoins Bowlero from its unlawful conduct and continuing and threatened future violations of the antitrust laws. Plaintiffs are thus entitled to injunctive relief against Bowlero under 15 U.S.C. § 26.

289. Plaintiffs are also entitled to recover from Bowlero costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. §§ 15 and 26.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

69

## COUNT FOUR

*Violations of Washington Consumer Protection Act, Wash. Rev. Code § 19.86, et seq., by Plaintiffs on Behalf of the Seattle-Tacoma-Bellevue, WA MSA Class Against Defendants Lucky Strike Entertainment Corporation and AMF Bowling Centers, Inc.*

290.     Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

291.     Bowlero's conduct, as described above, violates the Washington Consumer Protection Act ("WCPA"), Wash Rev. Code. § 19.86, *et seq*. The Seattle Acquisition may substantially lessen competition or tend to create a monopoly—indeed, it already has substantially lessened competition and tended to create a monopoly—in the relevant market(s) in the Seattle-Tacoma-Bellevue, WA MSA. Bowlero cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that the Acquisition is lawful. Plaintiffs were directly injured as a result of Bowlero's violations of Wash. Rev. Code. § 19.86.060, and the harm to competition caused by those violations.

292.     Bowlero's conduct, as described above, violates Wash Rev. Code. § 19.86.20, which prohibits any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

293.     Bowlero's conduct violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and Wash Rev. Code. § 19.86.060, and therefore constitutes an unfair method of competition under the WCPA.

294.     Bowlero's conduct otherwise constitutes unfair methods of competition and unfair practices within the meaning of the WCPA, irrespective of the violation of any other law.

295.     Plaintiffs have suffered injury in fact and lost money as a result of Bowlero's unfair methods of competition and unfair trade practices. Plaintiffs seek injunctive relief, actual damages, which may be trebled by the court, and any other equitable relief that may be just and appropriate, as provided by Wash. Rev. Code § 19.86.090.

Class Action Complaint
Case No.

296.    Plaintiffs are also entitled to recover from Bowlero attorneys' fees and costs, as provided by Wash. Rev. Code § 19.86.090.

## COUNT FIVE

### *Violations of Washington Consumer Protection Act, Wash. Rev. Code § 19.86, et seq., by Plaintiffs on Behalf of the Seattle-Tacoma-Bellevue, WA MSA Class Against Defendant Lucky Strike Entertainment LLC*

297.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

298.    Lucky Strike's conduct, as described above, violates the Washington Consumer Protection Act ("WCPA"), Wash Rev. Code. § 19.86, *et seq*. The Seattle Acquisition may substantially lessen competition or tend to create a monopoly—indeed, it already has substantially lessened competition and tended to create a monopoly—in the relevant market(s) in the Seattle-Tacoma-Bellevue, WA MSA. Lucky Strike cannot show any cognizable efficiencies of sufficient character and magnitude or any other countervailing factors such that the Acquisition is lawful. Plaintiffs were directly injured as a result of the Lucky Strike's violations Wash. Rev. Code. § 19.86.060, and the harm to competition caused by those violations.

299.    Lucky Strike's conduct, as described above, violates Wash Rev. Code. § 19.86.20, which prohibits any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

300.    Lucky Strike's conduct violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and Wash Rev. Code. § 19.86.060, and therefore constitutes an unfair method of competition under the WCPA.

301.    Lucky Strike's conduct otherwise constitutes unfair methods of competition and unfair practices within the meaning of the WCPA, irrespective of the violation of any other law.

302.    Plaintiffs have suffered injury in fact and lost money as a result of Lucky Strike's unfair methods of competition and unfair trade practices. Plaintiffs seek injunctive relief, actual

Class Action Complaint
Case No.

damages, which may be trebled by the court, and any other equitable relief that may be just and appropriate, as provided by Wash. Rev. Code § 19.86.090.

303.   Plaintiffs are also entitled to recover from Lucky Strike attorneys' fees and costs, as provided by Wash. Rev. Code § 19.86.090.

