Hon. Richard A. Jones

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| BENJAMIN DOEHR, ZACH SOLIZ, MITCHEL FEUER, KEVIN HOWARD, ANDRE HOWARD, MICHAEL CORDERO, ED MCDONALD, THEODORE HARKNESS, TIM KELLY, MAOR KRAMER, and CASEY GOODMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LUCKY STRIKE ENTERTAINMENT CORPORATION (f/k/a BOWLERO CORP.); AMF BOWLING CENTERS, INC.,<br><br>Defendants. | Case No. 2:26-CV-01535<br><br>**PLAINTIFFS' OPPOSITION TO BOWLERO DEFENDANTS' MOTION TO DISMISS COMPLAINT (ECF NO. 33) AND REQUEST FOR JUDICIAL NOTICE (ECF NO. 35)**<br><br>**ORAL ARGUMENT REQUESTED** |



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. PLAINTIFFS PLAUSIBLY ALLEGE AN ANTICOMPETITIVE "ROLL-UP" SCHEME THAT HAS INJURED AND THREATENS TO IRREPARABLY FURTHER INJURE PLAINTIFFS ............................................. 4

A. Plaintiffs Adequately Allege Violations of Federal Antitrust Law ................. 4

1. The Direct-Evidence Method of Proof Does Not Require an "Elaborate Market Analysis" ....................................................... 4

2. Plaintiffs Allege Direct Evidence of Anticompetitive Effects and the Elimination of Head-to-Head Competition, Dispensing with the Need for an "Elaborate Market Analysis"........................................................................... 5

3. Plaintiffs Allege Indirect Evidence that Bowlero's Acquisitions May Substantially Lessen Competition or Tend to Create a Monopoly in Violation of Clayton Act Section 7 ........................................................................... 9

a) The Relevant Market for the Purchase and Sale of Products and Services from Bowling Center Operators, Which Has Been Recognized for Decades, Is Plausible [I.A] ................................................. 10

b) Plaintiffs Allege Plausible Relevant Geographic Markets [I.B]........................................................... 17

c) Plaintiffs Allege the Acquisitions May Substantially Lessen Competition or Tend to Create a Monopoly............................................................ 22

4. Plaintiffs Allege Indirect Evidence that Bowlero's Attempted Monopolization Harmed Competition in Each Relevant Market................................................................... 24

B. Plaintiffs Establish Actual and Threatened Antitrust Injury and Causation [II.A-B] ....................................................................... 25

1. Plaintiffs Allege Quintessential Antitrust Injury .............................. 25

2. Bowlero's Causation Arguments Fail............................................. 25

C. The Complaint Establishes All Elements of Plaintiffs' State-Law Claims [V.A]................................................................................ 28



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

1. California UCL ... 28

2. Remaining State-Law Claims ... 30

III. THE AVAILABILITY OF CERTAIN FORMS OF RELIEF IS NOT A VALID BASIS FOR DISMISSAL ... 33

A. Umbrella Price Effects [II.C] ... 33

B. Damages for Bowlero's Attempted Monopolization [III] ... 34

C. Injunctive Relief [IV] ... 35

D. Timeliness of Plaintiffs' Request for Damages [V.C, X] ... 36

E. Timeliness of Plaintiffs' Request for a Divestiture Order [VI] ... 39

IV. BOWLERO'S CLASS-CERTIFICATION ARGUMENTS ARE PREMATURE AND DO NOT PROVIDE A BASIS FOR DISMISSAL [V.B, VIII-IX] ... 42

V. PLAINTIFFS SUFFICIENTLY DISTINGUISH BETWEEN DEFENDANTS [VII] ... 43

VI. CONCLUSION ... 43




Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alivecor, Inc. v. Apple Inc.*,
592 F.Supp.3d 904 (N.D. Cal. 2022) .......... 14

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) .......... 25

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .......... 26

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
116 F.Supp.2d 1159 (C.D. Cal. 2000) .......... 40, 41

*Arena Restaurant & Lounge LLC v. Southern Glazer's Wine & Spirits, LLC*,
2018 U.S. Dist. LEXIS 63869 (N.D. Cal. Apr. 16, 2018) .......... 18

*Ash Grove Cement Co. v. FTC*,
577 F.2d 1368 (9th Cir. 1978) .......... 40

*Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*,
738 F.2d 1509 (10th Cir. 1984) .......... 16

*Athos Overseas, Ltd. v. YouTube, Inc.*,
2022 U.S. Dist. LEXIS 57302 (S.D. Fla. Mar. 29, 2022) .......... 32

*Atl. Refining Co. v. FTC*,
381 U.S. 357 (1965) .......... 31

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
603 F.3d 1133 (9th Cir. 2010) .......... 39

*Batson v. Live Nation Ent., Inc.*,
746 F.3d 827 (7th Cir. 2014) .......... 33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .......... 36

*Bettys v. Washington*,
2024 U.S. Dist. LEXIS 149717 (W.D. Wash. Aug. 21, 2024) .......... 33

*Bettys v. Washington*,
2024 U.S. Dist. LEXIS 150981 (W.D. Wash. July 31, 2024) .......... 33



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)........................................................................................ 25

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ........................................................................ 22

*Bon-Ton Stores v. May Dep't Stores Co.*,
881 F.Supp.860 (W.D.N.Y. 1994)..................................................................... 17

*Bowl Am., Inc. v. Fair Lanes, Inc.*,
299 F.Supp. 1080 (D. Md. 1969)...................................................................... 12

*Brager & Co. v. Leumi Sec. Corp.*,
429 F.Supp. 1341 (S.D.N.Y. 1977) .................................................................. 37

*Brager & Co. v. Leumi Sec. Corp.*,
646 F.2d 559 (2d Cir. 1980) ............................................................................ 37

*Breier v. Northern California Bowling Proprietors' Asso.*,
316 F.2d 787 (9th Cir. 1963) ........................................................................... 12

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
176 F.Supp.3d 606 (W.D. La. 2016) ................................................................ 25

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ........................................................................... 4, 8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)........................................................................................ 24

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..................................................................................... *passim*

*Brown v. Department of Water & Power*,
2025 U.S. Dist. LEXIS 17182 (C.D. Cal. Jan. 29, 2025) ...................................... 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)........................................................................................ 12

*California v. Am. Stores Co.*,
495 U.S. 271 (1990)...................................................................................... 9, 40

*California v. Paramount Skydance Corp.*,
2026 U.S. Dist. LEXIS 160668 (N.D. Cal. Jul. 20, 2026)................................ 22, 23

*CaptiveAire Sys. v. ITW Food Equip. Grp., LLC*,
2009 U.S. Dist. LEXIS 145040 (W.D. Wash. Sep. 28, 2009)................................ 32

*Casey v. Lewis*,
4 F.3d 1516 (9th Cir. 1993) ........................................ 43

*Catlin v. Wash. Energy Co.*,
791 F.2d 1343 (9th Cir. 1986) ........................................ 26

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal.4th 163 (1999) ........................................ 28, 30

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ........................................ 3

*Chavez v. Whirlpool Corp.*,
93 Cal.App.4th 363 (2001) ........................................ 28

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ........................................ 13

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ........................................ 6

*Cobb Theatres III, LLC v. AMC Ent. Holdings, Inc.*,
101 F.Supp.3d 1319 (N.D. Ga. 2015) ........................................ 18, 21

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F.Supp.3d 926, 958 (D. Or. 2018) ........................................ 11

*CollegeNET, Inc. v. Common Application, Inc.*,
711 F.App'x 405 (9th Cir. 2017) ........................................ 8

*Collyer v. Catalina Snacks Inc.*,
712 F.Supp.3d 1276 (N.D. Cal. 2024) ........................................ 30

*Compass Inc. v. Nw. Multiple Listing Serv.*,
2026 U.S. Dist. LEXIS 58200 (W.D. Wash. Mar. 19, 2026) ........................................ 20

*Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc.*,
2016 U.S. Dist. LEXIS 86414 (C.D. Cal. May 11, 2016) ........................................ 38

*Connecticut v. Sandoz, Inc.*,
2025 U.S. Dist. LEXIS 214944 (D. Conn. Oct. 31, 2025) ........................................ 37

*Consumer Defense Group v. Rental Housing Industry Members*,
137 Cal.App.4th 1185 (2006) ........................................ 29

*Coronavirus Reporter v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) ........................................ 11, 12





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Corrente v. Charles Schwab Corp.*,
2023 U.S. Dist. LEXIS 31415 (E.D. Tex. Feb. 24, 2023) ........ 42

*Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........ 4

*Costco Wholesale Corp. v. AU Optronics Corp.*,
2014 U.S. Dist. LEXIS 133798 (W.D. Wash. Sep. 23, 2014) ........ 34

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
114 F.4th 280 (4th Cir. 2024) ........ 38

*Dairy, LLC v. Milk Moovement, Inc.*,
2023 U.S. Dist. LEXIS 83790 (E.D. Cal. May 12, 2023) ........ 21, 40

*Davis v. HCA Healthcare, Inc.*,
2022 NCBC LEXIS 108 (N.C. 2022) ........ 32

*Davis v. Pac. Bell*,
204 F.Supp.2d 1236 (N.D. Cal. 2002) ........ 34

*De Coster v. Amazon.com, Inc.*,
2024 U.S. Dist. LEXIS 218729 (W.D. Wash. Nov. 19, 2024) ........ 35

*De Los Santos v. Panda Express, Inc.*,
2010 U.S. Dist. LEXIS 127788 (N.D. Cal. Dec. 3, 2010) ........ 43

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
773 F.2d 1506 (9th Cir. 1985) ........ 26

*Dominick v. Collectors Universe*,
2012 U.S. Dist. LEXIS 141950 (C.D. Cal. Oct. 1, 2012) ........ 27

*Drivecam, Inc. v. Smartdrive Sys.*,
2012 U.S. Dist. LEXIS 201198 (S.D. Cal. Mar. 26, 2012) ........ 3

*Eastman v. Quest Diagnostics Inc.*,
108 F.Supp.3d 827 (N.D. Cal. 2015) ........ 26

*Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*,
2024 U.S. Dist. LEXIS 236177 (S.D. Tex. Sep. 27, 2024) ........ 35

*Elliott v. United Ctr.*,
126 F.3d 1003 (7th Cir. 1997) ........ 13

*Epic Games, Inc. v. Apple Inc.*,
559 F.Supp.3d 898 (N.D. Cal. 2021) ........ 30

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 10, 28, 29

*EpiPen Mktg., Sales Pracs., & Antitrust Litig.*,
336 F.Supp.3d 1256 (D. Kan. 2018).......... 37

*Exclaim Mktg., LLC v. DirecTV, LLC*,
134 F.Supp.3d 1011 (E.D.N.C. 2015) .......... 32

*Fodera v. Equinox Holdings, Inc.*,
2021 U.S. Dist. LEXIS 58449 (N.D. Cal. Mar. 26, 2021).......... 43

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .......... 34

*Frame-Wilson v. Amazon.com, Inc.*,
591 F.Supp.3d 975 (W.D. Wash. 2022).......... 27

*FTC v. Advoc. Health Care Network*,
841 F.3d 460 (7th Cir. 2016) .......... 15

*FTC v. Cement Inst.*,
333 U.S. 683 (1948).......... 31

*FTC v. Consol. Foods Corp.*,
380 U.S. 592 (1965).......... 9

*FTC v. Edwards*,
2026 U.S. Dist. LEXIS 19409 (D.D.C Jan. 9, 2026).......... 5, 6, 9

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001).......... 22

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986).......... 2, 8, 31

*FTC v. IQVIA Holdings Inc.*,
710 F.Supp.3d 329 (S.D.N.Y. 2023) .......... 15

*FTC v. Kroger Co.*,
2024 U.S. Dist. LEXIS 223077 (D. Or. Dec. 10, 2024) .......... *passim*

*FTC v. Meta Platforms Inc.*,
654 F.Supp.3d 892 (N.D. Cal. 2023).......... 11

*FTC v. Procter & Gamble Co.*,
386 U.S. 568 (1967).......... 23, 24



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*FTC v. Staples, Inc.*,
190 F.Supp.3d 100 (D.D.C. 2016) ........ 16

*FTC v. Sysco Corp.*,
113 F.Supp.3d 1 (D.D.C. 2015) ........ 10, 15, 18

*FTC v. Tapestry, Inc.*,
755 F.Supp.3d 386 (S.D.N.Y. 2024) ........ 9, 10, 11

*FTC v. Whole Foods Mkt.*,
548 F.3d 1028 (D.C. Cir. 2008) ........ 10

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ........ 26

*Gen. Foods Corp. v. FTC*,
386 F.2d 936 (3d Cir. 1967) ........ 23

*Gibson v. Cendyn Group, LLC*,
148 F.4th 1069 (9th Cir. 2025) ........ 26

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) ........ 40, 41

*Glen Holly Entertainment, Inc. v. Tektronix Inc.*,
343 F.3d 1000 (9th Cir. 2003) ........ 25

*Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*,
433 F.App'x. 598 (9th Cir. 2011) ........ 16

*GolTV, Inc. v. Fox Sports Latin Am., Ltd.*,
2018 U.S. Dist. LEXIS 29836 (S.D. Fla. Jan. 26, 2018) ........ 32

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ........ 34

*Heckman v. Live Nation Ent., Inc.*,
2025 U.S. Dist. LEXIS 69885 (C.D. Cal. Apr. 11, 2025) ........ 15

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ........ 11, 14, 15

*Hosp. Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) ........ 36

*Humana Inc. v. Mallinckrodt Ard LLC*,
2020 U.S. Dist. LEXIS 175033 (C.D. Cal. Aug. 14, 2020) ........ 38

*Image Tech. Servs. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .......... 9, 24

*In re Air Passenger Computer Reservation Systems*,
727 F.Supp. 564 (C.D. Cal. 1989) .......... 35

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).......... 43

*In re Bristol Bay, Salmon Fishery Antitrust Litig.*,
530 F.Supp. 36 (W.D. Wash. 1981).......... 34

*In re Buspirone Pat. & Antitrust Litig.*,
185 F.Supp.2d 363 (S.D.N.Y. 2002) .......... 37

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2014 U.S. Dist. LEXIS 184926 (N.D. Cal. Dec. 24, 2014).......... 39

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 U.S. Dist. LEXIS 189474 (N.D. Cal. Oct. 26, 2016).......... 34

*In re Cathode Ray Tube CRT Antitrust Litig.*,
2014 U.S. Dist. LEXIS 35391 (N.D. Cal. Mar. 13, 2014).......... 39, 40

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .......... 26

*In re Evanston Nw. Corp. Antitrust Litig.*,
2015 U.S. Dist. LEXIS 198712 (N.D. Ill. May 28, 2015).......... 37, 38

*In re Glumetza Antitrust Litig.*,
611 F.Supp.3d 848 (N.D. Cal. 2020).......... 38

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007).......... 35

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) .......... 37

*In re Neurontin Antitrust Litig.*,
2013 U.S. Dist. LEXIS 111587 (D.N.J. Aug. 8, 2013) .......... 8

*In re Nexstar-Tegna Merger Litig.*,
2026 U.S. Dist. LEXIS 85526 (E.D. Cal. Apr. 17, 2026).......... 22, 42

*In re Pacific Fertility Center Litigation*,
2019 U.S. Dist. LEXIS 133922 (N.D. Cal. Aug. 8, 2019) .......... 43