**COUNT SIX**

*Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, by Plaintiffs on Behalf of All California Classes and All Nationwide Classes against Defendants Lucky Strike Entertainment Corporation and AMF Bowling Centers, Inc.*

304.   Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

305.   Unlawful prong: Bowlero has engaged, and continues to engage, in the acts or practices described herein, which taken individually or collectively are unlawful and constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code. Bowlero has violated Clayton Act Section 7, 15 U.S.C. § 18, and Sherman Act Section 2, 15 U.S.C. § 2.

306.   Unfair prong: Bowlero has engaged, and continues to engage, in the acts or practices described herein, which individually or collectively are unfair, irrespective of the violation of any other law, and which individually or collectively constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

307.   Plaintiffs have suffered injury in fact and lost money as a result of Bowlero's unfair competition. Under California Business and Professions Code Section 17200, *et seq.*, Plaintiffs, on behalf of all California Classes and all Nationwide Classes, seek injunctive and other equitable relief to require Bowlero to cease their anticompetitive conduct and to restore fair competition, to deny Bowlero the fruit of their illegal conduct, specifically, through restitution, and to impose such other relief as may be just and appropriate for Bowlero's violations of the California Unfair Competition Law, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204 and the Court's inherent authority.

Class Action Complaint
Case No.

## COUNT SEVEN

*Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, by Plaintiffs on Behalf of All California Classes and All Nationwide Classes against Defendant Lucky Strike Entertainment LLC*

308.    Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

309.    Unlawful prong: Lucky Strike has engaged, and continues to engage, in the acts or practices described herein, which taken individually or collectively are unlawful and constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code. Defendants have violated Clayton Act Section 7, 15 U.S.C. § 18, and Sherman Act Section 2, 15 U.S.C. § 2.

310.    Unfair prong: Lucky Strike has engaged, and continues to engage, in the acts or practices described herein, which individually or collectively are unfair, irrespective of the violation of any other law, and which individually or collectively constitute unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

311.    Plaintiffs have suffered injury in fact and lost money as a result of Lucky Strike's unfair competition. Under California Business and Professions Code Section 17200, *et seq.*, Plaintiffs, on behalf of all California Classes and all Nationwide Classes, seek injunctive and other equitable relief to require Lucky Strike to cease their anticompetitive conduct and to restore fair competition, to deny Lucky Strike the fruit of their illegal conduct, specifically, through restitution, and to impose such other relief as may be just and appropriate for Lucky Strike's violations of the California Unfair Competition Law, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204 and the Court's inherent authority.

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

73

**COUNT EIGHT**

*Violations of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201* **et**

**seq.***, by Plaintiffs on Behalf of All Florida Classes Against Defendants Lucky Strike*

*Entertainment Corporation and AMF Bowling Centers, Inc*

312.    Plaintiffs restate, reallege, and incorporate by referenced each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

313.    Bowlero's conduct, as described above, violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and therefore constitutes unfair methods of competition under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204, which prohibits any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

314.    Bowlero's conduct otherwise constitutes unfair methods of competition and unfair trade practices within the meaning of the FDUTPA, irrespective of the violation of any other law.

315.    Plaintiffs have suffered injury in fact and lost money as a result of Bowlero's unfair methods of competition and unfair trade practices. Plaintiffs, on behalf of all Florida Classes, seek injunctive relief, actual damages, and any other equitable relief that may be just and appropriate, as provided by Fla. Stat. § 501.211.

316.    Plaintiffs, on behalf of all Florida Classes, are also entitled to recover from Bowlero attorneys' fees and court costs, as provided by Fla. Stat. § 501.2105.

**COUNT NINE**

*Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill.*

*Comp. Stat. § 505/2* **et seq.***, by Plaintiffs on Behalf of the Chicago-Naperville-Elgin,*

*IL-IN-WI MSA Class Against Defendants Lucky Strike Entertainment Corporation*

*and AMF Bowling Centers, Inc.*

317.    Plaintiffs restate, reallege, and incorporate by referenced each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

Class Action Complaint
Case No.