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*In re Pinnacle Ent., Inc.*,
2013 FTC LEXIS 80 (F.T.C. May 28, 2013) ..... 16

*In re Processed Egg Prods. Antitrust Litig.*,
851 F.Supp.2d 867 (E.D. Pa. 2012) ..... 31

*In re Vaccine Cases*,
134 Cal.App.4th 438 (2005) ..... 29

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
2023 U.S. Dist. LEXIS 83876 (N.D. Cal. May 12, 2023) ..... 42

*In re Zetia Ezetimibe Antitrust Litig.*,
2019 U.S. Dist. LEXIS 59469 (E.D. Va. Feb. 6, 2019) ..... 43

*Int'l Boxing Club of N.Y., Inc. v. United States*,
358 U.S. 242 (1959) ..... 15

*Intel Corp. v. Fortress Investment Group LLC*,
2022 U.S. App. LEXIS 30900 (9th Cir. Nov. 8, 2022) ..... 26

*ITCO Corp. v. Michelin Tire Corp.*,
722 F.2d 42 (4th Cir. 1983) ..... 31

*Jackson v. Allstate Ins. Co.*,
785 F.3d 1193 (8th Cir. 2015) ..... 21

*Junhan Jeong v. Nexo Fin. LLC*,
2022 U.S. Dist. LEXIS 10089 (N.D. Cal. Jan. 19, 2022) ..... 30

*Klein v. Facebook, Inc.*,
580 F.Supp.3d 743 (N.D. Cal. 2022) ..... 21

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ..... 26

*L.A. Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ..... 12

*L.G. Balfour Co. v. FTC*,
442 F.2d 1 (7th Cir. 1971) ..... 32

*Langan v. Johnson & Johnson Consumer Cos.*,
897 F.3d 88 (2d Cir. 2018) ..... 43

*Laughlin v. Evanston Hospital*,
133 Ill.2d 374 (1990) ..... 32, 33



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
700 F.2d 785 (2nd Cir. 1983) .......... 35

*LiveUniverse*, *Inc. v. MySpace, Inc.*,
304 Fed.App'x 554 (9th Cir. 2008) .......... 29

*Lomeli v. County of San Diego*,
637 F.Supp.3d 1046 (S.D. Cal. 2022) .......... 21

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
275 F.3d 762 (9th Cir. 2001) .......... 15

*LyricFind, Inc. v. Musixmatch, S.p.A.*,
798 F.Supp.3d 1040 (N.D. Cal. 2025) .......... 3

*Mayhall v. Amazon Web Servs.*,
2022 U.S. Dist. LEXIS 126094 (W.D. Wash. May 24, 2022) .......... 43

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
995 F.3d 123 (4th Cir. 2021) .......... 37

*Medicare Rentals, Inc. v. Advanced Servs.*,
119 N.C. App. 767 (1995) .......... 39

*Meijer, Inc. v. 3M*,
2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005) .......... 36, 37

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .......... 42, 43

*Midwestern Mach., Inc. v. Nw. Airlines, Inc.*,
167 F.3d 439 (8th Cir. 1999) .......... 38

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) .......... 37

*Miller v. Nationwide Mut. Ins. Co.*,
112 N.C. App. 295 (1993) .......... 31

*Milliken v. Bradley*,
433 U.S. 267 (1977) .......... 30

*Mishewal Wappo Tribe of Alexander Valley v. Salazar*,
2011 U.S. Dist. LEXIS 122828 (N.D. Cal. Oct. 24, 2011) .......... 39

*MLW Media LLC v. World Wrestling Ent., Inc.*,
2023 U.S. Dist. LEXIS 104499 (N.D. Cal. June 15, 2023) .......... 17

*Monument Bowl, Inc. v. N. Cal. Bowling Proprietors' Ass'n*,
197 F.Supp. 208 (N.D. Cal. 1961) ..... 12

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ..... 19

*Morrison v. YTB Int'l Inc.*,
649 F.3d 533 (7th Cir. 2011) ..... 43

*Nationwide Biweekly Admin., Inc. v. Superior Ct.*,
9 Cal. 5th 279 (2020) ..... 29, 30

*Natkin v. American Osteopathic Association*,
2018 U.S. Dist. LEXIS 7427 (D. Or. Jan. 1, 2018) ..... 13

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
2022 U.S. Dist. LEXIS 126239 (E.D. Cal. July 15, 2022) ..... 17

*Newcal Indus. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ..... 11, 15

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ..... 2, 6

*Oliver v. Am. Express Co.*,
2021 U.S. Dist. LEXIS 19578 (E.D.N.Y. Feb. 1, 2021) ..... 32, 33

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) ..... 25

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
939 F.Supp.2d 1002 (N.D. Cal. 2013) ..... 17

*Pa. Ave. Funds v. Borey*,
569 F.Supp.2d 1126 (W.D. Wash. 2008) ..... 15

*Panag v. Farmers Ins. Co.*,
166 Wash.2d 27 (2009) ..... 31

*PBTM LLC v. Football Northwest, LLC*,
511 F.Supp.3d 1158 (W.D. Wash. 2021) ..... 14, 15, 32

*Pennsylvania. v. Ctr. Lane Partners, LLC*,
2024 U.S. Dist. LEXIS 206697 (W.D. Pa. Nov. 14, 2024) ..... 42

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014) ..... 39, 42



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) .................................................. 2, 4

*Pluspass, Inc. v. Verra Mobility Corp.*,
2021 U.S. Dist. LEXIS 201843 (C.D. Cal. Aug. 9, 2021).................. 18, 20

*Pool Water Prods v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) .................................................. 25

*Porsche Cars N. Am., Inc. v. Diamond*,
140 So.3d 1090 (Fla. Dist. Ct. App. 2014) .................................... 31

*Portillo v. CoStar Group, Inc.*,
2025 U.S. Dist. LEXIS 169128 (W.D. Wash. Aug. 29, 2025) .................. 18

*Preston v. SB&C, Ltd.*,
6 Wn.3d 502 (2026) .................................................. 32

*Progressive W. Ins. Co. v. Superior Ct.*,
135 Cal.App.4th 263 (2005) .................................................. 29

*Purex Corp. v. Procter & Gamble Co.*,
596 F.2d 881 (9th Cir. 1979) .................................................. 23, 24

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................. *passim*

*Reilly v. Apple Inc.*,
578 F.Supp.3d 1098 (N.D. Cal. 2022) .................................................. 15

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979).................................................. 25

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F.Supp.3d 981 (N.D. Cal. 2020) .................................................. 41

*Rx Solutions, Inc. v. Caremark, L.L.C.*,
164 F.4th 436 (5th Cir. 2026) .................................................. 18

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) .................................................. 10, 22

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .................................................. 37, 38

*Santander Consumer USA Inc. v. drive.car LLC*,
2024 U.S. Dist. LEXIS 213596 (D. Alaska Nov. 25, 2024).................................. 30

*Sidibe v. Health*,
667 F.App'x 641 (9th Cir. 2016) .......... 20, 21

*Siegel v. Shell Oil Co.*,
480 F.Supp.2d 1034 (N.D. Ill. 2007) .......... 33

*Siegel v. Shell Oil Co.*,
612 F.3d 932 (7th Cir. 2010) .......... 31

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
2000 U.S. Dist. LEXIS 2604 (S.D.N.Y. Mar. 8, 2000) .......... 23, 25

*Solo v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) .......... 36, 37, 39

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .......... 26, 30

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) .......... 30

*Spectrum Sports v. McQuillan*,
506 U.S. 447 (1993) .......... 24, 35

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .......... 17, 26

*State v. Black*,
100 Wash.2d 793 (1984) .......... 31

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
988 F.3d 690 (4th Cir. 2021) .......... 39, 41

*Syufy Enters. v. Am. Multicinema, Inc.*,
793 F.2d 990 (9th Cir. 1986) .......... 15, 34

*Taleff v. Sw. Airlines Co.*,
828 F.Supp.2d 1118 (N.D. Cal. 2011) .......... 40, 41

*Teradata Corp. v. SAP SE*,
124 F.4th 555 (9th Cir. 2024) .......... 20, 21

*Texas v. Blackrock, Inc.*,
2025 U.S. Dist. LEXIS 147891 (E.D. Tex. Aug. 1, 2025) .......... 5, 8, 27

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) .......... 11



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Times-Picayune Publishing Co. v. United States*,
345 U.S. 594 (1953) ... 9, 15

*U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials*,
2025 U.S. Dist. LEXIS 101205 (C.D. Cal. May 28, 2025) ... 29

*Unigestion Holdings, S.A. v. UPM Technology, Inc.*,
412 F.Supp.3d 1273 (D. Or. 2019) ... 13

*United States v. ALCOA*,
377 U.S. 271 (1964) ... 34

*United States v. Blue Bell, Inc.*,
395 F.Supp. 538 (M.D. Tenn. 1975) ... 5, 6

*United States v. Bowling Proprietors' Ass'n of Am., Inc.*,
1965 U.S. Dist. LEXIS 9486 (S.D.N.Y. Feb. 24, 1965) ... 12

*United States v. Coca-Cola Bottling Co.*,
575 F.2d 222 (9th Cir. 1978) ... 42

*United States v. Conn. Nat'l Bank*,
418 U.S. 656 (1974) ... 17

*United States v. Cont'l Can Co.*,
378 U.S. 441 (1964) ... 9

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ... 10, 13

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ... 40

*United States v. First Nat'l Bank & Tr. Co. of Lexington*,
376 U.S. 665 (1964) ... 5

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ... 1, 25

*United States v. Jerrold Elecs. Corp.*,
187 F.Supp. 545 (E.D. Pa. 1960) ... 36

*United States v. JetBlue Airways Corp.*,
712 F.Supp.3d 109 (D. Mass. 2024) ... 3, 11, 12, 17

*United States v. Julius*,
14 F.4th 752 (7th Cir. 2021) ... 21



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*United States v. Live Nation Ent., Inc.*,
2026 U.S. Dist. LEXIS 33190 (S.D.N.Y. Feb. 18, 2026) ........ 15

*United States v. Maricopa Cnty.*,
915 F.Supp.2d 1073 (D. Ariz. 2012) ........ 33

*United States v. Mfrs. Hanover Tr. Co.*,
240 F.Supp. 867 (S.D.N.Y. 1965) ........ 9

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966) ........ 22

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) ........ *passim*

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ........ 15

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
643 F.Supp.2d 1256 (W.D. Wash. 2009) ........ 43

*Wall Prods. Co. v. Nat'l Gypsum* Co.,
357 F.Supp.832 (N.D. Cal. 1973) ........ 34

*Washington State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*,
356 F.2d 371 (9th Cir. 1966) ........ 12

*Washington v. Nat'l Express Grp. PLC*,
2012 U.S. Dist. LEXIS 82266 (W.D. Wash. May 10, 2012) ........ 36

*White v. Daniel*,
909 F.2d 99 (4th Cir. 1990) ........ 39

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
536 F.3d 663 (7th Cir. 2008) ........ 31

*Yaskot v. Intermountain Nat., Ltd. Liab. Co.*,
2011 U.S. Dist. LEXIS 56608 (D. Idaho May 24, 2011) ........ 33

*Z Technologies Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) ........ 38

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) ........ 28

*Zunum Aero, Inc. v. Boeing Co.*,
2022 U.S. Dist. LEXIS 144483 (W.D. Wash. Aug. 12, 2022) ........ 16

**Statutes**

Clayton Act § 16,
15 U.S.C. § 26 .......... 9

Clayton Act § 4,
15 U.S.C. § 15(a) .......... 34

Clayton Act § 7,
15 U.S.C. § 18 .......... 1, 4, 9

FTC Act Section 5,
15 U.S.C. § 45(a) .......... 1

Sherman Act § 2,
15 U.S.C. § 2 .......... 1, 4

N.C. Gen. Stat. § 75-16.2 .......... 39

N.C. Gen. Stat. § 75-8 .......... 39

RCW § 19.86.020 .......... 1

**Other Authorities**

FTC, File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the FTC Act 8 (Nov. 10, 2022) .......... 31

Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) (3d ed. updated 2026) .......... 30

U.S. Dep't of Just. & FTC, Merger Guidelines § 2 (2023) .......... 5, 22, 23, 24

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 3

Fed. R. Civ. P. 8(a)(2) .......... 43



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

## I. INTRODUCTION

In the 1950s—when bowling in America was nearing its zenith, *see* ¶39—Congress amended Section 7 of the Clayton Act ("Section 7"), originally passed in 1914.[1] "[T]he dominant . . . fear" motivating the amendments was the "rising tide of economic concentration in the American economy." *Brown Shoe Co. v. United States*, 370 U.S. 294, 315 (1962). The new Section 7 supplemented existing Sherman Act Section 2 ("Section 2"), which already outlawed attempts to monopolize, including through mergers and acquisitions. *See United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966). During those decades numerous states also passed "mini-FTC" or similar acts that, like FTC Act Section 5 ("Section 5"), reach beyond restraints of trade and monopolization to outlaw "unfair methods of competition" ("UMC"). *E.g.*, RCW § 19.86.020.

These laws were enacted to prevent the kind of unlawful acquisition scheme Defendants ("Bowlero") have carried out, causing substantial harm to competition and injuring Plaintiff Bowlers and the Classes. Local bowling markets were once competitive, featuring numerous independent providers offering high-quality, affordable bowling. League-bowling was affordable, families could bowl and eat for under $50, lanes were well maintained, and some centers provided free childcare. People of all backgrounds socialized while enjoying one of America's favorite pastimes.

Then Bowlero identified the industry as "ripe for roll ups," and Wall Street came for bowling. From 2012 to 2026, Bowlero went from operating six centers in North America to nearly 350, including by acquiring 17 Bowl America locations in 2021, 14 Lucky Strike locations in 2023, and numerous other independent centers in markets across the country. ¶¶11, 43, 60, 68. Bowlero is now the largest bowling center operator in the world, controlling 35% of U.S. revenues. ¶¶9, 43.

This lawsuit challenges dozens of these acquisitions and Bowlero's overall acquisition

---

[1] Citations to "¶" herein refer to Complaint (ECF No. 1) paragraphs.



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

scheme. After each acquisition, consumers suffered price increases, quality degradation, and output reductions. In five markets where it already operated, Bowlero purchased and then shuttered a rival. This drastically reduced marketwide supply, funneling consumers to the high-priced, low-quality centers it controls. Ultimately, Bowlero's acquisitions harmed competition in each relevant market, directly injuring Plaintiffs and fellow consumers.

By acquiring 30% to over 95% of market after market—paired with its strategic acquisition of the Professional Bowlers Association ("PBA")—Bowlero has solidified its national dominance. It uses its purchasing power and control of the PBA to secure exclusive supplier deals, limit rivals' access to key inputs, and raise barriers to entry and expansion and rivals' costs in market after market. Bowlero is now leveraging this dominance to roll up adjacent markets, including amusement and water parks.

This conduct violates antitrust and UMC laws. In its Motion, Bowlero nitpicks Plaintiffs' relevant-market allegations, ignoring that Plaintiffs are "not required to define a particular market" because they allege direct evidence of eliminated horizontal competition—reduced output, higher prices, and worsened quality. *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 & n.7 (9th Cir. 2022) (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("*IFD*"); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018) ("*Amex*"). Similarly, *none* of Plaintiffs' state-law claims requires relevant-market definition.