318.    Bowlero's conduct, as described above, violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and therefore constitutes unfair methods of competition under Illinois's Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), § 505/2, which prohibits any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

319.    Bowlero's conduct otherwise constitutes unfair methods of competition and unfair trade practices within the meaning of the ICFDBPA, irrespective of the violation of any other law.

320.    Plaintiffs have suffered injury in fact and lost money as a result of Bowlero's unfair methods of competition and unfair trade practices. Plaintiffs, on behalf of the Chicago-Naperville-Elgin, IL-IN-WI MSA Class, seek injunctive relief, actual economic damages, and any other equitable relief that may be just and appropriate, as provided by 815 Ill. Comp. Stat. § 505/10a.

321.    Plaintiffs, on behalf of the Chicago-Naperville-Elgin, IL-IN-WI MSA Class, are also entitled to recover from Bowlero attorneys' fees and costs, as provided by 815 Ill. Comp. Stat. § 505/10a.

## COUNT TEN

***Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/2 et seq., by Plaintiffs on Behalf of the Chicago-Naperville-Elgin, IL-IN-WI MSA Class Against Defendant Lucky Strike Entertainment LLC***

322.    Plaintiffs restate, reallege, and incorporate by referenced each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

323.    Lucky Strike's conduct, as described above, violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and therefore constitutes unfair methods of competition under Illinois's Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), § 505/2, which prohibits any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Class Action Complaint
Case No.

324. Lucky Strike's conduct otherwise constitutes unfair methods of competition and unfair trade practices within the meaning of the ICFDBPA, irrespective of the violation of any other law.

325. Plaintiffs have suffered injury in fact and lost money as a result of Lucky Strike's unfair methods of competition and unfair trade practices. Plaintiffs, on behalf of the Chicago-Naperville-Elgin, IL-IN-WI MSA Class, seek injunctive relief, actual economic damages, and any other equitable relief that may be just and appropriate, as provided by 815 Ill. Comp. Stat. § 505/10a.

326. Plaintiffs, on behalf of the Chicago-Naperville-Elgin, IL-IN-WI MSA Class, are also entitled to recover from Lucky Strike attorneys' fees and costs, as provided by 815 Ill. Comp. Stat. § 505/10a.

## COUNT ELEVEN

*Violations of North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, by Plaintiffs on Behalf of the Charlotte-Concord-Gastonia, NC-SC MSA Class Against Defendants Lucky Strike Entertainment Corporation and AMF Bowling Centers, Inc.*

327. Plaintiffs restate, reallege, and incorporate by referenced each of the allegations in paragraphs 1 through 252 as though fully set forth herein.

328. Bowlero's conduct, as described above, violates Clayton Act Section 7, 15 U.S.C. § 18, Sherman Act Section 2, 15 U.S.C. § 2, and therefore constitutes unfair methods of competition under North Carolina's Unfair and Deceptive Trade Practices Act, § 75-1.1, which prohibits any unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

329. Bowlero's conduct otherwise constitutes unfair methods of competition and unfair practices within the meaning of section 75-1.1, irrespective of the violation of any other law.

330. Plaintiffs have suffered injury in fact and lost money as a result of Bowlero's unfair methods of competition and unfair trade practices. Plaintiffs, on behalf of the Charlotte-

Class Action Complaint
Case No.

SIMONSEN SUSSMAN LLP
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

76

Concord-Gastonia, NC-SC MSA Class, seek damages to be proven at trial and automatically trebled, and any other equitable relief that may be just and appropriate, as provided by N.C. Gen. Stat. § 75-16.

331.    Plaintiffs, on behalf of the Charlotte-Concord-Gastonia, NC-SC MSA Class, are also entitled to recover from Bowlero attorneys' fees and costs, as provided by N.C. Gen. Stat. § 75-16.1.