Regardless, Plaintiffs have also established harm to competition indirectly—i.e., through "structural" proof of sufficiently higher market shares, concentrations, and barriers to entry to establish that each of Bowlero's acquisitions, and its overall acquire-dominate-leverage-extract scheme, violate Section 7, Section 2, and UMC laws. Indeed, the vast majority of Bowlero's acquisitions warrant a *presumption* that they violate Section 7. *See FTC v. Kroger Co.*, 2024 U.S. Dist. LEXIS 223077, *56-57 (D. Or. Dec. 10, 2024). Bowlero's only arguments to the contrary center on the relevant markets, ignoring and thus waiving any argument as to Plaintiffs' alternative theories of harm to competition, including entrenchment and increased risk of coordination. Regardless, "at the motion to dismiss stage, when [plaintiff] alleges a specific





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

[relevant] market, the hypothetical possibility that [consumers] might opt to use [other products or more distant providers] instead does not render the market definition legally deficient." *LyricFind, Inc. v. Musixmatch, S.p.A.*, 798 F.Supp.3d 1040, 1070 (N.D. Cal. 2025). Only "facially unsustainable" markets are dismissed. *Id*. Bowlero fails to show that localized markets for operations of bowling centers—recognized by the Supreme Court for decades—are "facially unsustainable." Bowlero's request for judicial notice only highlights the "fact intensive" nature of the "inquiry," *Drivecam, Inc. v. Smartdrive Sys.*, 2012 U.S. Dist. LEXIS 201198, *12 (S.D. Cal. Mar. 26, 2012), which counsels "hesitat[ion] [before] grant[ing] motions to dismiss." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

Bowlero dedicates the remainder of its motion to throwing a grab-bag of antitrust injury, standing, statute-of-limitations, and remedy arguments at the wall—frequently misstating the law or omitting controlling precedent. Plaintiffs' antitrust injury is clear: they suffered reduced output, higher prices, and worse quality from illegal conduct that lessened competition. Unlike in Bowlero's cited cases, Plaintiffs do not merely complain of high prices in a vacuum; they allege specific acquisitions that observably caused harm.

Bowlero argues Plaintiffs' state-law claims "fall" with their federal claims, ignoring that these broader laws intentionally reach conduct that may fail for technical proof under federal law—indeed, ignoring altogether the elements of these claims, all of which Plaintiffs allege.

Bowlero's remaining arguments are non-dispositive. Its assertion that certain remedies are unavailable misunderstands that Rule 12(b)(6) addresses failure to state a *claim*, not entitlement to forms of relief. Even if accepted, these flawed arguments would not dismiss any claim, as Bowlero fails to challenge standing and timeliness for all available relief. Finally, its class-certification arguments masquerading as "standing" challenges also fail and are non-dispositive.

The "'fundamental purpose' of Section 7 is to 'arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear through merger.'" *United States v. JetBlue Airways Corp.*, 712 F.Supp.3d 109, 146 (D. Mass. 2024) (quoting *United States*





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*v. Phila. Nat'l Bank*, 374 U.S. 321, 367 (1963) ("*PNB*")). That is exactly what has already happened and will continue to happen if Bowlero is allowed to continue its acquisition scheme and its exercise of unlawfully acquired market power at the expense of competition, consumers, and the social fabric of this country. The Court should deny Bowlero's Motion and allow Plaintiffs an opportunity to take bowling back from Wall Street.

## II. PLAINTIFFS PLAUSIBLY ALLEGE AN ANTICOMPETITIVE "ROLL-UP" SCHEME THAT HAS INJURED AND THREATENS TO IRREPARABLY FURTHER INJURE PLAINTIFFS

### A. Plaintiffs Adequately Allege Violations of Federal Antitrust Law

#### 1. The Direct-Evidence Method of Proof Does Not Require an "Elaborate Market Analysis"

Section 2 makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce." 15 U.S.C. § 2. In Section 2 attempted monopolization cases, the required market power showing "may be demonstrated through either of two types of proof." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Circumstantial proof requires plaintiff to "(1) define the relevant market, (2) show defendant owns a dominant share of that market, and (3) show there are significant barriers to entry [and expansion]." *Id.* But where plaintiffs allege a horizontal restraint such as a merger, they can alternatively demonstrate market power by "put[ting] forth evidence of restricted output and supracompetitive prices." *Id.* This "direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power," *id.*, obviates the need to define a relevant market. *See PLS.COM*, 32 F.4th at 838, n.7; *Costar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1068 (9th Cir. 2025); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007).

Similar methods of proof are available for Section 7 claims. Section 7 prohibits acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs can prove substantial lessening of competition not only indirectly—i.e., through a market-share and concentration analysis—but through proof of the





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

elimination of head-to-head competition (i.e., proof that the merging companies previously "vigorously compete[d]"), or direct evidence that the acquisition produced higher prices or reduced quality or output. *FTC v. Edwards*, 2026 U.S. Dist. LEXIS 19409, *73-74, *81 (D.D.C Jan. 9, 2026) (quoting *PNB*, 374 U.S. at 363); *see United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 669-70 (1964) (per curiam); *see, e.g.*, *Texas v. Blackrock, Inc.*, 2025 U.S. Dist. LEXIS 147891, *27 (E.D. Tex. Aug. 1, 2025). This method of proof does not require "an analysis of market shares." U.S. Dep't of Just. & FTC, Merger Guidelines ("Guidelines") § 2 (2023); *see, e.g.*, *United States v. Blue Bell, Inc.*, 395 F.Supp. 538, 542 (M.D. Tenn. 1975) ("not necessary to rely on numerical market share data" in light of "elimination of significant competition between the[] [merged entities]").

Bowlero's Motion is *silent* on whether Plaintiffs have alleged direct evidence of harm to competition, focusing almost entirely on whether Plaintiffs have properly alleged relevant markets and shares, which are not required for the direct-evidence route.

### 2. **Plaintiffs Allege Direct Evidence of Anticompetitive Effects and the Elimination of Head-to-Head Competition, Dispensing with the Need for an "Elaborate Market Analysis"**

The specific factual allegations detail exactly how Bowlero has, through acquisitions, weaponized its dominance to eliminate head-to-head competition between formerly competing centers, producing anticompetitive effects. ¶172. After each acquisition, Bowlero had acquired sufficient market power and eliminated sufficient competition to enable it to reduce output in the relevant market, in the form of reduced operating hours and, in some cases, the outright closure of previously competing centers. ¶¶176-81, 224-25. There is no better evidence of the *elimination of head-to-head competition* than Bowlero's pattern of buying up a center with which it formerly competed and shutting it down. Bowlero already owned Bowlero White Plains when it acquired Lucky Strike West Nyack—just 20 minutes away—and then promptly closed the West Nyack location. ¶177. In Richmond, Virginia, Bowlero already operated three existing centers, acquired four Bowl America locations within 25 miles, and promptly closed two of them. ¶179. In Fairfax, Virginia, Bowlero was already operating Bowlero Centreville when it





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

acquired Bowl America Chantilly and Bull Run, both 13 miles away, and closed the former. ¶¶27, 180. Bowlero has since closed at least two more formerly competing centers: Sabre Lanes in Menasha, Wisconsin, which Bowlero acquired in 2022, nine miles from Bowlero's Super Bowl Family Entertainment Center location, ¶109, and Lucky Strike Wrigleyville in Chicago, which Bowlero acquired as part of its 2023 Lucky Strike acquisition, just 6 miles from Bowlero's Lucky Strike Chicago, ¶111; *see* ECF No. 36 at 6 n.1.

Closed centers and reduced operating hours are inescapable output reductions. *See Amex*, 585 U.S. at 549 ("restricting output" is quintessential harm to competition enabling "anticompetitive prices"). One need not ascertain the precise bounds of the relevant market or catalog every competitor in that market to conclude that aggressively throttling supply from recently-acquired, close-proximity, former vigorous competitors eliminated head-to-head competition and likely harmed competition. *See, e.g.*, *Edwards*, 2026 U.S. Dist. LEXIS 19409, *101; *Blue Bell*, 395 F.Supp. at 542.

Hand in hand with these output restrictions, Bowlero's acquisitions have enabled Bowlero to raise prices in the acquisition markets. *See Amex*, 585 U.S. at 549 (court can "infer competitive injury from . . . some evidence that tends to prove that output was restricted or prices were above a competitive level."); *see, e.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 457 (9th Cir. 2021). As the Complaint alleges, "Bowlero's acquisitions in the relevant markets . . . left consumers *in these markets facing higher prices* that they generally could not avoid if they wanted to continue to bowl." ¶174 (emphasis added); ¶¶9, 140, 190, 211 ("Consumers in all the alleged markets have paid higher prices as a result of Bowlero's unlawful acquisitions."), 213, 280 (Bowlero's unlawfully acquired "market power in each relevant bowling center market" has enabled it "to charge supracompetitive prices in the relevant markets.").

The Complaint gives multiple specific examples of price increases in specific relevant markets resulting from the acquisition(s) in that market. For example, Plaintiff Doehr "has particularly noticed increased prices . . . at Garage Billiards & Bowl ('Garage'), a formerly independent bowling center subsequently acquired by Bowlero" in Seattle. ¶19. "In the last four





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

years," Los Angeles Plaintiff Soliz "has been forced to pay ever-increasing prices at both Bowlero and non-Bowlero centers in his area." ¶20. New York Plaintiff Feuer has paid "extravagant" prices to Bowlero White Plains, which can charge "much more" since Bowlero closed Lucky Strike West Nyack. ¶¶21-22, 177. New York Plaintiff Kevin Howard likewise "paid much higher prices for bowling and food than he had paid in the past at [a Bowlero] location." ¶22.

Bay Area Plaintiff Andre Howard "has experienced increased prices and worsened quality" at Bowlero centers in his area. ¶23. Plaintiff Cordero's weekly games with family and friends "used to cost approximately $40 an hour," but he "now must pay approximately $60 an hour" and bowls once every four or five months instead of weekly. ¶24. Virginia Plaintiff Kelly "estimates that prices at multiple Bowlero locations in his region have [at least] doubled . . . since Bowlero acquired them." ¶27. Kelly was a frequent bowler at Bowl America Chantilly, which Bowlero acquired and closed, "capturing and diverting nearly all of its preexisting customer base to Bowlero Centreville, where those customers now pay significantly higher prices for a worse experience." ¶180. Plaintiff Harkness "has paid increased prices at both Bowlero and non-Bowlero bowling centers in [Fairfax, Virginia]" since the relevant acquisitions. ¶26. Sacramento Plaintiff Goodman has faced increased prices at both Bowlero and non-Bowlero centers, including "consistent increase[s] in league fees and higher prices for food and beverages" since the relevant acquisitions. ¶29.

The Complaint pleads the same sequence at the market level: "prices . . . in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD MSA rose within a year of Bowlero's acquisition of Lucky Strike Philadelphia in that market." ¶175. In Richmond, Virginia, "Bowlero acquired four Bowl America locations and promptly closed two of them, funneling customers to the three preexisting Bowlero locations in the region or the remaining two Bowl America locations, where it was able to increase prices." ¶179. And "prices in Wichita rose dramatically following the [Wichita] acquisitions. . . . This pattern repeated itself in the Reading, PA and Jacksonville, FL MSAs." ¶¶198-99; ¶211. One Northrock Lanes bowler saw substantial price



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

increases following Bowlero's acquisitions. ¶211; *see* ¶213 (after Bowlero acquires a "really nice bowling alley with affordable prices and good deals" it then "immediately raises prices"). And the 14-center Lucky Strike acquisition enabled Bowlero to increase prices *in those markets*. *See* ¶190 (Bowlero raised prices at certain acquired Lucky Strike locations, leading to "an immediate 50% increase in profitability" at those locations).

As with reduced output, these detailed allegations of higher prices dispense with the need to prove harm to competition with relevant-market evidence. When Bowlero's acquisition of a competing bowling center within 30-60 minutes' travel time removes a competitive constraint and enables it to raise prices, that is direct evidence that *Bowlero itself recognizes* that it competes in a bowling center product market—i.e., that consumers do not substitute away to mini golf and laser tag—and that it competes with centers within 30-60 minutes' travel time. *See Broadcom*, 501 F.3d at 307 n.3; *see, e.g.*, *Blackrock*, 2025 U.S. Dist. LEXIS 147891, *27-28 (denying motion to dismiss where plaintiffs "plausibly allege[d] anticompetitive harm by stating that coal prices increased while output decreased as a result of Defendants' conduct").

As if lower output and higher prices were not enough, the Complaint further alleges the acquisitions have enabled Bowlero to reduce the customer experience or worsen quality in the markets in which it has acquired centers. ¶¶223-36; *see Rebel Oil*, 51 F.3d at 1433; *see, e.g.*, *CollegeNET, Inc. v. Common Application, Inc.*, 711 F.App'x 405, 406-07 (9th Cir. 2017). For example, Plaintiff "Doehr has particularly noticed . . . reduced quality at Garage Billiards & Bowl ('Garage')." ¶19. As another example, "after removing security on weekends at one acquired location in Wichita, Bowlero staff had to call the police to deal with repeat trespassers." ¶229.

Plaintiffs have satisfied the direct-evidence method for proving harm to competition, dispensing with the need to do more than roughly approximate the relevant markets—which they have indisputably done by alleging localized markets of bowling centers. ¶¶79-122; *see IFD*, 476 U.S. at 461; *see, e.g.*, *In re Neurontin Antitrust Litig.*, 2013 U.S. Dist. LEXIS 111587, *10-11 (D.N.J. Aug. 8, 2013) (sufficient for plaintiffs to "define[] the approximate" or "rough"



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

"contours of the relevant market" because they used the "direct evidence method"); *Edwards*, 2026 U.S. Dist. LEXIS 19409, *78-80 (denying motion to dismiss; declining to consider "market share and concentration evidence," "considering the strength of the FTC's [direct] evidence"); *United States v. Mfrs. Hanover Tr. Co.*, 240 F.Supp. 867, 951, 955 (S.D.N.Y. 1965).

**3. Plaintiffs Allege Indirect Evidence that Bowlero's Acquisitions May Substantially Lessen Competition or Tend to Create a Monopoly in Violation of Clayton Act Section 7**

Plaintiffs have also alleged facts showing likely harm to or substantial lessening of competition in properly defined relevant markets—satisfying the indirect-evidence method of proof. To be clear, "the force of § 7 is still in probabilities, not in what later transpired" because "once the two companies are united no one knows what the fate of the acquired company and its competitors would have been but for the merger." *FTC v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965). Similarly, Clayton Act Section 16—entitling private plaintiffs to injunctive relief—"expand[s] the[] availability [of remedies] against harms that [may be] as yet unrealized." *California v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990). Thus, at a minimum, Plaintiffs are eligible for injunctive relief because they have established Bowlero's acquisitions "may" have, and "may" still further, "substantially . . . lessen competition." 15 U.S.C. § 18; *see United States v. Cont'l Can Co.*, 378 U.S. 441, 465-66 (1964) (court must consider "not only . . . the static competitive situation but also the dynamic long-run potential" of the acquisition).