## REQUEST FOR RELIEF

332.    Wherefore, Plaintiffs Benjamin Doehr, Zach Soliz, Mitchel Feuer, Kevin Howard, Andre Howard, Michael Cordero, Ed McDonald, Theodore Harkness, Tim Kelly, Maor Kramer, and Casey Goodman, on behalf of themselves and classes of all others similarly situated, respectfully request that the Court enter an order or judgment in their favor and against Defendants, and:

   a.   Declare that Defendants have variously engaged in unlawful, anticompetitive, and unfair business acts and practices in violation of Clayton Act Section 7, 15 U.S.C. § 18; Sherman Act Section 2, 15 U.S.C. § 2; the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.20; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/2; and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

   b.   Enjoin Defendants from performing or proposing to perform any acts in violation of Clayton Act Section 7, 15 U.S.C. § 18; Sherman Act Section 2, 15 U.S.C. § 2; the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.20; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204; the Illinois Consumer Fraud and Deceptive Business Practices

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058

77

Act, 815 Ill. Comp. Stat. § 505/2; and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

c.  Order such divestitures as are necessary or proper to restore distinct, separate, independent, and viable businesses; to restore competition; and to prevent and mitigate further harm to competition in the relevant markets;

d.  Order Defendants to pay money damages—automatically trebled—to Plaintiffs for injuries suffered by reason of Defendants' violations of Clayton Act Section 7, 15 U.S.C. § 18; Sherman Act Section 2, 15 U.S.C. § 2; the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.20; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/2; the Nebraska Consumer Protection Act; and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

e.  Order Defendants to pay restitution of any money acquired by Defendants' unlawful, anticompetitive, and unfair business practices, pursuant to Cal. Bus. & Prof § 17203.

f.  Order Defendants to pay the cost of suit, including attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26; Wash. Rev. Code § 19.86.090; Cal. Code Civ. Proc. § 1021.5; Fla. Stat. § 501.2105; 815 Ill. Comp. Stat. § 505/10; Neb. Rev. Stat. § § 59-1609; N.C. Gen. Stat. § 75-16.1, and the Court's inherent authority.

g.  Order Defendants to pay any interest accrued from the date of entry of any money judgment, pursuant to Wash. Rev. Code § 4.56.110; Cal. Code Civ. Proc. § 685.010; Fla. Stat. § 55.03; 735 Ill. Comp. Stat. § 5/2-1303; Neb. Rev. Stat. § 45-103; and to pay any interest on any portion of a money judgment designated as compensatory damages from the date of commencement of this action, and on any other portion of a money judgment from the date of entry of judgment, pursuant to N.C. Gen. Stat. § 24-5.

Class Action Complaint
Case No.

h. Provide such further and additional relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

333. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Complaint so triable.

Dated May 6, 2026

Respectfully Submitted,

**SIMONSEN SUSSMAN LLP**

By: /s/ Catherine S. Simonsen
Catherine S. Simonsen (WSBA No. 45552)
1120 Pacific Avenue, Suite 100
Tacoma, WA 98402
Tel: (917) 747-5196
Fax: (913) 262-0058
Email: catherine@simonsensussman.com

Nico Gurian (*Pro hac vice* forthcoming)
307 West 38th Street, 16th Floor
New York, NY 10018
Tel: (718) 510-5495
Fax: (913) 262-0058
Email: nico.gurian@simonsensussman.com

**BARON & BUDD, P.C.**

John P. Fiske (*Pro hac vice forthcoming*)
Lindsay Stevens (*Pro hac vice forthcoming*)
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: (858) 251-7424
Fax: (214) 523-6600
Email:  jfiske@baronbudd.com
            lstevens@baronbudd.com

*Attorneys for Plaintiffs and the Proposed Classes*

Class Action Complaint
Case No.

**SIMONSEN SUSSMAN LLP**
1120 Pacific Avenue, Suite 100, Tacoma, WA 98402
Tel: (917) 747-5196 Fax: (913) 262-0058