"To establish a *prima facie* case," using indirect evidence, that a merger is anticompetitive under Section 7, "plaintiff must [1] propose a proper relevant market and [2] show that the effects of the merger in that market will likely be anticompetitive." *FTC v. Tapestry, Inc.*, 755 F.Supp.3d 386, 408 (S.D.N.Y. 2024) (collecting cases); *see id.* at 411. A "'market' [i]s the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'" *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) (quoting *Rebel Oil*, 51 F.3d at 1434). That grouping "must be drawn narrowly," *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n.31 (1953), to include only those sellers who, "'if unified by a monopolist or a hypothetical cartel'





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

could profitably raise prices above a competitive level." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (quoting *Rebel Oil*, 51 F.3d at 1434); *see also FTC v. Sysco Corp.*, 113 F.Supp.3d 1, 33-34 (D.D.C. 2015) (describing Hypothetical Monopolist Test).

"The relevant market has two components: the product market and the geographic market." *Kroger,* 2024 U.S. Dist. LEXIS 223077, *22 (citing *Brown Shoe*, 370 U.S. at 324); *accord Tapestry*, 755 F.Supp.3d at 412. For example, in *Kroger*, the court preliminarily enjoined the merger of Kroger and Albertsons, finding "the proposed merger will substantially lessen competition within two distinct markets, supermarkets and large format stores, in the local areas around defendants' existing stores." 2024 U.S. Dist. LEXIS 223077, *21; *see also PNB*, 374 U.S. at 356-61 (market for commercial banking in the Philadelphia MSA); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783-85 (9th Cir. 2015) (market for adult primary care physicians in Nampa, Idaho); *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1032 (D.C. Cir. 2008) (markets for "premium, natural, and organic supermarkets" in "eighteen cities" where merging parties were only competitors).

As to the second element, "[u]sually, the plaintiff demonstrates likely anticompetitive effects by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition." *Tapestry*, 755 F.Supp.3d at 408 (quotation marks omitted) (collecting cases).

**a) The Relevant Market for the Purchase and Sale of Products and Services from Bowling Center Operators, Which Has Been Recognized for Decades, Is Plausible [I.A]**

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S.at 325. "This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-81 (1956). The inclusion of products "reasonably interchangeable by consumers for the same purposes," *id.* at 395, "ensures that the relevant product market





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). In *Brown Shoe*, the Supreme Court listed several "practical indicia" of an economically distinct market: "industry or public recognition of the []market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. "'There is no requirement to use any specific methodology in defining the relevant market,' and 'courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT.'" *Tapestry*, 755 F.Supp.3d at 414 (quoting *FTC v. Meta Platforms Inc.*, 654 F.Supp.3d 892, 912 (N.D. Cal. 2023)) (collecting cases).

While "a complaint may be dismissed . . . if [its] 'relevant market' definition is facially unsustainable," *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008), Plaintiffs need only plead facts sufficient to "adequately consider[] and reject[] alternatives" that may be "conceivably interchangeable." *CollegeNet, Inc. v. Common Application, Inc.*, 355 F.Supp.3d 926, 958 (D. Or. 2018). "Courts should apply 'a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one.'" *JetBlue*, 712 F.Supp.3d at 147 (quoting *Brown Shoe*, 370 U.S. at 336).

**(1) Plaintiffs Identify the Relevant Products and Services**

Tenpin bowling, as standardized by the U.S. Bowling Congress ("USBC"), is a distinct activity. ¶¶79-82. Because such bowling is generally offered to consumers in bowling centers, the relevant product market is "the market for operating bowling centers." ¶79; *see Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) ("The goods and services that sellers or producers offer provide the best indicia of who competes in the same market."). Bowlero plays semantic games regarding the phrasing, but the alleged "market for operating bowling centers" is nothing like the markets alleged in *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023). There, plaintiffs "alleged in scattergun fashion that there were



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

at least fifteen 'relevant markets,'" many of which included single-brand aftermarkets—a distinct type of market requiring specific facts to plausibly allege. *Id.* at 956. Moreover, the *Coronavirus* plaintiffs "made no effort at all to define the markets or to distinguish them from one another." *Id.* In contrast to that case—indeed, in contrast to every case cited by Bowlero—Plaintiffs allege here a product market that is supported by decades of precedent and the *Brown Shoe* practical indicia, and specifically and reasonably distinguishes conceivable substitutes.

Since the 1950s, *see* ¶39, courts have repeatedly identified a product market in which operators of bowling centers compete to sell bowling, along with complementary goods and services. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 480 (1977) ("These acquisitions made petitioner by far the largest operator of bowling centers."); *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) ("market for retail bowling services"); *Washington State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d 371, 374 (9th Cir. 1966) (market of "operator[s] of a bowling establishment"); *Bowl Am., Inc. v. Fair Lanes, Inc.*, 299 F.Supp. 1080, 1085 (D. Md. 1969) (market for "operating bowling establishments"); *United States v. Bowling Proprietors' Ass'n of Am., Inc.*, 1965 U.S. Dist. LEXIS 9486, *1 (S.D.N.Y. Feb. 24, 1965) (market for "the operation of bowling alleys"); *Monument Bowl, Inc. v. N. Cal. Bowling Proprietors' Ass'n*, 197 F.Supp. 208, 210 (N.D. Cal. 1961) ("[I]t is the consumer, the bowler and his patronage, with whom we are concerned and whose patronage gives rise to the relevant market."), *rev'd on other grounds*, 316 F.2d 787 (9th Cir. 1963); *see also JetBlue*, 712 F.Supp.3d at 149-50 (recognizing relevant market definition based on its "[h]istorical[]" acceptance).

As the above-cited bowling cases make clear, the fact that lane rental is just one component of the broader bowling experience, which once included "nurseries for infants," *Bowl Am.*, 299 F.Supp. at 1085, along with "restaurant and bar facilities," *Monument Bowl*, 197 F.Supp. at 209, and today may include "other entertainment activities like arcades and laser tag" ¶43, does not render it a defective relevant market.

Plaintiffs' Complaint recognizes that, much as movie theaters "traditionally (and



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

notoriously) earn a substantial portion of their revenue from the sales of candies, popcorn, and soda," bowling centers profit by selling such complementary offerings. *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997). Bowlero erroneously confuses Plaintiffs' recognition of this commercial reality with failing to plead a relevant market at all, as in *Brown v. Department of Water & Power*, 2025 U.S. Dist. LEXIS 17182, *14 (C.D. Cal. Jan. 29, 2025), and *Natkin v. American Osteopathic Association*, 2018 U.S. Dist. LEXIS 7427, *24 (D. Or. Jan. 1, 2018), or gesturing at several distinct markets but failing to plead facts supporting any one, as in *Unigestion Holdings, S.A. v. UPM Technology, Inc.*, 412 F.Supp.3d 1273, 1285-86 (D. Or. 2019). In contrast, Plaintiffs have clearly alleged that a bowling center's core offering is bowling, ¶¶4-5, 38-45, 79-92, to which it attaches various offerings like food, beverages, and arcades. ¶¶13, 43, 220; *see, e.g.*, *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194 (10th Cir. 2009) ("The true product in these cases is the overall experience. Deer Valley offers a cluster of products that combine to create a destination ski experience."); *Elliott*, 126 F.3d at 1005 ("[P]eople do not go to the United Center to buy food; they go to watch a basketball game, a hockey game, or some other special event. . . . The price of the refreshments or the wine is just one part of the price of the evening out.").

**(2) The Proposed Product Market Is Not Too Narrow**

Bowlero argues the product market is too narrow because it excludes operators of entertainment venues that do not offer bowling. Yet following *Brown Shoe*, Plaintiffs extensively allege "practical indicia" of the distinct market for centers that offer *bowling*, which indicate that other activities are not "reasonably interchangeable by consumers *for the same purposes*." *E. I. du Pont*, 351 U.S. at 395 (emphasis added); ¶¶87-92. For consumers seeking to bowl, no other entertainment provider is a reasonable substitute. ¶¶85-87, 198. Moreover, bowling "unique[ly]" enables the participation of an entire family or group of friends, "regardless of age and agility," ¶91, unlike numerous other generic "entertainment" options. The Complaint highlights evidence of "industry or public recognition" of bowling as a separate market, *Brown Shoe*, 370 U.S. at 325, including by Bowlero's CEO himself, ¶¶77, 87; similar distinctions drawn by market

analysts between bowling centers and other entertainment venues, ¶90; and the existence of various organizations devoted to the sport and business of bowling, including bowling leagues, the PBA, the Bowling Proprietors' Association of America ("BPAA"), and the USBC. ¶¶41-42, 56, 73, 81-86. These examples of public recognition are also indicative of bowling's peculiar characteristics, including the USBC's standardization of the sport, which not only enables league and professional play, ¶¶81-82, 85-86, but also distinguishes the experience for all consumers.

Moreover, bowling centers have highly "specialized vendors," providing equipment and other products that serve *only* the distinct operations of a bowling center. ¶¶80-83. For example, QubicaAMF and Brunswick Corporation sell "lanes, pinsetters, scoring systems, and lane management software," and Kegel sells the conditioning oils needed to maintain the lanes, all to a single group of customers: bowling center operators. ¶¶47, 72, 182. Notably, the BPAA exists largely to negotiate with these "key suppliers." ¶73. Specialized vendors and organizations also serve the needs of league and professional bowlers. ¶¶56, 205.

These facts—which must be taken as true—indicate that bowling is insufficiently interchangeable with "seemingly similar [entertainment] products," *Alivecor, Inc. v. Apple Inc.*, 592 F.Supp.3d 904, 915 (N.D. Cal. 2022), such that competitive pressure from other entertainment activities do not constrain Bowlero from raising prices or degrading quality beyond a competitive level. ¶95. Based on the alleged facts, including quantified HHI (Herfindahl-Hirschman Index) increases across relevant local markets, ¶¶146-70, Plaintiffs plausibly allege that a "hypothetical monopolist of bowling centers" in any local market could profitably impose a small but significant, non-transitory increase in price or other worsening of terms, which indicates a market properly defined to account for cross-elasticities of demand. ¶¶94-95.

Plaintiffs' thorough discussion of why other activities are not substitutes clearly distinguishes the product market from the gerrymandered markets alleged in *Hicks*, 897 F.3d at 1113-15, and *PBTM LLC v. Football Northwest, LLC*, 511 F.Supp.3d 1158, 1180 (W.D. Wash. 2021): in both cases, plaintiffs alleged contrived aftermarkets related to constrained





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

foremarkets—respectively, "inplay" advertising inventory during the PGA tour and Seattle Seahawks merchandise. In the former, plaintiffs ignored competition from ads during commercial breaks and other media where "professional golf fans" could be reached. *Hicks*, 897 F.3d at 1121. In the latter, plaintiffs alleged "a sub-market defined by a single number associated with a single team," but failed to discuss *Brown Shoe* factors or other evidence of a lack of "cross-elasticity of demand" for other Seahawks or Seattle sports merchandise. *PBTM*, 511 F.Supp.3d at 1181-82. The product market here bears no resemblance to such gerrymandered and contrived aftermarkets. *See Newcal*, 513 F.3d at 1046-48; *see also, e.g.*, *Reilly v. Apple Inc.*, 578 F.Supp.3d 1098 (N.D. Cal. 2022); *Pa. Ave. Funds v. Borey*, 569 F.Supp.2d 1126 (W.D. Wash. 2008).

At bottom, Bowlero fundamentally misunderstands that "a relevant market cannot meaningfully encompass an infinite range." *Sysco*, 113 F.Supp.3d at 26 (quoting *Times-Picayune*, 345 U.S. at 612). The circle "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *FTC v. IQVIA Holdings Inc.*, 710 F.Supp.3d 329, 353 (S.D.N.Y. 2023); *see also FTC v. Advoc. Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016). Consistent with these principles, courts for decades have recognized distinct markets related to distinct entertainment activities, just as Plaintiffs do here. *See, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 251 (1959) (affirming finding of market for "nonchampionship fights" for which "championship contests" were not substitutable); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) (reversing summary judgment; *Brown Shoe* factors could support separate market for "original equipment major brand tires" distinct from "private label brand tires"); *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) (market for the exhibition of "first-run" films); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 992 (9th Cir. 1986) (markets for drive-in movie theaters and "hardtop major film exhibition"); *United States v. Live Nation Ent., Inc.*, 2026 U.S. Dist. LEXIS 33190, *51-59 (S.D.N.Y. Feb. 18, 2026) (submarket for "large amphitheaters"); *Heckman v. Live Nation Ent., Inc.*, 2025 U.S. Dist.

LEXIS 69885, *27-29 (C.D. Cal. Apr. 11, 2025) (submarket for "secondary ticketing" for "major concert venues"); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1513 (10th Cir. 1984) (market for "downhill skiing services"); *see also In re Pinnacle Ent., Inc.*, 2013 FTC LEXIS 80, *2 (F.T.C. May 28, 2013) (FTC alleging market for "casino services").

**(3) The Proposed Product Market Is Not Too Broad**

Bowlero inconsistently also argues that the alleged market is too broad. According to Bowlero, league, casual, corporate-event, and professional bowlers are not fungible *in the eyes of bowling center operators*. But at this stage, Plaintiffs are not required to allege *even-narrower* targeted-customer sub-markets. *See, e.g., FTC v. Staples, Inc.*, 190 F.Supp.3d 100, 117-18 (D.D.C. 2016). Nor have Plaintiffs alleged a product market analogous to the hopelessly broad "pharmaceutical industry" market alleged in *Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*, 433 F.App'x. 598, 599 (9th Cir. 2011). Rather, at this stage, Plaintiffs have pled a common bowling experience for *all* customers, regardless of whether they are casual or league bowlers, *see, e.g.*, ¶¶81-82, 85-86 (discussing USBC standardization), *all* of whom have suffered reduced output, increased prices, and degraded quality due to Bowlero's anticompetitive consolidation. ¶¶210-36; *see supra*, Section II.A.2. Even if "submarkets may exist" "[w]ithin th[e] broad market" defined in the Complaint—as Bowlero suggests—that would not call into question the validity of the broader market. *Brown Shoe*, 370 U.S. at 325.

Bowlero argues next that differences in interior design and marketing practices render bowling centers not interchangeable. Mot. 12-13. Plaintiffs allege that Bowlero's introduction of "atmospherics like night-club blacklights and extremely loud music" constitutes worsened quality. ¶14, 140. But such harmful differentiation does not render, for example, Bowlero's Lucky Strike Bellevue so dissimilar from an independent bowling center in Seattle that plaintiffs' grouping of the two is analogous—as Bowlero asserts, Mot. 13—to the grouping of "heart medication and antibiotics" in *Golden Gate*, 433 F.App'x. at 599, or to the grouping of "single-aisles, twin-aisles, regional jets, and turboprops" in *Zunum Aero, Inc. v. Boeing Co.*, 2022 U.S. Dist. LEXIS 144483, *27-28 (W.D. Wash. Aug. 12, 2022). Plaintiffs avoid arbitrary



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

line-drawing by delineating the boundaries of the alleged product market according to precedent and common sense, recognizing that "customers know a [bowling center] when they see it," even if they must tolerate blaring background music and lights. *Bon-Ton Stores v. May Dep't Stores Co.*, 881 F.Supp.860, 870 (W.D.N.Y. 1994) (finding a relevant market for "traditional department stores").

**b) Plaintiffs Allege Plausible Relevant Geographic Markets [I.B]**

Plaintiffs also allege facts establishing the existence of relevant geographic markets in 23 MSAs. ¶¶99-122. To begin with, "[a] geographic market need not be alleged or proved with 'scientific precision.'" *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 U.S. Dist. LEXIS 126239, *10 (E.D. Cal. July 15, 2022) (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)). Nor are Plaintiffs required to offer "detailed factual" findings, *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F.Supp.2d 1002, 1007 (N.D. Cal. 2013), or "plead specific facts eliminating all other possible markets as the relevant geographic market." *MLW Media LLC v. World Wrestling Ent., Inc.*, 2023 U.S. Dist. LEXIS 104499, *12 (N.D. Cal. June 15, 2023). Rather, Plaintiffs merely must provide sufficient plausible facts "to enable the opposing party to defend itself effectively." *Orchard Supply*, 939 F.Supp.2d at 1010 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

A relevant geographic market consists of "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." *JetBlue*, 712 F.Supp.3d at 148 (collecting cases); *accord Kroger*, 2024 U.S. Dist. LEXIS 223077, *46. The relevant question is "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *JetBlue,* 712 F.Supp.3d at 148 (quoting *PNB*, 374 U.S. at 357).

Throughout the Complaint, Plaintiffs consistently allege that relevant local markets are comprised of bowling centers within 30-60 minutes' travel time of the relevant Bowlero center(s)—namely the acquired center(s)—based on the alleged fact that, "[w]hile commuting patterns, traffic flows, and other local characteristics may cause some variation in the distance

and time consumers are willing to travel to go bowling, consumers in most markets are generally not willing to travel more than 30 to 60 minutes to go bowling." ¶97; *see* ¶98 ("localized geographic markets within 30 to 60 minutes of a Bowlero bowling center"). Paragraph 170, in which Plaintiffs allege market shares in relevant markets comprised of bowling centers located no farther than "approximately one hour's driving time of the acquired center(s)," is fully consistent with every other geographic market allegation in the Complaint, that consumers will travel up to 30-60 minutes to go bowling. *Contra* Mot. 13 n.4, 16:9-11.

This willingness-to-travel allegation is not a "conclusory assertion." Mot. 13. It is an alleged *fact* that must be taken as true, no different from "the light was red" or "the sky is blue." *See, e.g.*, *Pluspass, Inc. v. Verra Mobility Corp.*, 2021 U.S. Dist. LEXIS 201843, *15 (C.D. Cal. Aug. 9, 2021) (crediting as true plaintiff's factual allegation that customers tend to drive within a certain region). By contrast, in *Portillo v. CoStar Group, Inc.*, 2025 U.S. Dist. LEXIS 169128, *15-17 (W.D. Wash. Aug. 29, 2025), plaintiffs' own allegations made clear the information defendants shared was not pricing information, and yet plaintiffs engaged in "linguistic stretches" to nevertheless *label* it as such. In *Arena Restaurant & Lounge LLC v. Southern Glazer's Wine & Spirits, LLC*, 2018 U.S. Dist. LEXIS 63869, *33-34 (N.D. Cal. Apr. 16, 2018), plaintiff speculated that "Defendants sold liquor to different parties at different prices" but provided no "basis for believing that Defendants engaged in these practices." And in *Rx Solutions, Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443 (5th Cir. 2026), the complaint lacked "any allegations apart from merely offering the state and counties in which the parties do business."

Indeed, Plaintiffs' Complaint is consistent with decades of case-law defining local markets based on alleged (or proven) willingness-to-travel times. *See, e.g.*, *Sysco*, 113 F.Supp.3d at 51 ("Dr. Israel's premise in defining these markets—that driving distance matters—is amply supported by the record and common sense."); *see also Kroger*, 2024 U.S. Dist. LEXIS 223077, *47 ("Here, both sides agree that the distance a customer is willing to travel to a store is a significant factor in defining the relevant geographic market."); *Cobb Theatres III, LLC v. AMC*





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Ent. Holdings, Inc.*, 101 F.Supp.3d 1319, 1336 (N.D. Ga. 2015) ("[M]arkets involving services that can only be offered from a particular location, like those provided by hospitals, theaters, and ski areas, will often be defined by how far consumers are willing to travel . . . .").

Bowlero confusedly asserts that "[t]he Complaint . . . purportedly applies *30-to-60-minute* radii from *all* Bowlero locations." Mot. 15 (citing ¶¶97-98). But ¶¶97-98 do not allege this. Rather, they allege that "[r]elevant geographic markets for bowling centers are localized areas around each bowling center." ¶97. In any given MSA, there are dozens of plausible, *overlapping* relevant markets. The market of relevant focus in a merger case, however, is the market of operators surrounding the acquired location(s), because those operators—if there are enough of them—have the ability to act as a competitive constraint on the acquired location(s). *See, e.g.*, *Kroger*, 2024 U.S. Dist. LEXIS 223077, *47 (enjoining merger likely to harm competition in relevant geographic markets for grocery stores defined by FTC as "local area[s] drawn around each of defendants' stores"). This is not the same thing as defining a market by [w]here [a company] competes." Mot. 15 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)). In all of Bowlero's cited cases, plaintiffs defined the market solely by reference to defendant's trade area. Here, Plaintiffs properly define the market based on how far consumers are willing to travel to go bowling.

Bowlero next argues that "it is facially unsustainable that 23 markets can be defined based on a single, uniform travel-time unsupported by any market-specific allegations." Mot. 15. But Plaintiffs have not defined the markets in this way. Consistent with the allegation of a 30-to-60-minute willingness to travel, each relevant market alleged in the Complaint generally includes at least all bowling centers within 30 minutes' drive time of the acquired centers, and some but not necessarily all of the centers between 30 and 60 minutes' drive time. *See* ¶170 (market shares were calculated by including bowling centers located no farther than "approximately one hour's driving time of the acquired center(s)"). Plaintiffs have done exactly what Bowlero falsely faults them for not doing—they have taken into account that "'commuting patterns, traffic flows, and other local characteristics may cause some variation' in how far consumers will travel." Mot. 15





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

(quoting ¶97). But even if Plaintiffs had, for purposes of the Complaint, selected a "somewhat arbitrary" cutoff of one hour, that would not render their geographic markets "facially unsustainable." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 568 (9th Cir. 2024) (explaining there will nearly always be some "arbitrary" line-drawing in relevant-market definition; this reality does not doom the exercise).

After first falsely accusing Plaintiffs of uniformity, Bowlero then contradictorily argues that Plaintiffs' allegations *considering variations in local conditions*—which may produce some relevant geographic markets that are smaller than others—renders the alleged markets too "indeterminate." Mot. 16. But markets allowing for variations of this sort, far from rendering them "facially unsustainable," merely reflect and account for "commercial realities faced by consumers" and the inherent "fuzziness" of relevant market definition. *Compass Inc. v. Nw. Multiple Listing Serv.*, 2026 U.S. Dist. LEXIS 58200, *15 (W.D. Wash. Mar. 19, 2026); *see, e.g.*, *Kroger*, 2024 U.S. Dist. LEXIS 223077, *124 ("variation in the size of geographic markets is common and not disqualifying" even at later stages); *PNB*, 374 U.S. at 360-61 (customers vary in willingness to travel).

Indeed, Plaintiffs' geographic market allegations are far more robust than those deemed facially sustainable in other cases. *See, e.g.*, *Sidibe v. Health*, 667 F.App'x 641, 642-43 (9th Cir. 2016) (market based on allegations of consumers' unwillingness or inability to obtain hospital services outside their zip codes); *Pluspass*, 2021 U.S. Dist. LEXIS 201843, *13-15 (markets based on "customers['] tend[ency] to drive within a certain region"). Plaintiffs have identified local markets within each MSA, ¶¶99-122; put Bowlero on notice that generally no bowling center farther than 60 minutes' travel time from a Bowlero center competes in the same market, ¶¶97-98; and contrary to Bowlero's false claims, Mot. 13 n.4, 16, identified every acquired center in every alleged market, ¶¶99-122, and "specif[ied]" "the center point for each alleged market," Mot. 16, as "the acquired center(s)" in that market. ¶170. Moreover, for three markets, Plaintiffs display all competitors. ¶¶152-55, 158-61, 164-67.

True, Plaintiffs have not specified the precise day of week, hour of day, or route used to





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

calculate travel time between centers, or the lane counts used to calculate market shares and HHIs, or the full competitor set in each relevant market. But this kind of detail is reserved for expert reports—if at all. *See, e.g.*, *Dairy, LLC v. Milk Moovement, Inc.*, 2023 U.S. Dist. LEXIS 83790, *17-18 (E.D. Cal. May 12, 2023) (denying motion to dismiss and explaining "there is no requirement that [plaintiff] identify every competitor"); *Klein v. Facebook, Inc.*, 580 F.Supp.3d 743, 765 (N.D. Cal. 2022) (same); *Sidibe*, 667 F.App'x at 642-43 ("plaintiffs were not required to allege evidentiary facts such as what percentages of patients from inside and outside a particular HSA use the hospitals in that HSA"); *Teradata*, 124 F.4th at 568 (expert's "general definition" of "large enterprises" as "those with high annual revenues, a large number of staff, high data volume and complexity" was sufficiently concrete at expert stage).

Bowlero next cites non-judicially noticeable, *purported driving times* to centers outside the boundaries of three markets, claiming Plaintiffs should have included those centers because they are purportedly less than one hour's drive-time away from an acquired location in the relevant market. Mot. 17; RJN Exs. A-C. As an initial matter, as discussed, nowhere do Plaintiffs allege that they included *all* centers within 60 minutes' travel time of the acquired centers in each market. But regardless, unlike Plaintiffs (¶¶97-98), Bowlero unreasonably calculated drive times apparently assuming *no traffic*, which explains why the centers it identified were properly excluded. But this discussion just illustrates the fundamental problem with Bowlero's argument—it relies on alleged "facts" that are not judicially noticeable, and that contradict facts alleged in the Complaint that must be taken as true. *See, e.g., Lomeli v. County of San Diego*, 637 F.Supp.3d 1046, 1060 n. 5 (S.D. Cal. 2022) (refusing judicial notice of Google Maps drive-time estimates as subject to reasonable dispute); *Cobb Theatres*, 101 F.Supp.3d 1319 (same); *Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir. 2015) (same); *United States v. Julius*, 14 F.4th 752, 756 (7th Cir. 2021) (same). To illustrate the unreliability of Bowlero's proffered drive-time estimates, Plaintiffs have recreated each of Bowlero's maps and drive-time estimates assuming a reasonable amount of traffic. *See* Declaration of Catherine S. Simonsen & Ex. 1. When calculated in this way—i.e., consistent with the Complaint—all of the so-called "excluded





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

competitors" were reasonably excluded.

Given the extent and number of Bowlero's arguments, it is clear Bowlero understands the parties' relevant-market dispute and is capable of marshalling evidence to try to disprove Plaintiffs' allegations. This means Plaintiffs have done their job at the pleading stage.

**c) Plaintiffs Allege the Acquisitions May Substantially Lessen Competition or Tend to Create a Monopoly**

**(1) Plaintiffs Are Entitled to the Structural Presumption in 20 Markets**

A "merger that would result in 'a significant increase in the concentration of firms in that market' establishes a presumption that the merger 'is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.'" *California v. Paramount Skydance Corp.*, 2026 U.S. Dist. LEXIS 160668, *11 (N.D. Cal. Jul. 20, 2026) (citing *PNB*, 374 U.S. at 363); *see Saint Alphonsus*, 778 F.3d at 785-86; *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016). Plaintiffs can establish a presumption of harm to competition in two ways. First, the "Supreme Court has found that a merger that creates a firm with a combined market share of 30 percent or more is presumed likely to violate antitrust laws." *In re Nexstar-Tegna Merger Litig.*, 2026 U.S. Dist. LEXIS 85526, *44 (E.D. Cal. Apr. 17, 2026) (collecting cases); *see United States v. Pabst Brewing Co.*, 384 U.S. 546, 551-52 (1966). Second, "a merger that creates or further consolidates a market with an HHI greater than 1,800 and involves an increase in HHI greater than 100 is presumed to substantially lessen competition." *Kroger*, 2024 U.S. Dist. LEXIS 223077, *56-57 (collecting cases); *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); Guidelines § 2.1.

With respect to 20 of the 23 markets alleged in the Complaint, Plaintiffs have established Bowlero's acquisitions presumptively harmed competition. ¶¶150-70. For example, in Los Angeles, Bowlero's acquisitions increased market share to 41% and HHI by more than 500 to 2,118. ¶170. Bowlero's Santa Rosa acquisition increased market share to 56% and HHI more than 1,500 to 3,978. *Id.* Bowlero's Phoenix acquisition increased market share to 67% and HHI





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

by more than 300 to 4,640. *Id.* Bowlero's acquisition in Baltimore-Columbia-Towson, Maryland increased market share to 91% and HHI by more than 1,500 to 8,272. *See, e.g.*, *Paramount Skydance*, 2026 U.S. Dist. LEXIS 160668, *12-13. Bowlero's only arguments in response are that Plaintiffs have failed to define the relevant markets or disclosed their exact methodologies.

**(2) Bowlero's Acquisitions Are Unlawful Regardless of the Structural Presumption**

Bowlero has done more than substantially increase concentration and share levels in 20 discrete markets. Each of Bowlero's acquisitions has contributed to Bowlero's *national* dominance, which it has leveraged to create entry barriers and discipline rivals—further enabling Bowlero to impose anticompetitive terms on consumers. ¶¶188-201. When a nationally dominant firm acquires an "already dominant" competitor in one or more other markets, the "substitution" of the national behemoth "with its huge assets and advertising advantages for the already dominant [acquired rival] [can] dissuade new entrants and discourage active competition from the firms already in the industry due to fear of retaliation by [the dominant acquiror]." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 575 (1967) ("*Clorox*"). Suppliers may "be induced to give [the acquired company] preferred [deals]," sidelining competitors and allowing the acquired firm to raise prices. *Id.* The theory of harm to competition underlying condemnation of such mergers is "entrenchment." *See* Guidelines § 2.6 (Guideline 6); *Purex Corp. v. Procter & Gamble Co.*, 596 F.2d 881, 884 (9th Cir. 1979); *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 944-46 (3d Cir. 1967); *see also, e.g.*, *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 U.S. Dist. LEXIS 2604, *73-74 (S.D.N.Y. Mar. 8, 2000) (denying motion to dismiss complaint alleging merger harmed competition by enabling defendants to "restrain[] [rivals'] access to [essential inputs]").

This is exactly what Plaintiffs have alleged. Specifically with respect to Reading, Pennsylvania, Jacksonville, Florida, and Wichita, Kansas markets, although "Bowlero acquired one or more locations from the same owner and did not previously operate in that market," ¶150 n.4, its acquisitions still enabled Bowlero to substantially increase prices and worsen terms.

¶¶191-199, 211, 226. "[A]lready dominant" competitors holding over 30% of the market were substituted with Bowlero, which "enjoyed a dominant position nationally," already controlled key suppliers and inputs like the PBA, and had a formidable marketing and advertising presence. *Clorox*, 386 U.S. at 588; *see* ¶¶189-199, 202-09. As in *Clorox*, the remaining competitors in the markets "bec[a]me more cautious in competing due to their fear of retaliation by [Bowlero]. . . . [Bowlero] . . . bec[a]me the price leader and . . . oligopoly . . . bec[a]me more rigid." 386 U.S. at 578; ¶¶195-96. As in *Clorox*, "[t]he acquisition[s] . . . rais[ed] the barriers to new entry," 386 U.S. at 579; ¶¶132-33, 192-94, 200, 204, including by enabling Bowlero to "divert a large portion [of its budget] to meet the short-term threat of a new entrant." 386 U.S. at 579; ¶¶194-98, 200. As in *Six West*, Bowlero was able to use its preferential access to key inputs to disadvantage competitors in these markets. ¶¶182-84. Bowlero's acquisitions entrenched a dominant position not only in Reading, Jacksonville, and Wichita, but in every acquisition market. ¶¶182-87, 190-91. *See Purex*, 596 F.2d at 885. Relatedly, Bowlero's acquisitions are independently actionable because they create "excessive concentration" and, with it, the risk of "oligopolistic price coordination." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 229-30 (1993); ¶¶170, 195-97, 237-39; *see* Guidelines § 2.3 (Guideline 3).

Here again, Bowlero simply ignores the facts establishing these entrenchment and increased-risk-of-concentration theories of competitive harm.

#### 4. Plaintiffs Allege Indirect Evidence that Bowlero's Attempted Monopolization Harmed Competition in Each Relevant Market

Plaintiffs have likewise alleged a *prima facie* circumstantial-evidence case of Bowlero's violation of Section 2 for attempted monopolization, which requires Plaintiffs to show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993); *see Image Tech. Servs.*, 125 F.3d at 1202. Plaintiffs have alleged facts supporting each element of this claim. ¶¶72, 136-44, 150 (anticompetitive conduct); ¶¶11, 50, 55-68, 133, 171-90 (intent); ¶¶144-70 (high shares of relevant markets); ¶¶129-34,





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

191-97, 202-209 (barriers to entry and expansion). *See Grinnell*, 384 U.S. at 576; *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F.Supp.3d 606, 619 (W.D. La. 2016); *Six W.*, 2000 U.S. Dist. LEXIS 2604, *73-74; *Rebel Oil*, 51 F.3d at 1438 n.10. Indeed, Bowlero does not dispute that Plaintiffs have adequately stated a claim for attempted monopolization, other than its challenges to Plaintiffs' relevant markets.

### B. <u>Plaintiffs Establish Actual and Threatened Antitrust Injury and Causation [II.A-B]</u>

#### 1. <u>Plaintiffs Allege Quintessential Antitrust Injury</u>

All the injuries experienced by Plaintiffs in the relevant markets are paradigmatic antitrust injuries—reductions in output and "increase[s] in price resulting from a dampening of competitive market forces" as a result of Bowlero's anticompetitive conduct. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) (such injuries are "assuredly" the "type . . . for which [Clayton Act] § 4 potentially offers redress") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)); *see Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055-57 (9th Cir. 1999); *see, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).

Bowlero's cited cases, Mot. 17-19, only reinforce that Plaintiffs have established antitrust injury. As in *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000 (9th Cir. 2003), "Defendants' reliance on cases where courts found no anti-trust injury because the 'harm' resulted from lower prices, continued competition, or increased competition simply do not apply to the instant case." *Id.* at 1011. Here, Plaintiffs plausibly allege Bowlero's scheme *lessened* competition, resulting in "injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Pool Water Prods v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001). That is antitrust injury.

#### 2. <u>Bowlero's Causation Arguments Fail</u>

Bowlero asks the Court to disbelieve allegations that its conduct *caused* the reduced output, increased prices, and worsened terms Plaintiffs experienced simply because other causes are possible. This argument ignores that even at trial, Plaintiffs "need not rule out all possible

alternative sources of injury"; rather, they need only show the anticompetitive activity was a "material cause of the injury." *Catlin v. Wash. Energy Co*., 791 F.2d 1343, 1347 (9th Cir. 1986); *see, e.g.*, *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc*., 773 F.2d 1506, 1509-10 (9th Cir. 1985).

Bowlero's argument also mischaracterizes the pleading standard. "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "[I]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 652 F.3d at 1216. Here, Plaintiffs plausibly allege that Bowlero's anticompetitive conduct was the cause of the alleged anticompetitive effects. ¶¶172-75, 210. Bowlero has done nothing to show that Plaintiffs' allegations are "implausible." *Starr*, 652 F.3d at 1216. Accordingly, the Complaint must survive Bowlero's Motion. *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012) (reversing dismissal of federal antitrust claim: "[t]he question is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000).

In support of its argument, Bowlero primarily cites antitrust *conspiracy* cases, in which plaintiffs alleged the existence of higher prices, and concluded (and alleged) solely from the existence of those higher prices that defendants must have entered into a price-fixing agreement. *E.g.*, *Twombly*, 550 U.S. at 570; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Similarly, in *Intel Corp. v. Fortress Investment Group LLC*, 2022 U.S. App. LEXIS 30900, *4-5 (9th Cir. Nov. 8, 2022), *Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013), *Eastman v. Quest Diagnostics Inc.*, 108 F.Supp.3d 827, 835 (N.D. Cal. 2015), and *Gibson v. Cendyn Group, LLC*, 148 F.4th 1069, 1088 (9th Cir. 2025), plaintiff observed certain *absolute* price levels (as opposed to price *changes*), impermissibly concluded that those price levels must





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

be "inflated" or at "anticompetitive levels," and then inferred that arguably benign conduct by defendants had harmed competition and caused that speculative price inflation. Similarly, *Dominick v. Collectors Universe*, 2012 U.S. Dist. LEXIS 141950, *18-19 (C.D. Cal. Oct. 1, 2012), merely observed that allegedly "inflated" prices that are not shown to be above the levels that would prevail in a competitive market and are not coupled with defendant's ability to "limit marketwide output by reducing its own output" are insufficient to prove *market power*.

Here, no inferences or deductions are necessary. Plaintiffs do not *infer* Bowlero's wrongful conduct merely from "too-high" prices. Instead, Plaintiffs directly observed and alleged both the wrongful conduct, and that output decreased and prices increased *after* it occurred. ¶¶19-24, 26-29, 172-75, 211. That is antitrust injury.

Moreover, Plaintiffs nowhere allege—contrary to Bowlero's suggestion—that Defendants implemented uniform, nationwide price increases. Rather, Plaintiffs point to Bowlero's public boasts of "raising price on everything" as highly probative evidence of anticompetitive intent. ¶¶12-13. As discussed, the Complaint details Bowlero increasing its share in a relevant market and only then an increase in prices above competitive levels. *See infra*, pp. 6-8. These "allegations of increased prices" are not—as Bowlero claims—"conclusory" (Mot. 19). They are allegations of fact that must be taken as true. *See, e.g.*, *Blackrock, Inc.*, 2025 U.S. Dist. LEXIS 147891, *7 (denying motion to dismiss antitrust claims based on defendants' acquisitions; "Plaintiffs' allegations, moreover, are not vague and conclusory but include dozens of specific examples of Defendants' conduct supporting their theory."); *Frame-Wilson v. Amazon.com, Inc.*, 591 F.Supp.3d 975, 992 (W.D. Wash. 2022) (Jones, J.) (denying motion to dismiss where plaintiffs provided "factual support" in the form of anecdotes illustrating higher prices).

Bowlero cites no case requiring an antitrust plaintiff at any stage to show that "prices rose or quality degraded more in markets where [defendant] acquired a rival than in markets where it did not" or "that such changes tracked the size of the alleged market share gained in a given market." Mot. 19. This argument hopelessly oversimplifies antitrust law and economics. Any





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

number of exogenous factors unrelated to market share can influence the extent to which Bowlero raises prices or worsens terms. Later, economists will model these markets to estimate price increases attributable to the anticompetitive conduct. Plaintiffs are not required to quantify their damages at the motion-to-dismiss stage. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969).

To be clear, Plaintiffs allege Bowlero pursues a "mousetrap" business model both inside and outside the acquisition markets—getting people in the door by offering bowling and then charging for every little thing and pushing unwanted, overpriced products and services, including gambling. ¶¶13, 210-36. But nowhere do Plaintiffs allege Bowlero lacks market power outside the acquisition markets. In any event, that Bowlero engages in some consumer-unfriendly practices *nationally* is not an innocent alternative explanation for the specific anticompetitive effects alleged *in the acquisition markets caused by the challenged acquisitions* against a backdrop of Bowlero's national dominance. *See supra*, Section II.A.

### C. The Complaint Establishes All Elements of Plaintiffs' State-Law Claims [V.A]

#### 1. California UCL

"As relevant here, the UCL prohibits 'any [1] unlawful, [2] unfair or [3] fraudulent business act or practice.'" *Epic*, 67 F.4th at 1000 (quoting Cal. Bus. & Prof. Code § 17200) (alterations in original). The unlawful prong "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (quotation marks omitted). But the UCL "does more than just borrow." *Id.* "[A] practice may be deemed unfair even if not specifically proscribed by some other law." *Id.*

Bowlero is thus wrong that "the determination that . . . conduct [does not violate the antitrust laws] necessarily implies that the conduct is not 'unfair' toward consumers." Mot. 25. Bowlero cites *Chavez v. Whirlpool Corp.*, 93 Cal.App.4th 363, 375 (2001), and its progeny, but those cases held narrowly that "when a federal antitrust claim suffers from . . . a *categorical legal bar*"—such as the judge-made baseball antitrust exemption—"the conduct underlying the





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

antitrust claim cannot be deemed unfair pursuant to the UCL." *Epic*, 67 F.4th at 1001 (emphasis added) (discussing the *Chavez* "safe harbor" exemption). By contrast, "when a federal antitrust claim suffers from a [mere] proof deficiency"—as Bowlero argues here—"that proof deficiency does not automatically immunize the conduct from scrutiny under the UCL unfair prong." *Id.*

Bowlero cites a non-precedential opinion currently on appeal, *U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials*, 2025 U.S. Dist. LEXIS 101205 (C.D. Cal. May 28, 2025), and copies verbatim the three case citations—including *Chavez*—and explanatory parentheticals (including typos) in that opinion. *See* Mot. 25-26. All four cases are inapposite or contradict the later-dated, published (correct) opinion of the Ninth Circuit in *Epic*. The *U.S. Wholesale* court overread *Chavez* and ignored *Epic*. In *LiveUniverse*, *Inc. v. MySpace, Inc.*, 304 Fed.App'x 554, 557-58 (9th Cir. 2008), plaintiff "concede[d]" that its UCL claim "relie[d] on" its Sherman Act claims. And *Consumer Defense Group v. Rental Housing Industry Members*, 137 Cal.App.4th 1185 (2006), involved UCL claims predicated on alleged violations of California's Proposition 65, which includes statutory notice requirements that plaintiffs cannot "plead around" using the UCL. *In re Vaccine Cases*, 134 Cal.App.4th 438, 458 (2005).

Because Plaintiffs' UCL claim does not "fall" with their federal claims, even if Bowlero's arguments as to Plaintiffs' federal-law claims were meritorious, that would not dictate dismissal of their UCL claim. *See, e.g.*, *Epic*, 67 F.4th 946 (plaintiff failed to show violation of Sherman Act Section 1 but proved UCL unfair-prong claim).

California appellate courts have applied "three different tests for determining unfairness in the consumer context": the (1) balancing, (2) tethering, and (3) "Section 5" tests. *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 303 & n.10 (2020). Plaintiffs' alleged facts satisfy all three tests. As to (1), Plaintiffs allege that the negative "impact of [Bowlero's conduct] on its victim[s]" (Plaintiffs) "[outweigh] the reasons, justifications and motives of [Bowlero]"—i.e., "the gravity of the harm" outweighs any "utility of [Bowlero's] conduct." *Progressive W. Ins. Co. v. Superior Ct.*, 135 Cal.App.4th 263, 285 (2005) (internal quotation marks omitted). Indeed, this is the crux of the entire Complaint. *E.g.*, ¶¶1-24, 26-29, 136-43, 210-39. As to (2),

Bowlero's conduct clearly violates the public policy behind the antitrust laws of promoting open markets and competitive levels of output and price. *See Nationwide*, 9 Cal.5th at 303 n.10; *Cel-Tech*, 20 Cal.4th at 186-87; *Brown Shoe*, 370 U.S. at 315; *see, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F.Supp.3d 898, 1055-56 (N.D. Cal. 2021). As to (3), the Complaint alleges (a) "substantial" "consumer injury" that (b) is not "outweighed by any countervailing benefits to consumers or competition" and (c) Plaintiffs and the Classes "could not reasonably have avoided" their injury. *Nationwide*, 9 Cal.5th at 303 n.10; *see* ¶¶174, 187, 202, 210-13, 219-239.

Bowlero next argues that, because Plaintiffs claim damages, they have an adequate remedy at law and therefore are not entitled to equitable relief. But as the leading treatise explains, an "injunction covers only future violations . . . . As a result, one receives damages for harmful consequences that have already occurred, and an injunction for threatened future violations and harm." Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) ¶326a.1 (3d ed. updated 2026) ("Areeda"); *see Milliken v. Bradley*, 433 U.S. 267, 288-90 (1977). *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020), is not to the contrary. There, plaintiff did not *lack* an adequate legal remedy; rather, she voluntarily surrendered it. *Id.* at 844; *see Junhan Jeong v. Nexo Fin. LLC*, 2022 U.S. Dist. LEXIS 10089, *91-92 (N.D. Cal. Jan. 19, 2022). Here, Plaintiffs properly seek damages for past harm, and an injunction under the UCL for *different*, future harm for "irreparable injury" they will otherwise suffer. ¶¶16, 133, 262, 274, 288; *see, e.g.*, *Santander Consumer USA Inc. v. drive.car LLC*, 2024 U.S. Dist. LEXIS 213596, *10-11 (D. Alaska Nov. 25, 2024). Plaintiffs also seek restitution in the event that their damages claims fail, ¶¶307, 332(e), but in that case, they will have no "adequate remedy at law," and Plaintiffs are allowed to plead remedies in the alternative. *See Collyer v. Catalina Snacks Inc.*, 712 F.Supp.3d 1276, 1289 (N.D. Cal. 2024) (collecting cases).

### 2. <u>Remaining State-Law Claims</u>

Plaintiffs' remaining state-law claims require Plaintiffs to allege an unfair method of competition, occurring in trade or commerce, that caused them actual injury. *See Panag v.*



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Farmers Ins. Co.*, 166 Wash.2d 27, 37 (2009) (WCPA; also requires harm to public interest); *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 301 (1993) (NCUTPA); *In re Processed Egg Prods. Antitrust Litig.*, 851 F.Supp.2d 867, 900 (E.D. Pa. 2012) (FDUPTA); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (ICFA).

These UMC provisions track verbatim Section 5, 15 U.S.C. § 45, and each statute directs courts to be guided by the decisions of the FTC and federal courts interpreting that statute. *State v. Black*, 100 Wash.2d 793, 799 (1984) (WCPA); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 47-49 (4th Cir. 1983) (NCUTPA); *Porsche Cars N. Am., Inc. v. Diamond*, 140 So.3d 1090, 1097 (Fla. Dist. Ct. App. 2014) (FDUTPA); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008) (ICFA).

To constitute a UMC, the conduct must "go[] beyond competition on the merits." FTC, File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the FTC Act 8 (Nov. 10, 2022) (collecting cases). The analysis "examines whether the respondent's conduct has a tendency to generate negative consequences; for instance, raising prices, reducing output, limiting choice, lowering quality, reducing innovation, [or] impairing other market participants." *Id.* at 10 (collecting cases). Conduct can constitute UMC without violating any other law. *See IFD*, 476 U.S. at 454 (UMC "encompass[] not only practices that violate the Sherman Act and the other antitrust laws, . . . but also practices that . . . are against public policy"). Put differently, "there are many unfair methods of competition that do not assume the proportions of antitrust violations." *Atl. Refining Co. v. FTC*, 381 U.S. 357, 369 (1965); *see FTC v. Cement Inst.*, 333 U.S. 683, 708 (1948).

Plaintiffs' allegations easily establish Bowlero has engaged in UMC and therefore satisfy each state law's first element. Bowlero has substantial dominance nationally, and it has used that dominance not to compete on the merits (such as by offering a superior product or increasing output for the benefit of consumers), but to buy up its competitors, ¶¶48-69, 150-70, concentrate markets, ¶¶144, 150, 170, entrench its national dominance, ¶139, lock up or restrict access to inputs, ¶¶182-83, and reduce output, ¶¶141, 176-81, 224, raise price, ¶¶12, 172, 210-13, worsen





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

the consumer bowling experience, ¶¶14, 140, 225-36, and ultimately threaten the viability of one of America's greatest pastimes, ¶¶4-8. The Complaint also establishes the other elements of Plaintiffs' state-law claims. ¶¶35, 68, 104 (conduct occurred in trade or commerce); ¶¶19-29, 172, 211, 237-38 (injury); ¶¶172-75, 260, 286, 295 (causation); ¶¶5-18, 133, 187, 231-36 (affects public interest).

Bowlero does not argue otherwise, but instead insists that Plaintiffs' state-law claims must be "dismissed . . . alongside [their] federal antitrust claims." Mot. 25. But controlling precedent holds the opposite: a plaintiff's UMC claim may proceed even if their federal claim premised on the same conduct fails. *See Preston v. SB&C, Ltd.*, 6 Wn.3d 502, 512 (2026) (WCPA); *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F.Supp.3d 1011, 1025 (E.D.N.C. 2015) (NCUTPA); *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, 2018 U.S. Dist. LEXIS 29836, *64 (S.D. Fla. Jan. 26, 2018) (FDUPTA); *Oliver v. Am. Express Co.*, 2021 U.S. Dist. LEXIS 19578, *24 (E.D.N.Y. Feb. 1, 2021) (ICFA); *see, e.g.*, *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 19-20 (7th Cir. 1971) (discussing differing standards between Section 7 and UMC).

Bowlero's cases are not to the contrary. *See* Mot. 25 (WCPA) (citing *PBTM*, 511 F.Supp.3d at 1178 (plaintiff alleged not UMC, but violations of the "state law analogues" to Sherman Act Sections 1 and 2 (RCW 19.86.030 and 19.86.040)); *CaptiveAire Sys. v. ITW Food Equip. Grp., LLC*, 2009 U.S. Dist. LEXIS 145040 at *8 (W.D. Wash. Sep. 28, 2009) (court dismissed "private dispute"—unlike the "consumer transaction[s]" at issue here—because it did not implicate "the public interest")); Mot. 27 (NCUTPA) (citing *Davis v. HCA Healthcare, Inc.*, 2022 NCBC LEXIS 108, *23 (N.C. 2022) (finding Sherman Act "instructive" as to state-law analogue to Sherman Act Section 1, not—as Bowlero suggests—NCUTPA's UMC provision)); Mot. 26 (FDUTPA) (citing *Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 U.S. Dist. LEXIS 57302, *10 n.6 (S.D. Fla. Mar. 29, 2022) (whether "Sherman Act and FDUTPA claims rise and fail together" was not at issue; plaintiff did not argue otherwise)).

Bowlero's argument that *Laughlin v. Evanston Hospital*, 133 Ill.2d 374 (1990), bars Plaintiffs' ICFA claim, Mot. 26-27, is incorrect. *Laughlin* declined to provide a cause of action





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

for price discrimination under ICFA because the Illinois legislature had explicitly rejected including provisions against price discrimination in the state's antitrust law. *See* 133 Ill.2d at 391. Absent such circumstances, courts are clear that "[i]t remains possible . . . that an unfair practice might be covered by both the antitrust law and the [ICFA]." *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 831 (7th Cir. 2014); *see also Siegel v. Shell Oil Co.*, 480 F.Supp.2d 1034, 1048 (N.D. Ill. 2007) ("*Laughlin* . . . is silent as to . . . whether consumers can elect to pursue a remedy under the [ICFA] where the Illinois Antitrust Act may also provide relief."); *Oliver*, 2021 U.S. Dist. LEXIS 19578, *24 (*Laughlin* does not bar ICFA claim).

## III. THE AVAILABILITY OF CERTAIN FORMS OF RELIEF IS NOT A VALID BASIS FOR DISMISSAL

The remainder of Bowlero's arguments for "dismissal" are improper. Bowlero challenges Plaintiffs' entitlement to particular categories of relief. But "[i]t is . . . settled that the 'demand for relief,' while required by Rule 8(a)(3), does not constitute part of the 'claim' for the purpose of testing the sufficiency of a plaintiff's complaint." *Yaskot v. Intermountain Nat., Ltd. Liab. Co.*, 2011 U.S. Dist. LEXIS 56608, *8 (D. Idaho May 24, 2011) (collecting cases); *see Bettys v. Washington*, 2024 U.S. Dist. LEXIS 150981, *22 (W.D. Wash. July 31, 2024) ("Rule 12(b)(6) does not provide a vehicle to dismiss a portion of relief sought or a specific remedy, but instead applies only to dismiss a claim in its entirety."), *aff'd*, 2024 U.S. Dist. LEXIS 149717 (W.D. Wash. Aug. 21, 2024). Because Plaintiffs would be entitled to *some* relief even if the Court accepted all of Bowlero's standing and timeliness challenges regarding certain *categories* of relief, none of them provides cause to dismiss any claim. *See, e.g.*, *United States v. Maricopa Cnty.*, 915 F.Supp.2d 1073, 1082 (D. Ariz. 2012).

Regardless, none of Bowlero's arguments withstands scrutiny:

### A. Umbrella Price Effects [II.C]

Plaintiffs allege that Bowlero's anticompetitive conduct has enabled not only Bowlero, but also Bowlero's competitors, to increase prices. ¶¶196, 237-39. Under this well-established "umbrella damages" doctrine, when a dominant firm or group of conspirators unlawfully acquire



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

market power and inflate prices, independent competitors are enabled to raise their own prices under a protective "price umbrella." *See United States v. ALCOA*, 377 U.S. 271, 280-81 (1964); *Costco Wholesale Corp. v. AU Optronics Corp*., 2014 U.S. Dist. LEXIS 133798, *7-13 (W.D. Wash. Sep. 23, 2014) (Jones, J.); *In re Cathode Ray Tube (CRT) Antitrust Litig*., 2016 U.S. Dist. LEXIS 189474, *121-22 (N.D. Cal. Oct. 26, 2016); *In re Bristol Bay, Salmon Fishery Antitrust Litig*., 530 F.Supp. 36, 38 (W.D. Wash. 1981); *Wall Prods. Co. v. Nat'l Gypsum* Co., 357 F.Supp.832, 840 (N.D. Cal. 1973). These cases make clear (*contra* Mot. 32) that umbrella-pricing claims are not categorically barred as too "indirect." Bowlero's cited cases merely clarify that causation may be harder to prove if—*unlike* here—consumers purchase through an intermediary.

The Complaint alleges facts—not conclusions—establishing that, following Bowlero's acquisition(s) in each relevant market, both Bowlero and its competitors raised prices above pre-acquisition levels. ¶¶172-75, 210-13, 237-39. Bowlero demands detail and evidence to support these allegations, but none of its cited cases says that is required at the motion-to-dismiss stage.

### B. <u>Damages for Bowlero's Attempted Monopolization [III]</u>

Bowlero's boldest argument yet is that "consumers alleging attempted monopolization . . . have no standing" to recover damages. Mot. 23. Clayton Act Section 4 allows recovery of damages for injury "by reason of anything forbidden in *the antitrust laws*." 15 U.S.C. § 15(a) (emphasis added). Under the plain text, there is no carve-out for attempted monopolization. As a leading treatise explains, "[o]ne clear effect" of the "words 'attempt to monopolize'" is "the language has served to provide damages to plaintiffs even if the conduct in question never succeeded in creating a monopoly." Areeda ¶804; *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 172, 177 (3d Cir. 2015); *Am. Multicinema*, 793 F.2d at 999-1000.

Indeed, courts regularly allow consumer-plaintiffs' claims for damages for attempted monopolization to proceed. *See, e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997); *Davis v. Pac. Bell*, 204 F.Supp.2d 1236, 1240-41 (N.D. Cal. 2002); *Elec. Med. Tr. v. U.S.*

*Anesthesia Partners, Inc.*, 2024 U.S. Dist. LEXIS 236177, *30-31 (S.D. Tex. Sep. 27, 2024); *De Coster v. Amazon.com, Inc.*, 2024 U.S. Dist. LEXIS 218729, *28 (W.D. Wash. Nov. 19, 2024).

This makes sense. As the Ninth Circuit explained, "[w]ith a dominant share of the market's productive assets"—which is required for a Section 2 attempt claim in the absence of direct evidence—"a firm may have the market power to restrict marketwide output and, hence, increase prices." *Rebel Oil*, 51 F.3d at 1437. In other words, the attempted monopolization offense is not a "failed monopolization" concept or mens-rea offense. Rather, it "directs itself . . . against conduct which unfairly tends to destroy competition itself," even if it does not rise to the level of "actual monopolization." *Spectrum Sports,* 506 U.S. at 458. Naturally, then, consumer-plaintiffs can recover damages for elevated prices resulting from the harm to competition caused by a defendant's attempt to monopolize a market. *See Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 802-03, 821 (2nd Cir. 1983).

Defendants' cited cases are all predatory-pricing cases that rely on *In re Air Passenger Computer Reservation Systems*, 727 F.Supp. 564 (C.D. Cal. 1989). But unlike with other forms of attempted monopolization, "*consumers* could not be harmed by predatory pricing" that did not result in the achievement of a monopoly "because consumers actually benefit in the short-run in the form of lower prices." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 152 (C.D. Cal. 2007) (emphasis added). But where, as here, "Plaintiffs do not allege that Defendants engaged in predatory pricing in an attempt to attain monopoly power," but rather that defendants engaged in conduct that suppressed competition, leading to "*higher* costs to consumers in the form of *higher* . . . prices," consumers' standing to recover damages for this attempted monopolization is clear. *Id.* at 152-53 (emphasis added).

### C. <u>Injunctive Relief [IV]</u>

Bowlero argues Plaintiffs lack standing to seek injunctive relief because "they do not allege any impending acquisition that could violate Section 7 or the UCL." Mot. 24. First, Plaintiffs do not just seek "a prohibition on further acquisitions." Mot. 23 (quoting ¶3). Plaintiffs also seek divestitures and an injunction against future anticompetitive conduct. ¶¶262, 288; *see*





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

¶332.

In any event, Plaintiffs allege they are regular, repeat bowlers, who will continue suffering future injuries—reduced output, worsened quality, and higher prices—as they purchase bowling in their markets. ¶¶19-29. In Bowlero's cases (Mot. 24:12-18), plaintiffs could avoid future deception and thus suffered no threatened injury. Here, Plaintiffs cannot avoid the anticompetitive effects of Bowlero's acquisitions. ¶¶174, 237-39; *see supra*, Section II. Any additional acquisition will only magnify these ongoing injuries. ¶¶188-201; *see supra*, Section II.A.3(c)(2). Where continuing consolidation threatens future harm, courts can and do enjoin future mergers. *See, e.g.*, *United States v. Jerrold Elecs. Corp.*, 187 F.Supp. 545, 567 (E.D. Pa. 1960) ("plaintiff is entitled to the injunctive relief it seeks as to any future acquisitions"). *Cf., e.g.*, *Washington v. Nat'l Express Grp. PLC*, 2012 U.S. Dist. LEXIS 82266, *5-6 (W.D. Wash. May 10, 2012) (requiring defendant to give AG advance written notice of any intended acquisition); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1393 (7th Cir. 1986) (same; "respondents must remember that those caught violating the Act must expect some fencing in").

### D. <u>Timeliness of Plaintiffs' Request for Damages [V.C, X]</u>

Bowlero argues some of Plaintiffs' damages claims are untimely because in certain markets, Bowlero acquired a center outside the limitations period. But "it has long been held" that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Meijer, Inc. v. 3M*, 2005 U.S. Dist. LEXIS 13995, *9 (E.D. Pa. July 13, 2005); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979). *Cf. Solo v. SD-3C LLC*, 751 F.3d 1081, 1086-87 (9th Cir. 2014) ("[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."). This is because a purchaser—in contrast to defendant's *competitor*—"is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." *Berkey*, 603 F.2d at 295. "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no [timeliness defense]."



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

*Id.*; *see In re Evanston Nw. Corp. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 198712, *8 (N.D. Ill. May 28, 2015) (discussing rationale for rule).

Indeed, otherwise, a business could violate the antitrust laws, "wait four years to raise prices, then reap the profits of their illegal [conduct] with impunity because any antitrust claims would be time barred. That is not the law." *Connecticut v. Sandoz, Inc.*, 2025 U.S. Dist. LEXIS 214944, *38 (D. Conn. Oct. 31, 2025). Even if a consumer-plaintiff begins paying overcharges earlier than four years before they file suit, they "maintain a right of action for any overcharges paid within the four years prior to their filings." *In re Buspirone Pat. & Antitrust Litig.*, 185 F.Supp.2d 363, 365, 378 (S.D.N.Y. 2002); *see, e.g.*, *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123 (4th Cir. 2021); *Brager & Co. v. Leumi Sec. Corp.*, 429 F.Supp. 1341, 1349 (S.D.N.Y. 1977), *aff'd*, 646 F.2d 559 (2d Cir. 1980); *EpiPen Mktg., Sales Pracs., & Antitrust Litig.*, 336 F.Supp.3d 1256, 1329 (D. Kan. 2018). Consistent with this rule, the Ninth Circuit has held a damages claim for the "application" within the limitations period of an anticompetitive agreement entered outside the limitations period that caused plaintiff to pay higher prices was timely. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014); *accord Solo*, 751 F.3d at 1087 n.5. As in *Samsung*, here, Bowlero's "decision to [overcharge Plaintiffs] caused a new anti-competitive harm," causing a claim to accrue at that time. 747 F.3d at 1203.

Bowlero invokes the continuing violation doctrine, but in doing so, "obfuscates the difference between, on the one hand, an 'overt act' necessary to show the existence of a [violation], and, on the other hand, an 'injurious act' causing damages within the limitations period." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993). "[I]n purchaser antitrust actions, *the requisite injurious act* within the limitations period *can include being overcharged* as the result of an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control." *Meijer*, 2005 U.S. Dist. LEXIS 13995, *11 (emphasis added) (collecting cases).

Bowlero's cases are not to the contrary. In *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), "plaintiff's injury [wa]s immediate," and yet it





Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

waited *11 years* to file suit. *Midwestern Mach., Inc. v. Nw. Airlines, Inc.*, 167 F.3d 439, 440-41 (8th Cir. 1999). Plaintiff in *Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc.*, 2016 U.S. Dist. LEXIS 86414, *5 (C.D. Cal. May 11, 2016), was defendants' competitor, not customer, and "it was clear at the time of the merger" that the merger, and the "new use" enabled by the merger, had injured plaintiff. *See CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 290-91 (4th Cir. 2024) (distinguishing timeliness analysis for competitors versus purchasers).

Furthermore, in both of these cases and *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 595 (6th Cir. 2014), plaintiffs failed to cite *Berkey* and argued only that the continuing violations doctrine and hold-and-use doctrines extended the statute of limitations—not that overcharging was the relevant injurious act. *Id.* at 595; *see In re Evanston*, 2015 U.S. Dist. LEXIS 198712, *8. As another district court explained, "the Court could agree with *Z Technologies* that the continuing violation doctrine does not apply to merger cases and still decide against [defendant] by relying on *Berkey*, all without contradicting anything in *Z Technologies*." *Id.* at *12.

In any event, it is clear from *Samsung* that the Ninth Circuit does not apply the continuing violations doctrine as the Sixth and Eighth Circuits did in Bowlero's cited cases. *See Humana Inc. v. Mallinckrodt Ard LLC*, 2020 U.S. Dist. LEXIS 175033, *33 (C.D. Cal. Aug. 14, 2020) (*Midwestern Machinery* and *Z Technologies*, as out-of-circuit precedents, "[t]o the extent the[y] . . . contradict Ninth Circuit law," should be "disregard[ed]"). In this Circuit, if anticompetitive conduct occurring more than four years ago "did not permanently and finally control" subsequent, within-limitations-period acts enabled by the initial conduct, the subsequent acts "restart[] the statute of limitations." *Samsung*, 747 F.3d at 1203-04. Here, Bowlero's mergers did not make it inevitable that Bowlero would later shutter acquired locations and raise prices. Bowlero had to take those affirmative acts, and it did so within the limitations period, causing injury to Plaintiffs at those later times. *See also, e.g.*, *In re Glumetza Antitrust Litig.*, 611 F.Supp.3d 848 (N.D. Cal. 2020). For the same reasons, Plaintiffs' NCUTPA claim for damages



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

is timely. *See* N.C. Gen. Stat. §§ 75-16.2 (substantively identical to 15 U.S.C. § 15b), 75-8 (codifying equivalent of continuing violations doctrine); *see, e.g.*, *Medicare Rentals, Inc. v. Advanced Servs.*, 119 N.C. App. 767, 771-72 (1995).

**E. <u>Timeliness of Plaintiffs' Request for a Divestiture Order [VI]</u>**

Nor does laches bar Plaintiffs' requested relief of divestitures. To prevail on a claim of laches, Bowlero "must show that (1) plaintiff's delay in filing suit was unreasonable, and (2) defendant would suffer prejudice caused by the delay if the suit were to continue." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1139 (9th Cir. 2010). "A laches defense raised at the motion to dismiss posture requires exclusive reliance on the factual allegations in the complaint," which "poses a nearly insurmountable obstacle" to dismissal. *In re Cathode Ray Tube CRT Antitrust Litig.*, 2014 U.S. Dist. LEXIS 35391, *101-02 (N.D. Cal. Mar. 13, 2014) (collecting cases); *see Mishewal Wappo Tribe of Alexander Valley v. Salazar*, 2011 U.S. Dist. LEXIS 122828, *21-23 (N.D. Cal. Oct. 24, 2011) ("laches is ill-suited for a motion to dismiss") (collecting cases).

That "[l]aches turns on 'the particular circumstances of the case,' *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990), militat[es] against a singular focus on a merger's closing date." *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 716-17 (4th Cir. 2021). "If there is a presumptive deadline for Clayton Act injunctive claims, it's four years after the challenged action, tracking that statute's limitations period for damages claims." *Id.* at 717 n.3 (citing *Solo*, 751 F.3d at 1085-86). This is because "a plaintiff need not challenge an illegal act immediately after it happens; it may wait until it 'can estimate whether' the act threatens it with irreparable harm." *Jeld-Wen*, 988 F.3d at 718 (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682-83 (2014)). Indeed, "[i]f the rule were, as [Bowlero] urges, 'sue soon, or forever hold your peace,' [ordinary people] would have to mount a federal case fast to stop" a merger whose effects on them in terms of magnitude and duration are uncertain. *Petrella*, 572 U.S. at 682-83; *see In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 U.S. Dist. LEXIS 184926, *167-68 (N.D. Cal. Dec. 24, 2014) (applying *Petrella* to antitrust case).



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

Under well-established precedent, because Plaintiffs' damages are timely, *see supra*, Section III.D, their request for injunctive relief is also timely. Plaintiffs—who are not the FTC or the DOJ or a State AG, but ordinary people—are not required to sue to block a merger whenever they hear about it and think it might affect them. Moreover, Bowlero cites no Complaint paragraph showing Plaintiffs delayed in filing suit. Instead, Bowlero argues for a blanket rule — refuted by controlling precedent—that a plaintiff is never entitled to a divestiture—"the most important of antitrust remedies" because "[i]t is simple, relatively easy to administer, and sure," *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 330-31 (1961); *see Am. Stores*, 495 U.S. at 280; *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1379-80 (9th Cir. 1978)—unless they sue before the merger is consummated. Bowlero is wrong.

Nor does the Complaint allege any facts supporting prejudice to Bowlero. To the contrary, the acquired Lucky Strike locations (that were not shuttered) retain their original branding, as do several other formerly independent centers Bowlero unlawfully acquired. ¶¶104, 105, 109, 110, 121. Nothing in the Complaint establishes it would be anything but straightforward for Bowlero to sell its unlawfully acquired centers to an independent operator. *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234 (8th Cir. 2010) (remedy straightforward where "discrete tangible assets are all that later need be divested"). Bowlero has not surmounted the "nearly insurmountable obstacle" required to dismiss Plaintiffs' claims based on laches. *CRT*, 2014 U.S. Dist. LEXIS 35391, *101-02; *see, e.g.*, *Dairy*, 2023 U.S. Dist. LEXIS 83790, *30 (denying motion to dismiss based on timeliness).

Bowlero's cases are inapposite. All but one of them were filed by the same law firm. *Taleff v. Sw. Airlines Co.*, 828 F.Supp.2d 1118 (N.D. Cal. 2011); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.,* 116 F.Supp.2d 1159 (C.D. Cal. 2000); *Ginsburg*, 623 F.3d at 1235-36. That firm routinely files complaints around high-profile mergers, seeking a quick payoff to settle. Regardless of the firm's motives, the laches discussion is dicta. In *Taleff*, the court had already found plaintiffs were not entitled to injunctive relief because they had an adequate remedy at law. 828 F.Supp.2d at 1123-24. In *Ginsburg*, the court independently found plaintiffs'



Simonsen Sussman LLP
1120 Pacific Avenue, Suite 100
Tacoma, Washington 98402
(917) 747-5196

alleged "antitrust injury" was "speculative" because they pursued a speculative potential-competition theory and the distribution chain was multi-layered. 623 F.3d at 1235. The *Garabet* court independently found plaintiffs lacked standing under Clayton Act Section 4 and it was "doubtful" they could make a showing of standing under Section 16, irrespective of the laches issue. 116 F.Supp.2d at 1165-71. In any event, *Garabet* is a summary-judgment case.

Moreover, in all three cases, plaintiffs sought *only* injunctive relief (not damages), for *purely* future harm anticipated to result from a merger they knew about months in advance. *See Taleff*, 828 F.Supp.2d at 1124; *Ginsburg*, 623 F.3d at 1235; *Garabet*, 116 F.Supp.2d at 1172. In such circumstances, it is obvious that the plaintiff had already "estimate[d]" that the merger allegedly "threaten[ed] it with irreparable harm," *Jeld-Wen*, 988 F.3d at 718, but delayed in filing suit until after the merger closed. And in both *Ginsburg* and *Garabet*, plaintiffs were "neither a customer nor a competitor of the merging parties." *Ginsburg*, 623 F.3d at 1234 (citing *Garabet*, 116 F.Supp.2d at 1173 n.13). Moreover, in *Ginsburg*, plaintiff pursued a speculative potential-competition theory, *after* the U.S. DOJ had already obtained a limited divestiture and blessed the transaction. 623 F.3d at 1234. And in *Garabet*, there was a clear record of delay, including multiple empty threats to file a lawsuit in the months leading up to the merger. 116 F.Supp.2d at 1172.

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F.Supp.3d 981, 990 (N.D. Cal. 2020), is also inapposite. There, plaintiffs sought to unwind Facebook's then-eight-year-old acquisition of WhatsApp. *Id.* at 990. The court's only holding was to reject plaintiffs' extreme position that the doctrine of laches does not apply—as a matter of law—to any request for injunctive relief. *Id.* at 991-92. The court did not hold that a plaintiff cannot obtain injunctive relief unless they sue before a merger is consummated.

None of the circumstances in Bowlero's cited cases is apparent on the face of Plaintiffs' Complaint. To the contrary, the Complaint merely shows that at some point, Plaintiffs started noticing they were paying higher prices and suffering reduced quality. ¶¶19-29. But as laypeople, they cannot be assumed to have immediately connected the dots to a violation of the

antitrust laws. Even if they had, the law gives consumers time to consider whether "the game is worth the candle." *Petrella*, 572 U.S. at 683. Under these circumstances, their "right to prospective injunctive relief . . . remain[s] unaltered" after consummation. *Id.*; *see, e.g.*, *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222 (9th Cir. 1978) (remedy of rescission available in lawsuit filed post-consummation); *In re Nexstar-Tegna*, 2026 U.S. Dist. LEXIS 85526, *68-70 (same); *Pennsylvania. v. Ctr. Lane Partners, LLC*, 2024 U.S. Dist. LEXIS 206697, *19-21 (W.D. Pa. Nov. 14, 2024) ("[T]he Court is not convinced that divesture couldn't ultimately be ordered here. In other words, the eggs could be unscrambled."). Here, "Plaintiffs have adequately pleaded a claim for violations of the Clayton Act. Thus, whether divestiture or another form of injunctive relief is appropriate . . . will ultimately turn on a balancing of the equitable principles presented by the facts of this case." *Corrente v. Charles Schwab Corp.*, 2023 U.S. Dist. LEXIS 31415, *18-19 (E.D. Tex. Feb. 24, 2023).

## IV. BOWLERO'S CLASS-CERTIFICATION ARGUMENTS ARE PREMATURE AND DO NOT PROVIDE A BASIS FOR DISMISSAL [V.B, VIII-IX]

Bowlero's class-certification arguments masquerading as reasons for dismissal are also improper. "[O]nce the named plaintiff demonstrates her individual standing . . . the standing inquiry is concluded" and cannot be resurrected by inquiries into their adequacy or typicality. *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015). As in *Melendres*, Bowlero "does not" and cannot "dispute that the individually named plaintiffs . . . had individual standing to bring their own claims." *Id.*[2] That ends the inquiry. *See also In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 U.S. Dist. LEXIS 83876, *38 (N.D. Cal. May 12, 2023) ("class plaintiffs can represent absent class members whose claims do not 'implicate a significantly different set of concerns'") (quoting *Melendres*, 784 F.3d at 1263); *see, e.g.*, *In re Zetia Ezetimibe Antitrust Litig.*, 2019 U.S. Dist. LEXIS 59469, *77 (E.D. Va. Feb. 6, 2019); *In re Asacol Antitrust Litig.*,

[2] Plaintiffs stand ready to amend with the Court's leave to substitute and/or add plaintiffs from the relevant markets.

907 F.3d 42, 49 (1st Cir. 2018); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 95-96 (2d Cir. 2018); *Morrison v. YTB Int'l Inc.*, 649 F.3d 533, 536 (7th Cir. 2011). As this Court has explained, "to require Plaintiffs to add a plaintiff . . . in order to survive a motion to dismiss would be inefficient and contrary to the purposes of Rule 23[]." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F.Supp.2d 1256, 1264 (W.D. Wash. 2009).

Bowlero's cited cases are inapposite. In *Fodera v. Equinox Holdings, Inc.*, 2021 U.S. Dist. LEXIS 58449, *10 (N.D. Cal. Mar. 26, 2021), neither plaintiff was a member of the classes they sought leave to amend the complaint to add. In *De Los Santos v. Panda Express, Inc.*, 2010 U.S. Dist. LEXIS 127788, *18-20 (N.D. Cal. Dec. 3, 2010), plaintiffs lacked standing to assert a failure-to-hire *claim* on behalf of job applicants because they were already employed by defendant. Here, Plaintiffs are unquestionably members of an alleged class; they satisfy the "actual injury component of standing"; and they are in the same position vis-à-vis Bowlero and can assert the same claims against Bowlero as the absent class members. *Casey v. Lewis*, 4 F.3d 1516, 1519-20 (9th Cir. 1993).

## V. <u>PLAINTIFFS SUFFICIENTLY DISTINGUISH BETWEEN DEFENDANTS [VII]</u>

The Complaint gives both Defendants "fair notice" of the claims against them. Fed. R. Civ. P. 8(a)(2). Courts routinely reject such arguments from parent-subsidiary defendants (¶31) who share counsel, *In re Pacific Fertility Center Litigation*, 2019 U.S. Dist. LEXIS 133922, *10 (N.D. Cal. Aug. 8, 2019), especially where, as here, "defendants are alleged to be 'related entities' who acted in concert" and only "additional discovery" will uncover the details of each defendant's role. *Mayhall v. Amazon Web Servs.*, 2022 U.S. Dist. LEXIS 126094, *16 (W.D. Wash. May 24, 2022). Regardless, the Complaint alleges the "interrelatedness" of Defendants, *id.*; ¶¶52-54, and Bowlero still operates centers under the AMF brand. ¶¶102-03, 105, 110, 112, 116-17. Bowlero's reliance on cases rejecting pro se and "shotgun"-pleading complaints that fail to specify even defendants' relationship are plainly inapposite.

## VI. <u>CONCLUSION</u>

The Court should deny Bowlero's Motion or, in the alternative, grant leave to amend.

Dated August 28, 2026

Respectfully Submitted,

By: /s/ Catherine S. Simonsen

Catherine S. Simonsen (WSBA No. 45552)
**SIMONSEN SUSSMAN LLP**
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
Tel: (917) 747-5196
Fax: (646) 357-8447
Email: catherine@simonsensussman.com

Nico Gurian*
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
Tel: (646) 693-3929
Fax: (646) 357-8447
Email: nico.gurian@simonsensussman.com

Nicolas Stebinger*
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (202) 384-3130
Fax: (646) 357-8447
Email: nicolas@simonsensussman.com

John P. Fiske*
Lindsay Stevens*
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: (858) 251-7424
Fax: (214) 523-6600
Email: jfiske@baronbudd.com
Email: lstevens@baronbudd.com

Brett Land
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave. #1100
Dallas, TX 75219
Tel: (214) 523-6206
Fax (214) 523-6600

Email: bland@baronbudd.com

Adam Tamburelli*
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Encino, CA 91436
Tel: (818) 839-2329
Fax (214) 523-6600
Email: atamburelli@baronbudd.com

*Attorneys for Plaintiffs Benjamin Doehr, Zach Soliz, Mitchel Feuer, Kevin Howard, Andre Howard, Michael Cordero, Ed Mcdonald, Theodore Harkness, Tim Kelly, Maor Kramer, and Casey Goodman, and the Proposed Classes*

** Admitted Pro Hac Vice*

*I certify that this memorandum contains 15,637 words, in compliance with ECF No. 44.*